**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOEL SNIDER** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  15-951** |
| | : | |
| **PENNSYLVANIA DOC,** *et al.* | : | |

## MEMORANDUM

**KEARNEY, J.**                                    **December 8, 2020**

Consistent with years of academic, medical, and sociological criticism of the criminal justice system's treatment of mentally ill and intellectually impaired prisoners including the Department of Justice's 2014 review of the Pennsylvania Department of Corrections, our Court of Appeals has now issued three opinions in the last two years confirming these vulnerable persons' constitutional and statutory rights while incarcerated. We appreciate corrections officers are not medical professionals; society elected decades ago to spend public funds to imprison many mentally ill persons rather than place them in alternate forms of custody. As shown in cases now awaiting trial in Spring 2021, the criminal justice system placed some mentally ill prisoners in solitary confinement as discipline which may only further their illness. The system allegedly reacts with excessive discipline in prison because the mentally ill cannot conform to prison strictures and then compounds the harm with some measure of resigned apathy from the overwhelmed state courts which cannot find suitable places for rehabilitation and care. These prisoners may not afford lawyers and there is no right to counsel in these civil rights/conditions-of-confinement cases. And so they sit in jail with mental illness and no ability, other than their often rambling *pro se* filings, to shed light on the criminal justice system's alleged deficiencies.

Joel Snider *pro se* pleads facts consistent with the harm found by our Court of Appeals and described by medical professionals for years. Joel Snider is serving a thirty to sixty-year

sentence in Pennsylvania prison after pleading guilty but mentally ill to murder and burglary in Pennsylvania state court. Mr. Snider began challenging both his plea and his prison treatment shortly after his plea and sentence. We today scrutinize one of his cases alleging several state actors' mistreatment of him as an allegedly mentally ill person. Mr. Snider *pro se* pleads years of alleged mistreatment in almost diary-fashion beginning with his claiming mental illness leading to murder. He alleges nine groups of over sixty state actors discriminated against him during his incarceration under the Americans with Disabilities Act and Rehabilitation Act; created "an ongoing hostile environment of cruel and unusual conditions" and deliberate indifference to his serious medical needs in violation of the Eighth Amendment; denied him "meaningful court access" in state and federal courts and retaliated against him for "attempted court access" in state and federal courts; obstructed his ability to directly appeal his criminal state court conviction; used excessive force, destroyed his religious materials;  fabricated evidence to justify transferring him between correctional facilities in violation of the First, Fifth, Sixth, Eighth, and Fourteenth Amendments; and intentionally inflicted emotional distress under Pennsylvania law. Mr. Snider asks we declare all these state actors violated his rights and award him damages in an unspecified amount. He also seeks injunctive relief "to address ongoing retaliation, obstruction, defamation, exclusion, and failure to accommodate" and a "name-clearing hearing."

We address the sufficiency of Mr. Snider's *pro se* claims through the prism of rather limited motions to dismiss filed by the nine groups of state actors and consistent with our screening obligations for cases proceeding without paying filing fees.[1] We waited months for Mr. Snider to respond given his repeated requests for more time and the effects of COVID-19 mitigation upon *pro se* parties in state prisons. He responded to some motions but not others.[2]

After working our way through his often confusing fact recitals and with many state actors electing to challenge his claims based only on procedural grounds like Rule 20, we find Mr. Snider pleads claims against some but not all responsible entities under the Americans with Disabilities Act and Rehabilitation Act (together, "Disabilities Act"), against some but not all responsible persons under the civil rights laws, and for intentional infliction of emotional distress against two corrections officers. We proceed into discovery on claims against:

- the Commonwealth and Department of Corrections on Mr. Snider's Title II Americans with Disabilities Act and Rehabilitation Act discrimination claims;

- Corrections Officers McKeehan and Nichtman alleging excessive force under the Eighth Amendment and a state law claim for intentional infliction of emotional distress;

- Corrections Officers McKeehan and Nichtman, and Sergeant Romig on a right to exercise his religion under the First Amendment;

- Deputy Superintendent Miller, Deputy Superintendent Luscavage, Superintendent Mooney, Corrections Officers Crawford, Killeen, Byrne, Longendorfer, Sanders, Lieutenant Kuzar, Sergeant Cleaver, Sergeant Rivera, Psychology Services Specialists Shrieve, Valko, Falcione, Burt, and Waine, and Grievance Hearing Officer Kerns-Barr for First Amendment retaliation; and,

- Secretary Wetzel, Superintendents Mooney, Harry, Gilmore, Deputy Superintendent Luscavage, Deputy Superintendent Miller, Chief Grievance Coordinator Varner, Grievance Coordinators Shawley, Alvord, and Kelly, and Major Caro for cruel and unusual punishment under the Eighth and Fourteenth Amendment.

Without counsel, Mr. Snider over pleaded his claims in one lawsuit. He is unable to obtain discovery yet. He fails to plead claims against the other state actors or medical professionals. We dismiss all other named parties and claims without prejudice to possibly plead facts supporting his presently untenable claims based on discovery.[3]

# Table of Contents

I.     **Background from the public dockets leading to Mr. Snider's claims**…..…………….7

       A.     **Mr. Snider files his first federal action in May 2013 while a pretrial detainee**……………………………..….…………………….......………7

       B.     **Mr. Snider files this action on May 7, 2015**………………………………………..8

       C.     **Mr. Snider's 2015 motion for post-conviction relief in state court**…………...9

       D.     **Mr. Snider's April and September 2018 federal actions**……………..……...9

II.    **Alleged *pro se* facts**………………………………………………………………...11

       A.     **Treatment of Mr. Snider as a pretrial detainee from July 2010 to August 2014**…………………………………………………………………………....11

       B.     **Post-conviction treatment of Mr. Snider from August 8, 2014 to August 2016**……………………………………………………………….……..20

III.   **Mr. Snider's legal claims**………………..……………………………………….27

       A.     **We dismiss Mr. Snider's Title II and the Rehabilitation Act claims against individuals**……………………………………………………………….37

       B.     **Mr. Snider may proceed on his Title II and Rehabilitation Act claims against the Commonwealth challenging placing and keeping him in solitary confinement despite knowing of his disabling mental illness and depression** ………………………………………………………………………....38

              1.     **Mr. Snider may proceed against the Commonwealth through the Department of Corrections for not providing him with the services, programs, or activities under Title II**…………………………….39

              2.     **Mr. Snider does not plead a Title II claim against the Commonwealth through the Unified Judicial System**………………………….…..44

              3.     **Mr. Snider cannot state a Title II claim against the Attorney General**……………………………………………………….……48

              4.     **We dismiss Mr. Snider's Title II claims against Torrance State Hospital**………………………………………………………….50

              5.     **We dismiss Mr. Snider's Title II claims against Clinton County Defendants**……………………………………………………….51

6.        We dismiss Mr. Snider's Title II claims against Union County……..54

7.        We dismiss Mr. Snider's Title II claims against Snyder County……..57

8.        We dismiss Mr. Snider's Title II claims based on an alleged hearing impairment against SCI Green Officers Jones and Adamson……….58

9.        We dismiss Mr. Snider's Title II retaliation claims…..…………….58

IV.    **We will proceed on Section 1983 claims under the First, Eighth, and Fourteenth Amendments**………………………………………………………………………60

    A.    **Mr. Snider may proceed on Eighth Amendment excessive force claims against Corrections Officers McKeehan and Nichtman**………………..…62

    B.    **Mr. Snider may proceed on his First Amendment right to exercise his religion claim against Officers McKeehan, Nichtman, and Sergeant Romig**……………………………………………………………………....63

    C.    **Mr. Snider may proceed on his First Amendment retaliation claim against individual prison officials and employees as defined**…………………………64

    D.    **Mr. Snider may proceed on his Eighth and Fourteenth Amendment cruel and unusual punishment claims against Secretary Wetzel, Superintendent Mooney, Deputy Superintendent Luscavage, Deputy Superintendent Miller, Superintendents Harry and Gilmore, Chief Grievance Coordinator Varner, Grievance Coordinators Shawley, Alvord, and Kelley, and Major Caro alleged to have personal knowledge of the violations of constitutional rights**……………………………………………………………………..68

V.    **We dismiss Mr. Snider's remaining section 1983 claims**……………………………73

    A.    **We dismiss Mr. Snider's civil rights claims against the Commonwealth, Department of Corrections, Office of Attorney General, Torrance State Hospital, Unified Judicial System, and Clinton County Correctional Facility**………………………………………………………………………...74

    B.    **We dismiss Mr. Snider's civil rights claims against individual Commonwealth officials in their official capacity**…………………….……74

    C.    **We dismiss Mr. Snider's *Monell* claims against Union County, the Union County Prison Board, and Snyder County**…………………………………75

    D.    **We dismiss Mr. Snider's request for injunctive relief as moot**………………75

    E.    **We dismiss access-to-court claims**…………………………………………..76

F.      We dismiss Eighth Amendment claims against Medical Defendants..........79

G.      We dismiss remaining section 1983 claims against individual defendants....85

H.      We dismiss the Sixth Amendment claims………………………...…....86

I.      We dismiss the civil rights claims against Warden Shaffer…………………………………………………………………...87

J.      We dismiss the civil rights claims against Warden Cooper……………….....89

K.      We dismiss Mr. Snider's civil rights claims against Clinton County Defendants Warden Motter, Deputy Warden Bechdel, and Corrections Officers Nolte, Shearer, Richard, Walker, and Hughes……………….....90

VI.     We allow Mr. Snider's intentional infliction of emotional distress state law claim against Corrections Officers McKeehan and Nichtman only……………….....93

VII.    Conclusion…………………………………………………………………95

# I.

# Background from the public dockets leading to Mr. Snider's claims.

In July 2010, police arrested Joel Snider for murder and other charges for the shooting death of Sudharman Joseph Fenton in Union County, Pennsylvania. [4]  After an October 12, 2010 preliminary hearing, a magisterial district judge held Mr. Snider over for trial.[5]  Mr. Snider alleges incarceration as a pretrial detainee from July 2010 to August 2014 at the Union County Prison, Snyder County Prison, the Clinton County Correctional Facility, state correctional institutions of the Pennsylvania Department of Corrections and Torrance State Hospital.[6]

Over four years after his arrest, Mr. Snider entered into a negotiated plea of guilty but mentally ill to one count of third-degree murder and one count of burglary.[7] Mr. Snider received a sentence at the time of his plea in August 2014 to the agreed upon aggregate term of thirty to sixty years' imprisonment.[8] From 2014 to today, the Commonwealth housed Mr. Snider in several Pennsylvania correctional facilities including SCI-Coal Township, SCI-Camp Hill, SCI-Greene, SCI-Somerset, and SCI-Houtzdale where he resides today.

### A.    Mr. Snider files his first federal action in May 2013 while a pretrial detainee.

On May 6, 2013, Mr. Snider filed his first federal action, *Snider v. Motter*, No. 13-1226 in this District, claiming a variety of civil rights violations relating to his state criminal case and conditions of confinement as a pretrial detainee from September 2010 to May 2013.[9] An attorney at Pennsylvania Institutional Law Project entered her appearance on behalf of Mr. Snider and filed a second amended complaint on December 19, 2015.[10]

Mr. Snider's counseled second amended complaint alleged Fourteenth Amendment excessive force claims and Eighth and Fourteenth Amendment deliberate indifference to serious medical needs claims and violations of Title II of the Americans with Disabilities Act ("Title

7

II"), 42 U.S.C. § 12132.[11] Mr. Snider alleged these violations occurred while a pretrial detainee at the Clinton County Correctional Facility from December 6, 2012 until May 7, 2013.

The parties settled the case and the court dismissed the action on July 18, 2018.[12] After finalizing the terms of the settlement agreement, the parties filed a joint stipulation of dismissal.[13] After the parties' settlement, Mr. Snider filed a notice of appeal challenging, among other orders, the stipulation of dismissal because he disagrees with the settlement reached by his volunteer lawyer from the Pennsylvania Institutional Law Project. Mr. Snider's appeal is currently pending in our Court of Appeals at No. 19-1991.

### B.      Mr. Snider files this action on May 7, 2015.[14]

Two years after filing *Snider v. Motter*, Mr. Snider filed this case alleging state actors retaliated against him for filing *Motter* and challenging his conditions of confinement both as a pretrial detainee (as already alleged in *Motter*) and after his August 8, 2014 conviction. He sought to bring claims on behalf of a class of prisoners.[15]

After years of motions practice and dismissal of his amended Complaint following our judicial screening under 28 U.S.C. § 1915, Mr. Snider filed a second amended Complaint on December 21, 2018.[16]  He now sues on his own behalf over sixty individuals and entities alleging civil rights violations, violations of the Americans with Disabilities Act and Rehabilitation Act, and a state law tort claim. Mr. Snider challenges his conditions of confinement and alleges his lack of capacity as well as Defendants' wrongdoing deprives him of meaningful access to state and federal courts.  Mr. Snider challenges conduct beginning in 2010 as a pretrial detainee through 2018.

**C.      Mr. Snider's 2015 motion for post-conviction relief in state court.**

After filing two federal lawsuits, Mr. Snider moved for post-conviction collateral relief on September 11, 2015 under the Post-Conviction Relief Act.[17] On November 10, 2016, the Union County Court of Common Pleas granted, without a hearing, the Commonwealth's Motion to dismiss Mr. Snider's petition, including ineffective assistance of counsel in failing to file a timely direct appeal.[18] Mr. Snider appealed to the Pennsylvania Superior Court. On November 21, 2017, the Pennsylvania Superior Court vacated the trial court's order dismissing Mr. Snider's petition and remanded.[19] The Superior Court did not address the merits of Mr. Snider's petition, instead concluding the trial court should have considered Mr. Snider's request as a post-conviction petition, and Mr. Snider should have been appointed counsel.[20]

After remand, the post-conviction trial court held a hearing on Mr. Snider's petition and, on June 7, 2019, denied Mr. Snider's amended petition.[21] On July 8, 2019, Mr. Snider, represented by appointed counsel, appealed this denial.[22] On October 30, 2020, the Pennsylvania Superior Court affirmed the denial of his petition and the trial court's finding Mr. Snider did not establish his burden of proving he requested a direct appeal.[23] Mr. Snider filed an application for reargument in the Pennsylvania Superior Court on November 12, 2020 which remains pending.

**D.      Mr. Snider's April and September 2018 federal actions.**

Mr. Snider filed two new actions in April and September 2018. On April 13, 2018, Mr. Snider filed *Snider v. McKeehan*, No. 18-801 challenging conduct of the Pennsylvania Department of Corrections, the Secretary of the Department of Corrections, Director of the Pennsylvania Board of Probation and Parole, various prison officials and employees, and a Department of Corrections physician at SCI-Somerset from July 2017 to December 2018.[24] Mr. Snider asserts he brought No. 18-801 to "address the impeding and frustrating of [his]

attempts to have meaningful court access for the claims he is attempting to present" here (No. 15-951) and his state court post-conviction petition.[25]

Mr. Snider alleged Department of Corrections discriminated against him on the basis of his mental health disability and excluded him from programs, activities, and services including "the law library, legal research, production of legal documents, meaningful access to the court, recreation, socialization, general living, housing, adjustment, conferral with counsel, religious services, employment, mental health services, grievance services, etc. and has made his participation unusually difficult."[26] He alleged the Department of Corrections "regards him" as having personality disorder, a diagnosis which he contests.[27] He alleged Defendants' conduct impeded and frustrated his post-conviction relief action in state court and his "contemplated challenges" to prison conditions in this action, No. 15-951.[28] Mr. Snider brought civil rights claims alleging violations of his rights under the First, Sixth, Eighth, and Fourteenth Amendments; violations of the Americans with Disabilities Act, 42 U.S.C. § 12111, *et seq.* and the Rehabilitation Act, 29 U.S.C. § 794; and Pennsylvania state law claims.

On November 2, 2020, we dismissed all claims against all defendants except an Eighth Amendment deliberate indifference claim against Psychological Services Specialists Robin Alvarez and Stevens in their alleged failure to treat his mental illness.[29]

On September 10, 2018, Mr. Snider filed a claim against the United States and the United States District Court for the Middle District of Pennsylvania alleging violations of the Rehabilitation Act.[30] We dismissed the action with prejudice finding the Rehabilitation Act does not apply to the District Courts and the United States is immune from suit.[31] Mr. Snider appealed from our order. Our Court of Appeals dismissed his appeal on November 1, 2019.[32]

10

# II.

## Alleged *pro se* facts.[33]

We consider Mr. Snider's well pleaded allegations to be truthful for purposes of addressing the nine motions to dismiss and our obligations to screen his allegations under section 1915. Mr. Snider alleges he is disabled by mental health illnesses including attention deficit disorder without hyperactivity, schizophrenia paranoid type or schizoaffective disorder bi-polar type, bi-polar I disorder with psychotic features, and post-traumatic stress disorder, as well as a hearing impairment.[34] These illnesses substantially limit his brain function and ability to care for himself, but he concedes his mental health disability is episodic and treatable with medication.[35] When his illnesses are active, he experiences symptoms including slow intellectual processing, disorganized speech and thought, confusion, inhibited or excessive speech, compulsive behavior, depression, paranoia, hallucinations, self-harm and suicide attempts.[36]

Mr. Snider alleges the Department of Corrections "regards" him as having personality disorders including anti-social personality disorder, borderline personality disorder, and narcissistic personality disorder.[37] Mr. Snider disagrees with a diagnosis of personality disorder, arguing he does not meet the diagnostic criteria for personality disorder and such a disorder is derogatory and can injure "a person's" character, reputation, and credibility.[38]

### A.     Treatment of Mr. Snider as a pretrial detainee from July 2010 to August 2014.

Either Union County or the Union County Prison Board held Mr. Snider as a pretrial detainee from July 7, 2010 until August 21, 2014.[39] During the approximately four year period as a pretrial detainee, Union County detained Mr. Snider at the Union County Prison, Snyder County Prison, the Clinton County Correctional Facility, Torrance State Hospital, and various state correctional institutions.[40]

11

From his July 7, 2010 arrest on state criminal charges to the present, Mr. Snider "has been attempting to participate in the programs, activities and services or judicial proceedings of the Court of Common Pleas of Pennsylvania – Union County . . . while being prosecuted" in his underlying criminal case by Pennsylvania's Attorney General's Office.[41]

From May 3, 2013 (when Mr. Snider filed his first federal action) to the present, Mr. Snider "has been attempting to participate in the programs, activities and services or judicial proceedings of the United States District Court for the Middle District of Pennsylvania."[42]

There are no allegations challenging Defendants' conduct from July 7, 2010 until December 2012.

### Conditions of confinement beginning December 2012 at Snyder County Prison and transfer to Clinton County Correctional Facility.

From September 2010 to December 6, 2012, Union County or Union County Prison Board incarcerated Mr. Snider at the Snyder County Prison.[43] Mr. Snider's troubles began in early December 2012, when he  complained to Snyder County Prison Warden Shawn Cooper about abuse which exacerbated Mr. Snider's symptoms of mental health illness.[44] Mr. Snider requested psychiatric medications.[45]

On December 5, 2012, Warden Cooper threatened he would "make the abuse worse"; "bring . . . a [State Trooper] to harass you"; and "will make your case more difficult" if Mr. Snider continued to complain and "ask for grievances."[46] At this point in his underlying state criminal action, Mr. Snider and his counsel intended to pursue a mental health defense of not guilty by reason of insanity.[47]

On December 6, 2012, Mr. Snider asked Warden Cooper for a grievance form and to speak with State Police about abuse in the prison affecting his mental health.[48] Within hours of his December 6, 2012 request, Snyder County Prison, Union County or the Union County Prison

Board, Warden Cooper, and Doug Shaffer, Warden of the Union County Prison, transferred Mr. Snider to the Clinton County Correctional Facility.[49]

Warden Cooper falsely told Clinton County Correctional Facility staff Mr. Snider assaulted a female officer at the Snyder County Prison.[50] Mr. Snider alleges this false information went into his file at the Clinton County Correctional Facility and, later, in his Department of Corrections' file where it remains.[51] Mr. Snider concludes Warden Cooper "could reasonably understand" his actions "would set in motion a chain-of-events" causing Mr. Snider severe harm, a violation of his rights, and "severe injury to his criminal defense."[52]

Over the next five months (until May 2013), unidentified Clinton County Correctional Facility staff harassed Mr. Snider with the intent to exacerbate the symptoms of his mental illness to cause him harm and to cause harm to his defense in the underlying criminal action.[53] Mr. Snider alleges the harassment by Clinton County Correctional Facility staff consisted of unidentified staff obstructing his access to his psychiatrist and withholding psychiatric medications and Corrections Officers Nolte, Shearer, Hughes, Walker, and Richards, and non-party Corrections Officer Edger writing false documents and imposing disciplinary sanctions based on Mr. Snider's "resulting behavior" caused by his mental health disability, stealing his pens, and obstructing his ability to purchase paper, pens, and envelopes from the commissary.[54]

Jacqueline Motter, Warden of the Clinton County Correctional Facility, and Wayne Bechdel, Deputy Warden, then used the alleged falsified disciplinary documents and sanctions created by Corrections Officers Nolte, Shearer, Hughes, Walker, Richards, and non-party Corrections Officer Edger for a report provided to the Department of Corrections, Union County Prison Warden Shaffer, Union County, and Union County Prison Board.[55] Mr. Snider concludes Warden Motter and Deputy Warden Bechdel "could understand" their actions would cause him

13

harm, violation of his rights, harm to his criminal defense, and "indefinite placement into solitary confinement."

Mr. Snider asked Deputy Warden Bechdel for information on how the Disabilities Act applied to prisoners and prison, and Deputy Warden Bechdel "only provided" information on architectural requirements of the Disabilities Act. Mr. Snider "could not properly plead" his Disabilities claim against the Clinton County Correctional Facility.[56]

Mr. Snider alleges before arriving at Clinton County Correctional Facility, he had no disciplinary issues, and his conduct report showed respect for staff and good behavior during his two years of incarceration.[57] After five months at the Clinton County Correctional Facility, Warden Motter signed a conduct report showing Mr. Snider as disorderly, refusing to follow orders, and requiring segregation.[58] He alleges someone sent the false misconduct reports to Warden Shaffer, Union County, the Union County Prison Board, and the Department of Corrections including a false report from Corrections Officer Nolte reporting Mr. Snider wrote "frivolous grievances" against staff, "lied" in the grievances, and should not be permitted to "receive grievances."[59] Mr. Snider disagrees with this report and complains it is currently in his Department of Corrections file.[60]

Mr. Snider began drafting a civil action to challenge the perceived abuse at the Clinton County Correctional Facility resulting in his first federal action, *Snider v. Motter*, No. 13-1226. He alleges he filed the action "while . . . severely mentally ill."[61] Mr. Snider concedes in his pleading "[t]he content of this abuse [at Clinton County Correctional Facility] has been litigated in *Snider v. Motter*, No. 13-1226, resulting in settlement. However, the sequence of retaliatory transfer out of discrimination, from [Snyder County Prison] to [Clinton County Correctional

Facility] and from [Clinton County Correctional Facility] to the [Pennsylvania Department of Corrections] has not been litigated."[62] He nevertheless raises the same issues in this action.

### *Mr. Snider is transferred to SCI-Coal Township in May 2013.*

On May 7, 2013, Union County, the Union County Prison Board, Warden Shaffer, Secretary Wetzel, Vincent Mooney, Superintendent of SCI-Coal Township, Anthony Luscavage, Deputy Superintendent of Centralized Services at SCI-Coal Township, Michael Miller, Deputy Superintendent of Facilities at SCI-Coal Township, and John Doe One agreed to transfer Mr. Snider from Clinton County Correctional Facility to the Department of Corrections' SCI-Coal Township, immediately placing him in solitary confinement where he remained for fifteen months.[63] Other than two weeks at SCI-Graterford and three months at Torrance State Hospital, Mr. Snider spent the entirety of his incarceration at SCI-Coal Township from May 7, 2013 to August 21, 2014 in solitary confinement.[64]

Mr. Snider alleges he did not receive a hearing before transfer to the Department of Corrections' custody, "was not put through any [Department of Corrections] classification," his defense attorneys were not notified of his transfer, and when his attorneys called SCI-Coal Township, unnamed "administrators" refused to confirm Mr. Snider's presence there and refused to allow attorneys to speak with him."[65]

Mr. Snider challenges the following conditions of his confinement at SCI-Coal Township and retaliation:

- Horrific and oppressive conditions on the solitary unit including inmates banging on doors and sinks and yelling twenty-four hours a day making sleep impossible; he and inmates locked in cells twenty-three hours a day with only one hour of recreation which was infrequently given; only one fifteen minute phone call per week; noise and proximity to other inmates made it impossible to communicate with mental health staff; and when he and inmates complained either verbally or through the grievance procedure, prison officials punished them and made the grievance process impossible causing him and other inmates to resort to hunger strikes.[66]

15

- Upon arrival at SCI-Coal Township, Defendant Sergeant Romig threatened him with retaliation if Mr. Snider caused any problems, forced Mr. Snider to either "mail home" or "have destroyed" his Hindu religious items, and threatened retaliation for any attempted court access.[67]

- After complaining in writing to Deputy Superintendent Miller, Deputy Superintendent Luscavage, Superintendent Mooney, and Secretary Wetzel about conditions in solitary confinement and how those conditions exacerbated his mental illness, these officials and "other staff" repeatedly threatened and punished him and obstructed his grievance appeal rights.[68]

- Deputy Superintendent Miller, Deputy Superintendent Luscavage, Superintendent Mooney, and "other staff" obstructed Mr. Snider's meaningful access to his attorneys in the state criminal action including denying his attorneys the ability to visit him.[69]

- After submitting grievances about solitary confinement and loss of his religious items, Defendant Corrections Officer Longendorfer or his supervisors left Mr. Snider in a cell for thirty-one hours with no working toilet, unknown individuals flooded the cell, and tore apart one of his remaining religious books.[70]

Mr. Snider alleges the circumstances of his solitary confinement made his criminal case "more difficult" as threatened by Snyder County Prison Warden Cooper.[71]

Mr. Snider alleges Law Librarian Eric Stracco, Deputy Superintendent Miller, Deputy Superintendent Luscavage, and Superintendent Mooney refused to provide him "meaningful court access" and removed all civil litigation materials from the unit law library including the instructions for computer research and allowed only one, three hour visit to the law library per month.[72]

***Mr. Snider's attempted suicide at SCI-Coal Township in early June 2013 and
treatment at Torrance State Hospital.***

Mr. Snider attempted suicide on June 6, 2013.[73] Medical Defendants Nurse Practitioner
Kaskie, Dr. Polmueller, Dr. Martinez, and Commonwealth Defendants Jeremiah and Fallon, both
Psychological Services Specialists at SCI-Coal Township "refused to view" Mr. Snider's pre-
incarceration mental health record; ignored the records and diagnoses of non-party Dr. Calvert,
psychiatrist from Clinton County Correction Facility; created "false documentation" in
Mr. Snider's mental health records by falsely documenting Mr. Snider "was faking mental illness
and being manipulative" and a malingerer; intentionally omitted actual mental illness symptoms
in his mental health records; and, documented a false diagnosis of personality disorder.[74]

An unpleaded person transferred Mr. Snider to a mental health unit at SCI-Graterford
where non-party Sergeant Rivera befriended Mr. Snider and told him "the staff there were
'against him because he had 'filed grievances' and a 'lawsuit,' and . . . staff were not going to
treat him or allow him out of his cell'" because of his "mental health defense."[75]

Mr. Snider alleges an unpleaded person(s) did not allow him to participate in the
programs, activities, or services at SCI-Graterford's mental health unit and Dr. Martinez claimed
Mr. Snider as malingering and stopped one of his medications causing him painful headaches
and hallucinations.[76]

Two weeks after the attempted suicide, Mr. Snider's criminal defense counsel moved the
Union County Court of Common Pleas for an order transferring Mr. Snider to Torrance State
Hospital for treatment and competency evaluation.[77] Counsel apparently won this motion as Mr.
Snider transferred to Torrance State Hospital on August 12, 2013 where he remained until
approximately October 31, 2013.[78]

Non-party psychiatrist Dr. Daly evaluated Mr. Snider at Torrance State Hospital and found Mr. Snider to have, among other symptoms, auditory hallucinations, paranoia, and delusions.[79] Mr. Snider alleges his defense counsel asked Torrance State Hospital staff to address "how solitary confinement placement was affecting his mental health and competency," but the Hospital refused to do so and "did not comment on this in their report."[80] After three months of treatment, an unpleaded person at the Hospital deemed Mr. Snider stable and competent.[81] Mr. Snider challenges the Hospital's evaluation because it only measured his "'competency' to provide information to a defense attorney and to make decisions regarding plea negotiations" and "did not measure his ability to represent himself *pro se* in any legal matter or his legal education."[82]

### Mr. Snider returns to SCI-Coal Township after Torrance State Hospital.

Mr. Snider returned to SCI-Coal Township on October 31, 2013 and Union County, the Union County Prison Board, and Warden Shaffer put him back in solitary confinement without considering his mental health disability.[83] Mr. Snider alleges he remained in solitary confinement for nine more months and became severely mentally ill with the same symptoms as before his treatment at Torrance State Hospital.[84] Mr. Snider alleges his housing in solitary confinement "obstructed his ability to work with defense counsel, engage in the plea negotiation process, and participate in" the Union County Court of Common Pleas' judicial process.[85]

On December 10, 2013, Mr. Snider's defense attorney in his state criminal case filed a motion in the Union County Court of Common Pleas to transfer Mr. Snider from solitary confinement at SCI-Coal Township to the Union County Prison. Mr. Snider's attorney argued solitary confinement only exacerbated Mr. Snider's mental health, legal visits are limited, access

to Mr. Snider "has been severely curtailed and infringed upon" by the Department of Corrections, and these conditions "severely infringe on trial preparation."[86]

The Union County Court of Common Pleas refused to hold an evidentiary hearing, claiming lack of jurisdiction. But the Union County Court of Common Pleas ordered him to be transferred to a county jail a month before his criminal trial contingent on "maintenance of the status quo" which Mr. Snider alleges means "as long as Mr. Snider is not having severe mental health issues or having behaviors caused by his mental illness."[87]

### Mr. Snider prepares for his state criminal trial and pleads guilty but mentally ill.

The docket of Mr. Snider's state criminal action confirms on February 7, 2014, the Union County Court of Common Pleas granted Mr. Snider's motion to transfer to the Union County Prison and ordered trial.[88] It is unclear when Mr. Snider transferred to Union County Prison. The docket reflects Mr. Snider's attorneys explained his "rights non-jury trial [sic]," Mr. Snider waived his right to a jury trial on April 2, 2014, and the trial court granted his attorneys' request for a trial continuance.[89]

Mr. Snider alleges between February and August 2014, he needed to prepare for trial and "engage in the plea negotiation process" with his attorneys but could not do so because of the "substantially limiting symptoms" of his mental illness.[90] He alleges during June and July 2014, he experienced delusions, drank his own urine, and did not eat for twenty-four days.[91]

Mr. Snider alleges because of his mental state, he could not competently accept a guilty but mentally ill plea and "felt coerced" by the unidentified actions of unnamed "prison staff" and by the conditions of his confinement.[92]

The docket of the state criminal action in Union County confirms Mr. Snider pleaded guilty after a mentally ill colloquy on August 8, 2014.[93] Mr. Snider read a statement at his

19

sentencing in the trial court regarding the isolation and conditions in the Department of Corrections, its effect on his mental health, and effect on his court access.[94] The court sentenced Mr. Snider to the agreed upon thirty to sixty years' imprisonment.

**B.      Post-conviction treatment of Mr. Snider from August 8, 2014 to August 2016.**

After his August 8, 2014 sentencing, Mr. Snider returned to SCI-Coal Township. He alleges Deputy Superintendent Miller, Deputy Superintendent Luscavage, and Superintendent Mooney were angry with him for reading his statement to the trial court at sentencing. Superintendent Mooney rejected Mr. Snider's request to be housed in the general population, responding, "No! You are going back to the hole!"[95] Mr. Snider appealed his placement in solitary confinement to Superintendent Mooney and wrote a letter to Secretary Wetzel complaining about his placement in solitary confinement and conditions there.[96]

Mr. Snider returned to solitary confinement despite having no disciplinary sanction and without a hearing. He alleges Psychological Services Specialist Fallon performed a mental health evaluation upon his return to SCI-Coal Township where she threatened he would remain in solitary confinement for the rest of his life if he continued to complain.[97]

Non-party Psychological Services Specialist Jessica Carey spoke with Mr. Snider and told him Deputy Superintendent Miller, Deputy Superintendent Luscavage, Superintendent Mooney, and Nurse Practitioner Herrold were angry the trial court found him "mentally ill and had not given him a more severe sentence."[98] Mr. Snider alleges Nurse Practitioner Herrold refused to render treatment for the remainder of his time at SCI-Coal Township, refused to increase his medication, and refused to provide "continuity of care" upon his transfer to SCI-Camp Hill.[99]

20

### *Mr. Snider is transferred to SCI-Camp Hill in August 2014.*

On August 21, 2014, the Department of Corrections transferred Mr. Snider to SCI-Camp Hill and placed  him in solitary confinement.[100] Mr. Snider asserts his plea of guilty but mentally ill required the Department of Corrections to house him in a mental health facility for evaluation and treatment, but it failed to do so.[101] Mr. Snider alleges although his attorneys provided his mental health files dating back to 2003 "from prison-to-prison" to John Doe Two, John Doe Two did not put these records in his mental health file.[102]

Upon arrival at SCI-Camp Hill, Corrections Officers McKeehan and Nichtman told Mr. Snider they would destroy his legal files and religious items or he could "mail them home."[103] Mr. Snider needed his legal files to appeal his criminal conviction and for his federal action in *Snider v. Motter*. Mr. Snider alleges Corrections Officers McKeehan and Nichtman received "prior instruction" from an unidentified person(s) to "ship out or destroy" his property.[104]

When Mr. Snider asked to file a grievance regarding his property, Corrections Officers McKeehan and Nichtman became "enraged"; yelled at him; grabbed his arm causing bruising; pushed him into a cell; after telling Corrections Officer McKeehan he had not received his psychiatric medication for the day, Corrections Officer McKeehan grabbed him by the shirt collar and throat and tried to strangle him while slamming his head and body into a concrete wall causing injury to his back and neck, threatened him with physical harm, called him a derogatory term, and mocked his religious items; and Corrections Officer Nichtman read aloud his integrated case summary to all staff and inmates on the unit, and sang the "*Twilight Zone*" theme song, and mocked his mental illness.[105] Corrections Officers McKeehan and Nichtman wrote a

false disciplinary sanction on Mr. Snider which he alleges "could have been caused by" his mental illness.

Mr. Snider complains of the conditions in solitary confinement at SCI-Camp Hill which he alleges is "notorious throughout" the Department of Corrections to staff and inmates "due to its long tradition of extremely cruel conditions and abuse of inmates by staff," conditions so "bad for so long, and complained of by so many inmates that it would be impossible" for Superintendent Harry, Secretary Wetzel, or "any employee" at SCI-Camp Hill to be unaware of the conditions and "tradition of abuse."[106] Mr. Snider complains of cockroaches, vermin, rusted metal, black mold, small cells, non-working toilets, inmates being deprived of food, showers, and recreation, and threats and physical assault.[107]

Mr. Snider alleges Corrections Officers McKeehan and Nichtman stole his legal files and broke, damaged, or stole his religious items.[108] An unpleaded person(s) at an unpleaded time denied Mr. Snider his anti-psychotic medication for four days.[109] Mr. Snider spent the next eighteen days attempting to file grievances and an unpleaded person(s) denied him his psychiatric medications, food, recreation, pens, paper, cleaning supplies, a working toilet, and access to a phone.[110] Mr. Snider alleges solitary confinement unit staff Lieutenant Kuzar, Sergeant Cleaver, Corrections Officer Killeen and non-parties Sergeant Khoelsch, Counselor Schneck, and Lieutenant Davy told him the filing of grievances caused, and will continue to cause, him problems and threatened him with bodily harm and denial of medications, showers, food, recreation.[111] After Mr. Snider appealed disciplinary sanctions, Major Horner told him he would cut his time in solitary confinement in half if Mr. Snider did not mention the conditions there.

Mr. Snider alleges he told Sergeant Cleaver, Lieutenant Kuzar, and non-parties he needed to speak with his attorney because the deadline for filing a direct appeal from his conviction ran on September 8, 2013 and asked to make a phone call to counsel.[112] Mr. Snider alleges these state actors denied his requests and non-party Corrections Classification Programs Manager Scott Moore told him he could make a call when he moved from the solitary confinement unit.[113]

State actors at SCI-Camp Hill transferred Mr. Snider out of solitary confinement on September 8, 2014.  He does not allege he attempted to make a phone call to his attorney upon arriving in his new housing block that day. He alleges when leaving the solitary confinement unit, Corrections Officer Byrne told him the officers on his new housing block will assault him and, when he arrived on his new block, Sergeant Rivera threatened him with physical harm if he continued to file grievances.[114]

An unpleaded person(s) denied Mr. Snider his anti-psychotic medication for six days.

The day after Sergeant Rivera's threats, Corrections Officer Crawford forced Mr. Snider to carry two boxes of his records to another block and, upon reaching the new block, Corrections Officer Crawford confiscated his legal materials and religious items because he filed grievances. Mr. Snider alleges Corrections Officer Morton put the items confiscated by Corrections Officer Crawford in a box in the "property/intake unit" and told Mr. Snider the property would be returned when he proved it is his and received permission from the Warden.[115]

After Mr. Snider submitted a written complaint to Superintendent Harry about his confiscated property, Corrections Officers McKeehan and Nichtman threatened to kill him, ripped apart and damaged his religious items.[116] Mr. Snider alleges unpleaded actors retaliated through obstruction, threats, and destruction of religious items for his attempts to use the grievance procedure or "access court."[117]

*Mr. Snider is transferred to SCI-Greene in October 2014 and files this action in May 2015.*

The Commonwealth, through its Department of Corrections, transferred Mr. Snider to SCI-Greene on October 9, 2014 without a misconduct finding or hearing and placed him in solitary confinement there.[118] Upon arrival at SCI-Greene, Mr. Snider requested mental health treatment. He alleges receipt of treatment but Dr. Pillai, Psychological Services Specialists Shreve, Valko, Falcione, Burt, and Waine, and non-party Dr. Wittig[119] harassed him and threatened him during mental health sessions.[120]

Unidentified person(s) denied him psychiatric medication when Mr. Snider attempted to access the grievance procedure, attempted to pursue his claims against the Department of Corrections in court, and attempted to help other disabled inmates with their grievances. He alleges Psychological Services Specialists Shreve, Valko, Falcione, and Burt falsified his mental health records and non-party Dr. Wittig, Psychological Services Specialists Waine and Falcione, and Unit Manager Cowan threatened him for his continued grievances and helping other inmates.[121] Undeterred, Mr. Snider "did not stop using the grievance procedure, writing this [Middle District of Pennsylvania] court and attempting to assist other disabled inmates."[122]

Mr. Snider asked for legal assistance from Law Librarian Jay Gardener and Deb Rand, an attorney for the Department of Corrections and "other staff" but they denied assistance and threatened him. Mr. Snider asked for legal assistance from Secretary Wetzel and Dan Caro, formerly Secretary Wetzel's staff assistance until August 2015, but they denied him legal assistance.[123]

Mr. Snider filed his case on May 7, 2015. He alleges days after filing this lawsuit, Corrections Officer King wrote a false misconduct for Mr. Snider, someone again denied him psychiatric medications, Hearing Examiner Kerns-Barr refused to allow Mr. Snider to call

witnesses in a later misconduct hearing and sentenced him to solitary confinement, and Dr. Pillai threatened him by explaining the reason for a misconduct finding is because of his legal activity and helping others.[124]

Mr. Snider's mental health deteriorated because of alleged "indifferent mental health care and abuse" but he pleads it "did not stop" him from assisting other disabled inmates "to address their problems about their disabilities through the grievance procedure."[125]

On February 12, 2016, Corrections Officer Collins and Lieutenant Stickle wrote another false misconduct charge on Mr. Snider claiming he engaged in "unauthorized group activity" assisting disabled and illiterate inmates in writing letters and using the grievance procedure.[126] At a misconduct hearing, Hearing Officer Kerns-Barr refused to allow Mr. Snider to call witnesses, present evidence or a defense, and sentenced him to solitary confinement for six months.[127]

Mr. Snider's mental health deteriorated and he repeatedly banged his head on the wall, including as a result of Corrections Officer Sanders's harassment about his litigation and disability.[128] Unpleaded person(s) in "medical" repeatedly refused to give Mr. Snider treatment for injuries to his head and for mental health care.[129] Mr. Snider attempted to appeal the February 12, 2016 misconduct ruling and placement in solitary confinement but unpleaded "prison staff" and Superintendent Gilmore obstructed the process.[130]

Unidentified "solitary staff" denied Mr. Snider meals, recreation, showers, and "groups" because his mental illness caused him to frequently sleep or because of his hearing impairment. Non-party Corrections Health Care Administrator Kyle Guth refused to administer a hearing test or make accommodations for his self-reported hearing impairment.[131]

On June 23, 2016, Corrections Officers Jones and Adamson denied him a shower due to his hearing impairment. Mr. Snider does not allege how his hearing impairment relates to the denial of a shower.

Mr. Snider, overwhelmed and manic because of his mental health symptoms, requested from Corrections Officers Jones and Adamson to speak with Psychological Services Specialist Burt because of his (Mr. Snider's) history of self-harm. Corrections Officers Jones and Adamson refused to do so and Corrections Officer Jones laughed and yelled at him "in front of the entire block." Mr. Snider began banging his head on the wall until he began to bleed to which Corrections Officer Jones laughed and Corrections Officers Jones and Adamson and John Doe Three failed to notify medical staff or mental health staff.[132]

On June 27, 2016, Major Caro threatened Mr. Snider if he filed a grievance about the head banging event he "will have more problems," but Mr. Snider wrote to Secretary Wetzel and never received a response.[133]

### Mr. Snider transfers to SCI-Waymart in August 2016.

On August 16, 2016, the Department of Corrections transferred Mr. Snider to the ICU mental health program at SCI-Waymart.  He remained there for one year.[134]

After arriving at SCI-Waymart, Mr. Snider attempted to write to this Court and our Court of Appeals about his litigation against the Department of Corrections pending at No. 15-951. Immediately after his attempt, unidentified "mailroom staff" began tearing his incoming mail, obstructing his incoming mail, and tore apart a religious prayer card.[135]

Mr. Snider alleges he "was so afraid of further retaliation and these events exacerbated his mental illness to the point where he was afraid to write to this [Court] *pro se* or to file any documents in this present case or any other case for the next seven months, until April 2017."[136]

26

# III.

## Mr. Snider's legal claims.

Mr. Snider alleges multiple claims against dozens of state actors. His overarching allegations are persons participated in the Commonwealth's policy and practice of "silencing and punishing prisoners who attempt to utilize the avenues of court access" and the Commonwealth housed him in solitary confinement because of his disabling mental illness.[137] He brings his claims of disability discrimination and retaliation under Title II and Title III of the Disabilities Act and the Rehabilitation Act[138] and civil rights claims under 42 U.S.C. § 1983.

Mr. Snider alleges the Commonwealth discriminated against him because of his mental health disability and failed to provide a reasonable accommodation for the limitations of his disability, causing his exclusion from participation in the Commonwealth's programs and activities and his participation in programs and activities to be unusually difficult and painful. He identifies the Commonwealth's "programs [and] activities" to include judicial proceedings in his underlying state court action both pretrial and post-trial and "the activity" of working with his defense counsel in his criminal case, and his civil litigation in federal court.

Against these allegations, we find it helpful to specifically outline Mr. Snider's causes of action consistent with Rule 8. Our responsibility is to parse through his *pro se* allegations to see if he has a legal claim. Mr. Snider alleges wrongdoing from July 7, 2010 through 2016:

1. The Commonwealth violated his rights under the Disabilities Act;

2. The Department of Corrections, Pennsylvania Attorney General's Office, and the Unified Judicial System violated his rights under the Disabilities Act and the Rehabilitation Act;

3. Forty-six (and four John Doe) "Employees of the Commonwealth/Department of Corrections," including the Medical Defendants, created cruel and unusual conditions, were deliberately indifferent to his serious medical needs, retaliated against him, and denied him meaningful access to defense counsel in his underlying

state criminal action in violation of his civil rights and the Disabilities Act's retaliation provision, as well as a state law claim of intentional infliction of emotional distress;

4. SCI-Camp Hill Corrections Officers McKeehan and Nichtman used excessive force, retaliated against him for attempted court access, and obstructed his religious practices  in violation of his civil rights, the Disabilities Act's retaliation provision, as well as a state law claim of intentional infliction of emotional distress;

5. SCI-Camp Hill Corrections Officers McKeehan, Nichtman, Byrne, Killeen, Lieutenant Kuzar, and Sergeant Cleaver obstructed his ability to file a direct appeal, possibly at the instruction of others including SCI-Coal Township Superintendent Mooney, Deputy Superintendent of Centralized Services Luscavage, and Deputy Superintendent of Facilities Miller, in violation of his civil rights, the Disabilities Act's retaliation provision, as well as a state law claim of intentional infliction of emotional distress;

6. SCI-Greene Corrections Officers Jones and Adamson, Psychological Services Specialist Burt, and John Doe Three violated his civil rights and a state law claim for intentional infliction of emotional distress;

7. Clinton County Correctional Facility (or possibly the Clinton County Defendants) discriminated against him because of his disability when they provided information about his behaviors caused by mental illness to Union County, the Union County Prison Board, Union County Prison Warden Shaffer, and the Department of Corrections to justify indefinite placement in solitary confinement in violation of the Disabilities Act;

8. Clinton County Correctional Facility Warden Motter, Deputy Warden Bechdel, and Corrections Officers Nolte, Shearer, Richards, Walker, and Hughes fabricated evidence to justify the May 7, 2013 transfer from Clinton County Correctional Facility to  SCI-Coal Township in violation of his civil rights and the Disabilities Act's retaliation provision;

9. Union County and the Union County Prison Board violated his rights under the Disabilities Act;

10. Snyder County Prison Warden Cooper, Union County Prison Board, and Union County Prison Warden Shaffer violated his civil rights and the Disabilities Act's retaliation provision; and

11. Clinton County Correctional Facility Deputy Warden Bechdel, SCI-Coal Township Law Librarian Stracco, SCI-Coal Township Superintendent Mooney, Deputy Superintendent of Centralized Services Luscavage, Deputy Superintendent of Facilities Miller, SCI-Greene Unit Management Major Caro, Secretary Wetzel,

Department of Corrections Attorney Rand, and SCI-Greene Law Librarian Gardner denied him meaningful court access in violation of his civil rights.[139]

The nine groups of state actors separately move to dismiss under Federal Rule of Civil Procedure 8(a), Rule 12(b)(6), and Rule 20.[140] We may also dismiss all of part of Mr. Snider's *in forma pauperis* amended complaint under 28 U.S.C. § 1915(e)(2)(B) if we determine it "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."[141] When considering whether Mr. Snider fails to state a claim under Section 1915(e)(2)(b)(ii), we apply the Rule 12(b)(6) standard.[142]

Screening Mr. Snider's allegations, and not guessing as to defenses, we will allow him to proceed into discovery on his damages claims under the Disabilities Acts relating to the decision by the Commonwealth, through its Department of Corrections, to place Mr. Snider in solitary confinement allegedly knowing of his disabling mental illnesses. He may also proceed on his specifically identified Eighth Amendment excessive force claims and violation of his First Amendment rights to free exercise of his religion against corrections officers.

Mr. Snider may proceed on defined Title II Disabilities Act claims against the Commonwealth, Department of Corrections, and Unified Judicial System only.  We dismiss all other Disabilities Act claims against all other individuals and entities.

### Title II of the Disabilities Act.

"Title II of the [Disabilities Act] prohibits discrimination against the disabled in public services, programs, and activities."[143] Section 12132 of Title II provides "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[144] State prisons are "public entities" under Title II.[145]

To state a claim for disability discrimination under either the Disabilities Act, Mr. Snider must allege he: (1) is a qualified individual with a disability;[146] (2) "who was precluded from participating in a program, service, or activity, or otherwise was subject to discrimination"; (3) "by reason of his disability."[147] "A plaintiff who shows he was 'otherwise discriminated against' but not 'excluded' by a public entity makes out a prima facie case of discrimination under Title II."[148]

To assure the requirements of section 12132 are met, "'reasonable accommodation' may have to be provided to the qualified individual."[149] Mr. Snider may assert a failure to accommodate as an independent basis for liability under the Disabilities Act by alleging "the accommodation he seeks is reasonable . . . *i.e.* that it is 'necessary to avoid discrimination on the basis of disability.'"[150]

Where, as here, a plaintiff seeks compensatory damages, Mr. Snider must also allege "intentional discrimination under a deliberate indifference standard."[151] To show deliberate indifference, Mr. Snider must allege Defendants (1) had "knowledge that a federally protected right is substantially likely to be violated," and (2) failed "to act despite that knowledge."[152]

### Title III of the Disabilities Act does not apply.

"Title III of the [Disabilities Act] prohibits discrimination against the disabled in the full and equal enjoyment of public accommodations, 42 U.S.C. § 12182(a), and public transportation services, § 12184(a)."[153] Title III provides generally: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."[154]

The Disabilities Act defines "public accommodation" by twelve specific categories.[155] None of the defined categories of "public accommodation" include state or county prisons or the Department of Corrections. The language of section 12181(6) excludes "public entit[ies]" from the definition of "private entities" considered "public accommodations." As discussed above, state prisons are "public entities" under Title II of the Disabilities Act and, by definition, are excluded from "public accommodations" under Title III.

We dismiss Mr. Snider's claims under Title III because he fails to allege facts bringing the Department of Corrections within the definition of "public accommodation."[156] We will consider Mr. Snider's Disabilities Act discrimination claims under Title II only.[157]

### Anti-retaliation protections in the Disabilities Act.

Section 12203 of Title II prohibits retaliation and interference, coercion, and intimidation for exercising rights under the Act.[158] To state a claim for retaliation under section 12203(a), Mr. Snider must allege "(1) he engaged in protected activity, (2) he suffered an adverse action after or contemporaneous with the protected activity, and (3) a causal connection between the protected activity and the adverse action."[159]

Section 12203(b) prohibits coercion, intimidation, threats, and interference with an individual in the exercise of his own rights under the Act or because he aided or encouraged any other individual to exercise his rights under the Act. Our Court of Appeals recognizes "the scope of this second anti-retaliation provision of the [Disabilities Act] 'arguably sweeps more broadly' than the first."[160] To state a claim for coercion under section 12203(b), Mr. Snider must allege "when the defendant 'coerced,' 'threatened,' 'intimidated,' or 'interfered,' the plaintiff was exercising or enjoying a right protected by the [Disabilities Act]."[161] "Although there is little jurisprudence interpreting this provision, '[t]he language of the statute and what case law there is

31

. . . make clear that to establish a violation of § 12203 plaintiffs must show that when the coercion took place they were exercising or enjoying a right protected by the [Disabilities Act].'"[162] "The plain words of the statute . . . preclude a party from intimidating or coercing another party not to exercise his rights under the [Disabilities Act], as well as barring interference against a person who has exercised his rights under the [Disabilities Act]."[163]

### The groundwork for our analysis set by our Court of Appeals in Porter and Geness.

We begin our analysis with three recent opinions from our Court of Appeals addressing state actors' treatment of mentally ill persons in custody: *Porter v. Pennsylvania Department of Corrections,*[164] *Geness v. Cox,*[165] and *Geness v. Administrative Office of Pennsylvania Courts.*[166]

In *Porter*, our Court of Appeals held thirty-three years of solitary confinement may violate the Eighth Amendment's prohibition on cruel and unusual punishment. Ernest Porter, a death row inmate whose death sentence had been vacated, challenged his three-decade incarceration in solitary confinement as violative of the Eighth Amendment and his procedural and substantive due process rights. Mr. Porter alleged the conditions of solitary confinement caused "irreversible damage" to his mental health, including "severe anxiety, depression, panic, paranoia, bipolar mood swings, and at sometimes [sic] suicidal impulses" for which he takes depression medication.[167]

In analyzing the Eighth Amendment claim, our Court of Appeals noted it "repeatedly recognized the severe effects of prolonged solitary confinement, as have our sister circuits and Justices of the Supreme Court."[168] Citing case law and scientific and medical research, "prolonged solitary confinement . . . poses a substantial risk of serious psychological and physical harm."[169] Highlighting the mental and physical effects of solitary confinement, our Court of Appeals found: "[t]he empirical record compels an unmistakable conclusion: this

32

experience is psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long-term . . . damage."[170] A representative sample of sensory deprivation studies show "virtually *everyone* exposed to such conditions is affected in some way"; "[t]here is not a single study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects;" and "all [individuals subjected to solitary confinement] will . . . experience a degree of stupor, difficulties with thinking and concentration, obsessional thinking, agitation, irritability, and difficulty tolerating external stimuli."[171]

Psychological effects of solitary confinement include anxiety, panic, depression, post-traumatic stress disorder, psychosis, hallucinations, paranoia, claustrophobia, and suicidal ideation, and the "risk of disintegration."[172] Physical effects include suicide, self-mutilation, general physical deterioration, dangerous weight loss, hypertension, heart abnormalities, and the aggravation of pre-existing medical problems.[173]

After finding Mr. Porter's conditions of solitary confinement posed a substantial risk of serious harm, our Court of Appeals found the Pennsylvania Department of Corrections, through Secretary Wetzel, knew the serious risks of long-term solitary confinement including through the work of a doctor studying the harmful effects of solitary confinement.[174] In fact, the Department of Corrections' policies "specifically recognize the mental health risk posed by solitary confinement," including a policy recommending assessment of inmates with mental illness for placement into "other treatment units as an alternative," supporting Mr. Porter's argument defendants were deliberately indifferent to his health and safety.[175]  Upon remand, the court set trial for May 21, 2021.

*Porter* squarely recognizes the substantial and serious risk of mental harm resulting from prolonged solitary confinement and the Department of Corrections' knowledge of the risk.

In *Geness*, our Court of Appeals held intellectually impaired Craig Geness adequately pleaded the Commonwealth failed to carry out requirements imposed by Title II and Pennsylvania's Mental Health Procedures Act, and these alleged failures deprived Mr. Geness of the benefits of procedural safeguards designed to protect him.[176] The denial of "those procedural protections . . . lea[d] to the 'unjustified institutional[ization] . . . of persons with disabilities,' [and] is 'a form of discrimination.'"[177]

The Court of Appeals found the Commonwealth had the responsibility to "ensure inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals"; not to "place inmates or detainees with disabilities in inappropriate security classifications because no accessible cells or beds are available"; to timely transfer a detainee in need of a mental health evaluation to a mental health facility; and not to subject a detainee to involuntary competency restoration treatment for an unreasonable period of time.[178]

The Court of Appeals held Mr. Geness adequately pleaded a Title II claim by alleging the Commonwealth failed to carry out its responsibilities imposed by Title II and these alleged failures deprived Mr. Geness of the benefits of procedural safeguards designed to protect him.[179] The Court of Appeals additionally found "[t]hese same circumstances are also sufficient to sustain Geness's claim that he was 'deprived . . . of normal benefits of criminal procedure and due process of law . . . both as to his protracted incarceration without prompt transfer to a mental health facility, and his protracted institutionalization without a realistic prospect of trial.'"[180]

After our Court of Appeals remanded Mr. Geness's action allowing claims against the Commonwealth to go forward, Mr. Geness filed a complaint against the Administrative Office of

the Pennsylvania Court ("AOPC") and the Commonwealth. He later amended his complaint to add the Pennsylvania Department of Human Services ("DHS").

The litigation resulted in *Geness II*. In *Geness II*, the AOPC appealed from the denial of its motion to dismiss arguing sovereign immunity over, among other claims, Title II claims against the AOPC. On appeal, our Court of Appeals applied *United States v. Georgia*[181] to determine whether the AOPC's conduct violated Title II as a threshold inquiry to Eleventh Amendment immunity.[182]

In *Georgia*, the Supreme Court found "Congress unequivocally expressed its intent to abrogate sovereign immunity for claims brought under Title II of the [Disabilities Act]"[183] and "insofar as Title II creates a private cause of action for damages against the States for conduct that actually violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity."[184] The Court established a three-part test to determine whether sovereign immunity has been abrogated in a particular case, as determined on a "claim-by-claim" basis: "(1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid."[185]

The first prong of the *Georgia* test requires a party sufficiently plead "(1) he is a qualified individual; (2) with a disability; (3) who was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability."[186] Having met the first two elements, the Court of Appeals focused on the third and fourth elements—whether the AOPC

denied Mr. Geness "the benefits of [its] services, programs, or activities . . . by reason of his disability."[187]

Mr. Geness alleged Title II required the AOPC to provide him two services from which the AOPC excluded him based on his disability: (1) a duty to "intervene directly with the Fayette County Court to ensure the Plaintiff's case moved forward," and (2) a duty to "seek intervention for such result by the Pennsylvania Supreme Court."[188]

The Court of Appeals held neither duty is a "service, program, or activity" of the AOPC, finding "judicial decision-making is not a service AOPC provides to either disabled or nondisabled individuals."[189] While recognizing the "service, program, or activity" requirement under Title II is "extremely broad in scope and includes anything a public entity does," the "'service, program, or activity' must be one that the entity *actually provides*."[190]   The Department of Human Services settled Mr. Geness's claims by paying him $375,000 for his care which we approved as fair earlier this year.[191]   We are now preparing for the trial of Mr. Geness's claims against the Commonwealth early next year.[192]

We are guided by *Porter* and the *Geness* opinions: *Porter* provides us with a primer on the well-known substantial risks associated with prolonged solitary confinement; *Geness* instructs when the Commonwealth denies the Disabilities Act's procedural protections leading to the "unjustified institutionalization of persons with disabilities" it is a form of discrimination; and *Geness II* guides our inquiry into the "services, programs, and activities" allegedly deprived an individual to state a claim under Title II.

### The Commonwealth knew or should have known of the standards for treatment of mentally ill incarcerated persons.

Mr. Snider alleges the state actors knew of constitutional deficiencies in treatment of mentally ill incarcerated persons before his harm.[193] Discovery will tell. But we can take judicial

notice around the same time the Commonwealth repeatedly moved Mr. Snider into solitary

confinement despite knowing he pleaded, and a judge accepted, his mental illness, the

Department of Justice found the Commonwealth's use of solitary confinement towards mentally

ill incarcerated persons created substantial risks of harm and denied them access to services and

programs offered to other persons.  The Department of Justice found in a 2014 report:

- The Commonwealth isolates incarcerated persons with serious medical illness in a manner exacerbating their mental illness and leading to serious psychological and physiological harms

- 'The manner in which [Commonwealth] uses solitary confinement often discriminates against prisoners with [serious mental illness]: [The Commonwealth often unnecessarily and inappropriately places prisoners in solitary confinement because they have [serious mental illness/intellectual disabilities]. Isolating prisoners on the basis of their [serious mental illness/intellectual disabilities] without adequate justification constitutes impermissible discrimination and unjustifiably denies them access to services and programs provided to most other prisoners. [The Commonwealth] has failed to make reasonable modifications to its policies, procedures, and practices to meet the needs of prisoners with [serious mental illness/intellectual disabilities] in the most integrated setting appropriate to their needs and consistent with legitimate safety requirements. Instead, it has routinely elected to segregate these prisoners unnecessarily in its solitary confinement units' (p. 3)

- The Department of Justice in 2014 suggested "minimum remedial measures", including the necessity for ongoing assessment to determine appropriate housing and the prompt address of mental health needs upon credible signs of decompensation in isolation.[194]

### A.    We dismiss Mr. Snider's Title II and the Rehabilitation Act claims against individuals.

Mr. Snider alleges over forty-five Department of Corrections' employees and officials,

including the Medical Defendants, SCI-Coal Township Law Librarian Stracco, SCI-Coal

Township Deputy Superintendent of Facilities Miller, SCI-Coal Township Deputy

Superintendent of Centralized Services Luscavage, and SCI-Coal Township Superintendent

Mooney, SCI–Greene Law Librarian Gardner, Department of Corrections Attorney Rand, "other

staff," Secretary Wetzel, and Major Caro, as well as Clinton County Correctional Facility Deputy Warden Bechdel all discriminated against him because of his disability and failed to accommodate him under Title II.[195] He alleges some individual defendants retaliated against him for "attempted court access" purportedly violating the Disabilities Act.

Individuals are not liable under Title II or the Rehabilitation Act.[196] We dismiss all Title II and Rehabilitation Act claims against all individual defendants with prejudice.

### B. Mr. Snider may proceed on his Title II and Rehabilitation Act claims against the Commonwealth challenging placing and keeping him in solitary confinement despite knowing of his disabling mental illness and depression.

Having dismissed all individual defendants, we analyze Mr. Snider's Title II and Rehabilitation Act claims against the Commonwealth; Pennsylvania's Department of Corrections; and the Pennsylvania Attorney General's Office. Mr. Snider claims discrimination and retaliation under Title II and the Rehabilitation Act.[197] We analyze Mr. Snider's Title II Rehabilitation Act claims together because "the substantive standards for determining liability are the same."[198]

The Commonwealth, Pennsylvania's Department of Corrections, and Pennsylvania Attorney General's Office move to dismiss Mr. Snider's second amended complaint. The Commonwealth Defendants do not specifically address the Disabilities Act claims. They ask we dismiss the second amended complaint with prejudice or, alternatively, sever claims under Federal Rule of Civil Procedure 20.[199]  But we must screen his complaint.

1.      **Mr. Snider may proceed against the Commonwealth through the Department of Corrections for not providing him with the services, programs, or activities under Title II.**

Mr. Snider alleges the "Commonwealth/Department of Corrections" excluded him from "numerous programs, activities and services ***and*** . . . discriminated against him . . . by reason of his disability" by:

- placing him in solitary confinement for an aggregate of two years;

- excluding him from "socialization, recreation, education, employment, legal research, legal document production, religious activity, medical, mental health, disciplinary, grievance, court-access, etc. activities, services and programs" by putting him in "solitary placement";

- failing to make disability accommodations to participate in programs and activities;

- failing to "take his mental illness into account when issuing misconducts, or when considering solitary placement;

- failing to provide accommodations for his mental health disability in disciplinary hearings;

- failing to provide accommodations for use of "administrative exhaustion and court access activities and programs";

- punishing him for his symptoms of mental health disability;

- intentionally fabricating evidence and creating false mental health diagnosis to "make it appear [he] did not have a mental health disability" requiring accommodation;

- excluding him from meals, recreation, mental health, shower, etc." because of his hearing impairment;

- "regarding him" as having personality disorder and treating him harshly and discriminating against him on the basis of personality disorder; and

- failing to make accommodations to access court from SCI-Waymart in August 2016.[200]

39

Mr. Snider clarifies his Title II claims in his opposition to the Commonwealth Defendants' and Unified Judicial System's motions to dismiss. He cites his allegations the Commonwealth failed to ensure he received "consistent and proper mental health care" and failed to house him in "an environment which would support [his] mental health," instead housing him in solitary confinement for two years.[201] Mr. Snider argues the Commonwealth's failures occurred during the period of time to take a direct appeal in his criminal case and his post-conviction petition for relief. He alleges the Commonwealth's failures resulted in his exclusion from "meaningful participation" in the Commonwealth's judicial proceedings in his criminal case and made his participation unusually difficult and painful.[202]

He argues the Commonwealth and Department of Corrections knew he carried a diagnosis of schizoaffective disorder and schizophrenia; knew about abuse of mentally ill prisoners by the Department of Corrections; knew, through the Unified Judicial System and the Union County Court of Common Pleas, of Mr. Snider's mental health disability and knew he did not receive appropriate mental health care by being held in solitary confinement; knew solitary confinement affected his ability to work with his defense counsel in his underlying state criminal action and to participate in judicial proceedings including during the period of time he should have filed a direct appeal in his criminal case; failed to take steps to protect him or ensure his ability to participate in judicial proceedings; and failed to house him in a mental health treatment facility after the Union County Court of Common Pleas' finding of guilty but mentally ill as required by Pennsylvania statute.[203]

Mr. Snider alleges he pleaded guilty but mentally ill and the Union County Court of Common Pleas found him "severely mentally ill."[204] Mr. Snider alleges Department of

Corrections policy required it to provide him with a mental health treatment facility for evaluation but failed to do so.[205]

As directed by our Court of Appeals in *Geness* and *Geness II*, we apply the *Georgia* test to determine if Congress validly abrogated the Commonwealth's immunity for Mr. Snider's Title II claims. *Georgia's* test requires us to determine (1) which aspects of the Commonwealth's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) if the misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.[206]

The first prong of the *Georgia* test requires us to determine which aspect of the Commonwealth's alleged conduct violated Title II. Mr. Snider sufficiently pleads he is a qualified individual with a disability.[207] We turn our attention to the third prong; whether the first prong of the *Georgia* test requires us to determine whether Mr. Snider sufficiently pleads exclusion from participation in, or the denial of the benefits of, "services, programs, or activities" of the Commonwealth through its Department of Corrections.

Under Pennsylvania law, a defendant found guilty but mentally or whose plea of guilty but mentally ill is accepted and "who is severely mentally disabled and in need of treatment at the time of sentencing shall, consistent with available resources, be provided such treatment as is psychiatrically or psychologically indicated for his mental illness. Treatment may be provided by the Bureau of Correction, by the county or by the Department of Public Welfare in accordance with the 'Mental Health Procedures Act.'"[208]

Department of Corrections Policy 13.8.1, "Access to Mental Health Care" provides: "It is the policy of the Department to deliver a broad continuum of mental health services to ensure

that regardless of how major or minor the emotional disturbance, services are available to every inmate in the Department" including "A. screening for mental health problems on intake as approved by the mental health professional . . .; B. outpatient services for the detection, diagnosis, and treatment of mental illness . . . C. crisis intervention and the management of acute psychiatric episodes . . . ; D. stabilization of the mentally ill and the prevention of psychiatric deterioration in the correctional setting . . .; E. preventive treatment . . .; F. provision for referral and admission to a licensed mental health unit/facility . . .; G. facilities for an offender whose psychiatric needs exceed the treatment capability of the facility . . .; and H. procedures for obtaining and documenting informed consent . . . ."[209]

The Policy's Procedures Manual provides a section specifically for the treatment of guilty but mentally ill individuals.[210] Individual who, at the time of sentencing are found by a court to be "seriously mentally disabled"—as Mr. Snider alleges the Union County Court of Common Pleas found him—"and in need of treatment pursuant to the provisions of the Mental Health Procedures Act at the time of sentencing" **shall**, among other requirements: "be housed in the infirmary or other appropriate mental health setting if space, facilities, and security considerations permit"; "receive such care as available resources permit" while waiting for transfer to a mental health facility; and "have an initial psychiatric evaluation and psychological assessment upon arrival to the [Diagnostic and Classification Center]."[211]

Regulations implementing the Disabilities Act prohibit discrimination in jails, detention and correctional facilities, and community correctional facilities. Such public entities: "shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected

42

to discrimination by any public entity" and "shall ensure that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals."[212] "Unless it is appropriate to make an exception, a public entity—(i) Shall not place inmates or detainees with disabilities in inappropriate security classifications because no accessible cells or beds are available; (ii) Shall not place inmates or detainees with disabilities in designated medical areas unless they are actually receiving medical care or treatment; (iii) Shall not place inmates or detainees with disabilities in facilities that do not offer the same programs as the facilities where they would otherwise be housed; and (iv) Shall not deprive inmates or detainees with disabilities of visitation with family members by placing them in distant facilities where they would not otherwise be housed."[213] In *Geness*, our Court of Appeals specifically found these federal regulations, as well as Pennsylvania's Mental Health Procedures Act, to be "services" under the Disabilities Act.[214]

Mr. Snider alleges the Commonwealth, through its instrumentality the Department of Corrections, housed him in solitary confinement despite his mental illnesses. He alleges after the Union County Court of Common Pleas accepted his guilty but mentally ill plea on finding him "severely mentally ill," the Department of Corrections did not send him to a mental health facility for evaluation and treatment. After his attempted suicide in June 2013, Mr. Snider received treatment at Torrance State Hospital. When he recovered, the Commonwealth returned him to solitary confinement—the very conditions of which caused his attempted suicide. The Commonwealth failed to appropriately house Mr. Snider given his mental illnesses, instead housing him in solitary confinement for an aggregate of two years all while knowing his mental illnesses. He alleges the Commonwealth excluded him from its services and discriminated against him "by reason of disability."[215]

Mr. Snider satisfies the first prong of the *Georgia* test. Turning to the second prong, we determine the extent to which the Commonwealth's alleged conduct also violates the Fourteenth Amendment. Mr. Snider alleges after his August 2014 guilty plea, the Department of Corrections placed him in solitary confinement without hearing and without a classification assessment and repeated housing in solitary confinement without hearing upon transfers to various state prisons. Pennsylvania's Mental Health Procedures Act requires a defendant who is convicted on a guilty but mentally ill plea shall "be provided such treatment as is psychiatrically or psychologically indicated for his mental illness"; Department of Corrections Policy 13.8.1 requires an initial psychiatric evaluation and assessment upon arrival to the Department's Diagnostic and Classification Center; and Disabilities Act regulations require the Department to house Mr. Snider in "the most integrated setting appropriate" to his needs. Mr. Snider alleges deprivation of these procedural safeguards.

In *Geness I*, our Court of Appeals found the Commonwealth's conduct violated the Fourteenth Amendment finding, "[t]hese same circumstances are also sufficient to sustain Geness's claim that he was 'deprived . . . of the normal benefits of criminal procedure and due process of law . . . both as to his protracted incarceration without prompt transfer to a mental health facility, and his protracted institutionalization without a realistic prospect of trial.'"[216] Accepting Mr. Snider's allegations as true, the Commonwealth's conduct actually violates the Fourteenth Amendment.  We need not reach the third prong of the *Georgia* test. Mr. Snider sufficiently states a claim under Title II and the Rehabilitation Act against the Commonwealth.[217]

> **2.      Mr. Snider does not plead a Title II claim against the Commonwealth through the Unified Judicial System.**

The judicial power of the Commonwealth is vested in a Unified Judicial System consisting of the Supreme Court, Superior Court, Commonwealth Court, courts of common pleas, and other community and municipal courts as defined by statute.[218] "The Unified Judicial System exercises the judicial power of the Commonwealth."[219] We grant the Unified Judicial System's motion to dismiss the Title II claims against it.

The Unified Judicial System argues it is a part of the Commonwealth and entitled to Eleventh Amendment immunity from Mr. Snider's claims in their entirety, including his Title II claims. It relies on *Benn v. First Judicial District*,[220] a 2005 decision of our Court of Appeals, and the Supreme Court's decision in *Board of Trustees of University of Alabama v. Garrett*,[221] for its argument it is immune from suit under the Disabilities Act.

Reliance on *Benn* is misplaced. In *Benn*, our Court of Appeals examined the Commonwealth's Eleventh Amendment immunity in the context of a Title I Disabilities Act employment discrimination claim. Relying on the Supreme Court's decision in *Garrett*, our Court of Appeals held the First Judicial District absolutely immune from the plaintiff's employment discrimination action under Title I of the Disabilities Act.[222] But Mr. Snider's claims arise under Title II, not Title I. Our Court of Appeals explained the Supreme Court's decision in *Garrett* considered Eleventh Amendment immunity in the context of Title I only, and "expressly reserved the issue of abrogation [of Eleventh Amendment immunity] of Title II … dealing with the 'services, programs, and activities of a public entity.'"[223] Distinguishing Title I and Title II, our Court of Appeals recognized the Supreme Court's decision in *Tennessee v. Lane*[224] holding a  plaintiff could maintain a Title II action against a state for its failure to provide access to judicial proceedings for disabled parties, and recognized, at the time of its *Benn* decision, the Supreme Court granted certiorari in *United States v. Georgia*, on the

"question of whether the immunity of the state has been abrogated for a suit under Title II by a disabled state prisoner."[225]

We apply *Georgia's* three-part test to determine whether Congress validly abrogated sovereign immunity for Mr. Snider's claims against the Unified Judicial System. This requires us to first determine which aspect of the Unified Judicial System's alleged conduct violated Title II.

Mr. Snider makes three allegations regarding the Unified Judicial System's violation of Title II. First, he alleges on June 20, 2013, his attorney in his state criminal action filed a motion in the Union County Court of Common Pleas requesting Mr. Snider's transfer to Torrance State Hospital.[226] Although Mr. Snider does not plead it, we infer the court granted the motion because the Commonwealth transferred Mr. Snider to Torrance State Hospital for a period of three months where he received treatment.[227]

He next alleges on December 10, 2013, after Mr. Snider's discharge from Torrance State Hospital, Mr. Snider's counsel again filed a motion with the Union County Court of Common Pleas requesting a transfer from solitary confinement at SCI-Coal Township to the Union County Prison.[228] Mr. Snider alleges the Union County Court of Common Pleas "refused to actually hold the hearing or to allow evidence, claiming it 'didn't have jurisdiction.'"[229] Nevertheless, the Union County Court of Common Pleas ordered Mr. Snider to be transferred to a county jail before trial "contingent on 'maintenance of the status quo.'"[230]

Mr. Snider lastly alleges the Commonwealth, through the Unified Judicial System, knew of his mental disability, knew he did not receive appropriate mental health care, knew of his housing in solitary confinement, and knew it affected his ability to work with defense counsel in his underlying criminal case. He alleges the Commonwealth, through the Unified Judicial

46

System, accepted his guilty by mentally ill plea but failed to transfer him to a mental health treatment facility as required by Pennsylvania statute.[231]

Applying the first prong of the *Georgia* test, we must determine whether the Unified Judicial System denied Mr. Snider "the benefits of [its] services, programs, or activities . . . by reason of his disability."[232] Mr. Snider alleges the Union County Court of Common Pleas acted on two motions: the first granted his motion to transfer him to Torrance State Hospital; the second denied his motion on a finding it did not have jurisdiction. Mr. Snider does not provide us with more detail on the court's jurisdictional analysis.

Mr. Snider fails to identify the "services, programs, or activities" of the Unified Judicial System he believes it denied him by reason of his disability. To the extent he alleges the Commonwealth, through the Unified Judicial System and Union County Court of Common Pleas, denied him a "service, program, or activity" because it determined it lacked jurisdiction, he fails to state a claim under Title II. The court did not deny Mr. Snider its "services"; it considered his motion and determined it did not have jurisdiction to act. Mr. Snider simply disagrees with the court's decision. Like the AOPC in *Geness II*, Mr. Snider fails to allege the "services, program, or activities" the Unified Judicial System denied him by reason of his disability. It is axiomatic the court cannot dispose of a motion where it lacks jurisdiction.

Mr. Snider alleges generally the Commonwealth, through the Unified Judicial System knew of his mental disability, knew he did not receive appropriate mental health care, knew of his housing in solitary confinement, knew it affected his ability to work with defense counsel in his underlying criminal case, and accepted his guilty by mentally ill plea but failed to transfer him to a mental health treatment facility as required by Pennsylvania.

Mr. Snider again fails to plead a service the Unified Judicial System denied him by reason of his disability. As in *Geness II*, we cannot assume a court or court system "knows" facts and fails to perform a service. The courts respond to motions. Courts do not look for injustice; we instead work to remedy injustice after due process. Many of Mr. Snider's challenges seemingly relate to acts leading to his guilty plea. But he pleads no facts as to services the Unified Judicial System did not provide him by reason of his disability. He may disagree with a Union County judge's decision declining jurisdiction but the court provided him with the service of a hearing. Like the AOPC in *Geness II*, Mr. Snider cannot cite a service not provided him. Unlike the Commonwealth in *Geness II* which faces a trial based on judges' alleged deliberate indifference after a specific judicial finding, Mr. Snider does not plead the judge declining jurisdiction deprived him of a service under the Disabilities Act.[233]

Mr. Snider fails to meet the first prong of *Georgia's* test; he fails to allege the Unified Judicial System's conduct violated Title II.  We dismiss his Title II claim against the Unified Judicial System.

### 3. Mr. Snider cannot state a Title II claim against the Attorney General.

Mr. Snider alleges Pennsylvania's Attorney General's Office prosecuted the underlying criminal action against him "as any other non-disabled defendant."[234]

Mr. Snider alleges the Attorney General's Office violated Title II by:

- arguing he should be housed in solitary confinement "due to behaviors which they knew to be caused by his mental health disability in the county prisons";

- coordinating with Snyder County Prison to use "confidential informants who encouraged conflict" between him and his counsel to obstruct his defense his actions "were caused entirely by reason of disability";

- preventing him from "meaningful participation" in his underlying criminal case; and,

- performing a psychiatric review "for his mental health defense" when incompetent and "t[aking] advantage of the circumstance" to falsify the psychiatric report to coerce and intimidate him into entering a plea bargain.[235]

Mr. Snider alleges the Attorney General's Office took these actions despite knowing of his mental illness and the effects of solitary confinement on persons with mental illness.

Under Pennsylvania law, "[t]he Office of Attorney General shall be an independent department and shall be headed by the Attorney General. The Attorney General shall exercise such powers and perform such duties as are hereinafter set forth."[236] The duties include providing legal advice in civil matters to the Governor or the head of any Commonwealth Agency and representing the Commonwealth and all Commonwealth agencies and certain departments in any civil action brought by or against the Commonwealth or its agencies; and other civil matters.[237]

In criminal matters, the Attorney General "shall have the power to prosecute in any county criminal court:

(1) Criminal charges against State officials or employees affecting the performance of their public duties or the maintenance of the public trust and criminal charges against persons attempting to influence such State officials or employees or benefit from such influence or attempt to influence.

(2) Criminal charges involving corrupt organizations . . . .

(3) Upon the request of a district attorney who lacks the resources to conduct an adequate investigation or the prosecution of the criminal case or matter or who represents that there is the potential for an actual or apparent conflict of interest on the part of the district attorney or his office.

(4) The Attorney General may petition the court having jurisdiction over any criminal proceeding to permit the Attorney General to supersede the district attorney in order to prosecute a criminal action or to institute criminal proceedings. . . .

(5) When the president judge in the district having jurisdiction of any criminal proceeding has reason to believe that the case is a proper one for the intervention of the Commonwealth, he shall request the Attorney General to represent the

Commonwealth in the proceeding and to investigate charges and prosecute the defendant. . . .

(6) Criminal charges investigated by and referred to him by a Commonwealth agency arising out of enforcement provisions of the statute charging the agency with a duty to enforce its provision.

(7) Indictments returned by an investigating grand jury obtained by the Attorney General.

(8) Criminal charges arising out of activities of the State Medicaid Fraud Control Unit . . . .[238]

Mr. Snider does not allege a "service, program, or activity" of the Attorney General, instead challenging its prosecution of his criminal case. The Office of Attorney General does not provide a "service, program, or activity" to provide appropriate housing in prison or to facilitate Mr. Snider's defense in his criminal matter. Its function is to prosecute criminally matters enumerated by the Pennsylvania General Assembly. *Geness II* instructs we must identify the "services, programs, or activities" of the public entity "at the foundation of . . . [a] Title II claim . . . [as] a necessary first step to determining whether his claim is cognizable."[239] The "service, program, or activity" must be one the Office of Attorney General "actually provides."[240] Mr. Snider fails to do so. His claim against the Attorney General fails the first prong of the *Georgia* test. The Office of Attorney General is immune from Mr. Snider's Title II claims.[241]

### 4. We dismiss Mr. Snider's Title II claims against Torrance State Hospital.

Mr. Snider did not respond to Torrance State Hospital's motion to dismiss and we can treat its arguments as uncontested. The Hospital argues Mr. Snider fails to allege the disability from which he suffers and the programs in which he is being denied participation, contending these elements "are all mysteries here."[242] We disagree, at least as to Mr. Snider's disabilities; he alleges he is disabled by his mental illnesses including schizophrenia and bipolar disorder and

disabled by a hearing impairment.[243] He plausibly alleges he is a qualified individual with a disability. We have no basis to find he does not allege a disability.

But Mr. Snider fails to allege the first element of a Title II claim under the *Georgia* test: the service, program, or activity at Torrance from which his participation is excluded or otherwise subject to discrimination by reason of his disability. We must focus on the context in the long saga: Mr. Snider alleges treatment at Torrance for three months where he stabilized. Torrance deemed him "competent" and discharged him.[244] Mr. Snider alleges his defense counsel in his state criminal action asked staff at Torrance "to address how solitary placement was affecting his mental health and competency," but the hospital "did not do so, and did not comment on this in their report."[245] Mr. Snider fails to identify how this alleged failure to address an issue in a medical report denied him participation in a service, program, or activity or otherwise subjected him to discrimination because of his disability. He fails to allege how the alleged failure constitutes retaliation under Title II.

We dismiss Mr. Snider's Title II and retaliation claims against Torrance State Hospital.

### 5.    We dismiss Mr. Snider's Title II claims against Clinton County Defendants.

Clinton County Defendants the Clinton County Correctional Facility, Warden Motter, Deputy Warden Bechdel, and Corrections Officers, Nolte, Shearer, Richard, Walker, and Hughes move to dismiss the Title II claims as (a) barred by the statute of limitations; (b) barred by the doctrine of claim splitting; and (3) not stating a claim because there is no individual liability under Title II. Mr. Snider did not respond to the Clinton County Defendants' motion and we can treat their arguments as uncontested.

We earlier determined there is no individual liability under Title II and dismissed claims against Warden Motter, Deputy Warden Bechdel, and Corrections Officers, Nolte, Shearer,

Richard, Walker, and Hughes. We turn to the Title II claim against the Clinton County Correctional Facility. Mr. Snider alleges confinement at the Correctional Facility from December 2, 2012 through May 7, 2013. Neither Title II nor Section 504 of the Rehabilitation Act contain statutes of limitations. Our Court of Appeals borrows Pennsylvania's two-year statute of limitations for personal injury claims.[246] Mr. Snider's Title II and Rehabilitation Act claims against the Clinton County Correctional Facility must have been brought by May 7, 2015. Mr. Snider's original complaint, filed May 7, 2015, did not name the Clinton County Defendants. Mr. Snider did not name the Clinton County Defendants until his December 21, 2018 second amended complaint. His Title II and Rehabilitation Act claims against the Clinton County Defendants are dismissed as time barred unless they relate back.

Under Rule 15(c)(1), and amended complaint "relates back" to the date of the original pleading when: "(A) the law that provides the applicable statute of limitations allows relation back; (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment: (i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity."[247]

Rule 15(c)(1)(A) does not apply. We turn to Rule 15(c)(1)(B) and (C) to analyze whether Mr. Snider's claims against the Clinton County Correctional Facility "arose out of the conduct, transaction, or occurrence" set out in his original complaint. "[R]elations back depends on the

existence of a common 'core of operative facts' uniting the original and newly asserted claims."[248] "A common core of operative facts exists if 'the opposing party has had fair notice of the general fact situation and legal theory upon which the amending party proceeds.'"[249] "[N]ew claims will relate back if they 'restate the original claim with greater particularity or amplify the factual circumstances surrounding the pertinent conduct, transaction or occurrence in the preceding complaint.'"[250] But, if a new claim "'asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth[,]' the claim will not relate back."[251]

Mr. Snider originally sued the Commonwealth, Department of Corrections, SCI-Coal Township, SCI-Graterford, Torrance State Hospital, Union County, SCI-Camp Hill, and SCI-Greene, and various prison officials, employees, and medical professionals. He did not name as a defendant Clinton County Correctional Facility, where he where he was housed as a pre-trial detainee from December 6, 2012 to May 7, 2013. While he alleges Union County housed him at the Clinton County Correctional Facility and alleges generally he "ha[d] similar experiences" at Clinton County Correctional Facility as he experienced in Department of Corrections prisons,[252] his claims against the Correctional Facility do not arise from a "common core of operative facts." Clinton County Correctional Facility would not have had "fair notice" of the "general fact situation and legal theory" Mr. Snider now advances against it.  Mr. Snider's claims against Clinton County Correctional Facility assert new grounds for relief for events occurring at a different time period than those asserted in the original complaint.

Mr. Snider's claims against the Correctional Facility do not "relate back" under Rule 15(c)(1)(B) and because he does not meet the requirements of Rule 15(c)(1)(B), he fails to meet the requirements of Rule 15(c)(1)(C).

Mr. Snider's Title II claims against the Correctional Facility are barred by the statute of limitations from the face of the second amended Complaint.

**6.      We dismiss Mr. Snider's Title II claims against Union County.**

Union County moves to dismiss Mr. Snider's Title II claims because (a) they are barred by *res judicata*; (b) they are barred by the statute of limitations; (c) Union County is an improper party; and (d) Mr. Snider fails to allege facts to support a Disabilities Act claim.[253]

Although unclear from his second amended Complaint, Mr. Snider's response to Union County's motion to dismiss asserts Union County confined him at the Union County Prison from approximately August 1, 2010 to September 9, 2010.[254] Whatever Title II claims arose from this time period are time-barred.

While only confined at the Union County Prison for a month in 2010, Mr. Snider claims Union County or the Union County Prison Board incarcerated him until August 21, 2014 through contractual arrangements with Snyder County Prison, Clinton County Correctional Facility, the Department of Corrections, and Torrance State Hospital to house him in their facilities.[255] In his opposition to Union County's motion to dismiss, Mr. Snider clarifies Union County failed to "take steps to ensure" he received consistent and proper mental health care and remained housed in an environment to support his mental health while incarcerated in the other facilities.[256] He cites pages fifteen to twenty-five of his second amended complaint, but there are no allegations there regarding Union County.

His opposition states "Union County discriminated against me by reason of my disability"; "excluded me from numerous programs and activities by reason of my disability"; "made my participation unusually difficult by reason of my mental health disability'" and "did this directly and through contractual arrangements with" other state and county prisons.[257] These

facts are not pleaded in his second amended complaint. Mr. Snider instead refers us to other filings outside his pleading. He refers to contractual agreements between Union County and the Commonwealth and Department of Corrections he cited in *Snider v. Motter*, No. 13-1226.

Mr. Snider argues his claims are not barred by the statute of limitations because Union County is somehow involved in his transfers from prison to prison; the County is liable for the acts of its agents; and the County is not relieved of its obligations under Title II simply because in the state actors transferred or housed him in other facilities. He asks we equitably toll the limitations period because of his mental health disability and treatment at Torrance State Hospital.[258]

Mr. Snider appears to argue Union County's contractual relationships with Snyder County, Clinton County, and the Department of Corrections created a principal-agent relationship imposing Title II liability on Union County. Under Pennsylvania law, "[w]hile it is unnecessary to plead all the various details of an alleged agency relationship, a complainant must allege, as a minimum, facts which: (1) identify the agent by name or appropriate description; and (2) set forth the agent's authority, and how the tortious acts of the agent either fall within the scope of that authority, or, if unauthorized, were ratified by the principal."[259] Mr. Snider does not allege facts supporting a principal-agent relationship between Union County and other counties and the state. On the face of Mr. Snider's second amended complaint, Mr. Snider's Title II claims are barred by the statute of limitations.

Even if not barred by the statute of limitations, Mr. Snider's claims against Union County are barred by *res judicata*. In his original complaint in *Snider v. Motter*, No. 13-1226, Mr. Snider sued Warden Shaffer, among others, but not Union County. He did not raise a Disabilities Act claim. The court dismissed his claims against Warden Shaffer with prejudice.[260]

Mr. Snider, with the benefit of counsel, filed a second amended complaint in *Motter* on December 19, 2015.[261] He claimed several persons violated his Title II rights but did not name Union County. The parties ultimately stipulated to the dismissal of the *Motter* action upon the parties' settlement, which the court granted and dismissed the case. Mr. Snider later appealed the dismissal, arguing he did not consent to settlement. The appeal is still pending in our Court of Appeals.

Union County argues *res judicata*, or claim preclusion, applies and we must dismiss the Disabilities Act claims against it. *Res judicata* applies when "there has been (1) a final judgment on the merits in a prior suit involving (2) the same claim and (3) the same parties or their privies."[262] The "pendency of an appeal does not affect the potential for *res judicata* flowing from an otherwise-valid judgment."[263]

The first element is met because there is a final judgment on the merits in *Motter*.[264] The court dismissed with prejudice claims against Warden Shaffer. Mr. Snider's counseled second amended complaint did not name either Warden Shaffer or Union County. The parties ultimately settled the case and stipulated to its dismissal, which the court entered dismissing the case. Under the second element, "[t]he doctrine of *res judicata* bars not only claims that were brought in a previous action, but also claims that could have been brought."[265] Mr. Snider initially alleged Warden Shaffer of the Union County Prison violated Mr. Snider's civil rights under section 1983. He did not, but could have, [266] brought a Title II claim against Union County based on the same facts and events as alleged against Warden Shaffer, which the court dismissed with prejudice in accordance with the parties' stipulation in No. 13-1226.[267] Later changing his mind or disagreeing with his attorney and now contending she filed the second amended complaint without his consent does not change the fact he could have, but did not, bring a Title II claim

against Union County. The third element requires the same parties or their privies. Union County and Warden Shaffer are "privies" because Warden Shaffer is an agent of the Union County Prison under Union County control. Mr. Snider's Title II claims against Union County barred by *res judicata*.

Even if his Title II claims against Union County are not barred by the statute of limitations or *res judicata*, he fails to state a claim. There are no allegations of the programs, services, or activities of Union County from which he was precluded or allegations of how Union County subjected him to discrimination by reason of his disability. We dismiss the Title II claims against Union County.

Mr. Snider's Title II claims against the Union County Prison Board are similarly barred by the two-year statute of limitations. We dismiss claims against the Union County Prison Board for the reasons we dismissed claims against Union County.[268]

### 7. We dismiss Mr. Snider's Title II claims against Snyder County.

Snyder County moves to dismiss the Title II claim arguing it is an improper party, barred by the statute of limitations, and barred by *res judicata*. Snyder County is a Seventh Class County and, consistent with Pennsylvania statute, adopted a Prison Board structure to operate the County's prison.[269] Snyder County argues the Snyder County Prison Board is the statutory entity responsible for operating the prison and is solely liable for the prison. Under Pennsylvania statute, a prison "board and the officers appointed by it shall provide for the safekeeping, discipline and employment of inmates and the government and management of the correctional institution."[270] To the extent Mr. Snider alleges Snyder County denied him "services, activities, or programs" or otherwise discriminated against him by reason of his disability, we deny his

claim.  The County does not operate the prison; its Prison Board operates the prison. Mr. Snider did not sue the Prison Board.  He did not respond to Snyder County's motion to dismiss.

Even if Snyder County is the proper party, any claim against it is barred by the two-year statute of limitations.  The Commonwealth incarcerated Mr. Snider at the Snyder County Prison from September 9, 2010 to December 6, 2012.  Mr. Snider did not file this case until May 7, 2015. His claims are barred by the statute of limitations. We need not reach the County's *res judicata* argument.  We dismiss Mr. Snider's Title II claims against Snyder County.

### 8.    We dismiss Mr. Snider's Title II claims based on an alleged hearing impairment against SCI-Greene officers Jones and Adamson.

Mr. Snider alleges he is also disabled by a hearing impairment at least to as to two officers.[271] He alleges unidentified SCI-Greene "solitary staff frequently denied him" showers, recreation, meals, and "groups," because of his mental illness or "due to his hearing impairment."[272] He alleges unidentified "prison officials" including non-party Corrections Health Care Administrator Kyle Guth refused to administer a hearing test or make any accommodations for his hearing.[273] He alleges on June 23, 2016, SCI-Greene Corrections Officers Jones and Adamson denied him a shower "due to his hearing impairment."[274] Even assuming this bare bones allegation states a claim under Title II, there is no individual liability for Officers Jones and Adamson.

### 9.    We dismiss Mr. Snider's Title II retaliation claims.

Mr. Snider claims all Commonwealth and Department of Corrections employees, including the Medical Defendants, and specifically SCI-Camp Hill Corrections Officers McKeehan, Nichtman, Byrne, and Killeen, Lieutenant Kuzar, and Sergeant Cleaver retaliated against him under the Disabilities Act, 42 U.S.C. § 12203.[275] Section 12203(a) prohibits

discrimination against "any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."[276] To state a claim for retaliation under section 12203(a), Mr. Snider must allege "(1) he engaged in protected activity, (2) he suffered an adverse action after or contemporaneous with the protected activity, and (3) a causal connection between the protected activity and the adverse action."[277]

Section 12203(b) prohibits the "coerc[ion], intimidate[ion], threat[s], or interfer[ence] with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.[278] To state a claim for retaliation under section 12203(b)—the broader "coercion, intimidation, threats, and interference" section—Mr. Snider must allege "when the defendant 'coerced,' 'threatened,' 'intimidated,' or 'interfered,' the plaintiff was exercising or enjoying a right protected by the ADA."[279] Mr. Snider does not allege which subsection he bases his retaliation claim.

Mr. Snider alleges generally Secretary Wetzel maintains, or is indifferent to, a policy and practice of retaliation against inmates who attempt court access or utilize the grievance procedure.[280] He alleges various prison officials in various state prisons and county jails retaliated against him by threatening him, destroying his religious items, falsifying his medical records, and somehow interfering with his state criminal prosecution. But Mr. Snider fails to allege the act or practice he opposed; fails to identify his protected activity; the adverse action he suffered after or contemporaneous with the protected activity; and a causal connection between the protected activity and adverse action. He fails to plead a retaliation claim under section 12203(a). He likewise fails to plead a claim under section 12203(b) because he does not allege

which defendant(s) coerced, threatened, intimidated, or interfered with his exercise or enjoyment of a right protected by Title II.[281]

# IV.

## We will proceed on section 1983 claims under the First, Eighth, and Fourteenth Amendments.

We now consider Mr. Snider's claims against Commonwealth and Department of Corrections employees in their individual capacities.

Congress provides a cause of action in section 1983 against "every person who, under color of state [law], . . . subjects, or causes to be subjected, . . . [another] person . . . to the deprivation of any" federally protected right.[282] "Section 1983 claims are subject to Pennsylvania's two-year statute of limitations."[283] Mr. Snider brings his claims under section 1983 alleging these individuals violated his civil rights including the free exercise of religion, freedom from excessive force, freedom from cruel and unusual punishment and freedom to grieve and complain about state actors without retaliation.

He sues:

- Department of Corrections Secretary Wetzel;

- Chief Grievance Officer for the Department of Corrections Dorina Varner;

- SCI-Coal Township officials and employees: Superintendent Mooney, Grievance Coordinator Kelley, Deputy Superintendent of Centralized Services Luscavage, Deputy Superintendent of Facilities Miller, Law Librarian Stracco, Psychological Services Specialists Fallon and Jeremiah, Corrections Officer Longendorfer, and Sergeant Romig.

- SCI-Camp Hill officials and employees: Superintendent Harry, Grievance Coordinator Alvord, Corrections Officers McKeehan, Nichtman, Crawford, Morton, Byrne, and Killeen, Sergeants Rivera and Cleaver, Lieutenant Kuzar, and Major Horner;

- SCI-Greene officials and employees: Superintendent Gilmore, Grievance Coordinator Shawley, Psychological Services Specialists Valko, Waine, Shrieve, Burt, and Falcione,

Hearing Examiner Kerns-Barr, Unit Manager Cowan, Corrections Officer King, Collins, Sanders, Adamson, Jones, Lieutenant Stickle, and Law Librarian Gardner;

- Prison Official Dan Caro, staff assistant to Secretary Wetzel until August 2015, then Major of Unit Management at SCI-Greene, and later Deputy Superintendent of SCI-Somerset in March 2018;

- Department of Corrections attorney Rand;

- Medical Defendants;[284] and

- Four John Does.

Mr. Snider may proceed on defined civil rights claims:

(1) Eighth Amendment excessive force claim against Corrections Officers McKeehan and Nichtman;

(2) First Amendment right to exercise his religion claim against Officers McKeehan, Nichtman, and Sergeant Romig;

(3) First Amendment retaliation claim against Deputy Superintendent Miller, Deputy Superintendent Luscavage, Superintendent Mooney. Corrections Officers Crawford, Killeen, Byrne, Longendorfer, Sanders, Lieutenant Kuzar, Sergeant Cleaver, Sergeant Rivera, and Psychological Services Specialists Shrieve, Valko, Falcione, Burt, and Waine, and Grievance Hearing Officer Kerns-Barr;

(4) Eighth and Fourteenth Amendment cruel and unusual punishment claims against Secretary Wetzel, Superintendent Mooney, Deputy Superintendent Luscavage, Deputy Superintendent Miller, and John Doe One; and

(5) civil rights claims against supervisors Secretary Wetzel, Superintendents Harry, Gilmore, and Mooney, Chief Grievance Coordinator Varner, Grievance Coordinators Shawley, Alvord, and Kelly, and Major Caro specifically alleged to have personal knowledge of the alleged violations of his constitutional rights.

A.     **Mr. Snider may proceed on Eighth Amendment excessive force claims against Corrections Officers McKeehan and Nichtman.**

Mr. Snider arrived at SCI-Camp Hill in August 2014. He alleges SCI-Camp Hill Corrections Officers McKeehan and Nichtman used excessive force, obstructed his religious practices, and retaliated against him for his attempted court access.[285] Defendants failed to address these claims in their motion to dismiss.

Mr. Snider claims excessive force in violation of the Eighth Amendment against Corrections Officers McKeehan and Nichtman. Our Court of Appeals identified "the pivotal inquiry in reviewing an inmate's § 1983 claim for excessive force is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'"[286] "In conducting this analysis of the officer's intent, we consider five factors: '(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of facts known to them; and (5) any efforts made to temper the severity of the forceful response.'"[287]

Mr. Snider alleges he filed a grievance at SCI-Camp Hill regarding Corrections Officers McKeehan and Nichtman's threat they would destroy his legal files and religious items or he could "mail them home." After filing a grievance, Mr. Snider alleges Officers McKeehan and Nichtman became "enraged"; yelled at him; grabbed his arm causing bruising; pushed him into a cell; and after telling Officer McKeehan he had not received his psychiatric medication for the day, Officer McKeehan grabbed him by the shirt collar and throat and tried to strangle him while slamming his head and body into a concrete wall causing injury to his back and neck.[288]

Applying *Smith*, Mr. Snider states a claim Officers McKeehan and Nichtman used excessive force after Mr. Snider asked to file a grievance. Based on these allegations, asking to

file a grievance does not justify the need for application of force, satisfying the first and second factors. Mr. Snider alleges the Officers attempted to strangle him and slammed his head and body against a concrete wall causing injuries to his back and neck, satisfying the third element. The facts as alleged do not suggest Mr. Snider's request to file a grievance created a "threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of facts known to them," satisfying the fourth element. And we infer from the force used, particularly the allegation of attempted strangling and slamming Mr. Snider's head and body into a concrete wall, the Officers did not attempt to "temper the severity of the forceful response," satisfying the fifth *Smith* factor. Mr. Snider's Eighth Amendment excessive force claims against Corrections Officers McKeehan and Nichtman may proceed into discovery.

### B.      Mr. Snider may proceed on his First Amendment right to exercise his religion claim against Officers McKeehan, Nichtman, and Sergeant Romig.

Mr. Snider is Hindu. He alleges he worships by reading Hindu scriptures, meditating on a special mat, and repeating prayers on special beads held inside a special prayer bag.[289]

Mr. Snider alleges Corrections Officers McKeehan and Nichtman broke, damaged, or stole his religious items, including ripping apart four Hindu scriptures and tearing out fifty to sixty page sections, digging a pencil through twenty pages of a yoga book, and breaking his only remaining set of Hindu prayer beads.[290]

Mr. Snider  alleges Sergeant Romig at SCI-Coal Township "forced him to get rid of his Hindu religious items" and threatened retaliation for court access.[291] He alleges "unknown individuals" at SCI-Coal Township tore apart one of his remaining Hindu books after submitting grievances about solitary confinement.[292]

To determine whether Mr. Snider states a First Amendment claim for violation of his right to exercise his religion, we must "as a threshold matter," evaluate "whether the prisoner has

alleged a belief that is 'both sincerely held and religious in nature.'"[293] If he does, we must then apply the Supreme Court's four-factor test in *Turner v. Safley*,[294] "to determine whether the curtailment at issue is 'reasonably related to penological interests.'"[295] Under *Turner*, (1) "there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there is "an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests."[296]

Drawing all reasonable inferences from Mr. Snider's allegations, he alleges a sincerely held belief in the Hindu religion. Applying the *Turner* factors, and as alleged, there is no valid, rational connection between the alleged conduct and a legitimate Department of Corrections interest pleaded by Mr. Snider; having destroyed his religious items, there are no alternatives to Mr. Snider's religious practice; there is no impact to the prison or its corrections officers to allow Mr. Snider his religious items; and there is no alternative to fully accommodate Mr. Snider's rights at a *de minimis* cost to valid penological interests. Mr. Snider alleges destruction and loss of his religious items used in his religious worship by Corrections Officers McKeehan and Nichtman and Sergeant Romig prevented him from exercising his religious practice.

### C.    Mr. Snider may proceed on his First Amendment retaliation claim against individual prison officials and employees as defined.

Mr. Snider alleges retaliation against prison officials and Commonwealth or Department of Corrections employees for filing grievances and attempting to participate in his state criminal action and federal civil litigation.

To state a First Amendment retaliation claim, Mr. Snider must allege "(1) constitutionally protected conduct, (2) an adverse action by prison officials sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the exercise of his constitutional rights and the adverse action taken against him."[297]

Mr. Snider alleges retaliation began in December 2012, as a pretrial detainee, when he began to complain to Warden Cooper about abuse at the Snyder County Prison.[298] Mr. Snider alleges transfer to the Clinton County Correctional Facility and then transfer to SCI-Coal Township on May 7, 2013.[299] He alleges he filed his first federal civil action, *Snider v. Motter*, No. 13-1226 on May 3, 2013.

Upon arriving at SCI-Coal Township, prison officials placed Mr. Snider in solitary confinement. Sergeant Romig threatened, "If you give us any problems there will be retaliation plain and simple,"[300] Mr. Snider does not allege the constitutionally protected conduct, adverse action, or any causal link between the protected conduct and adverse action. We dismiss any retaliation claim against Sergeant Romig.

After complaining in writing to Deputy Superintendent Miller, Deputy Superintendent Luscavage, Superintendent Mooney, and Secretary Wetzel about conditions in solitary confinement and how those conditions exacerbated his mental illness, these officials repeatedly threatened and punished him and obstructed his grievance appeal rights.[301] Mr. Snider does not identify the threats or punishments visited upon him. He does, however, allege after filing grievances, Superintendent Mooney, Deputy Superintendent Miller, and Deputy Superintendent Luscavage punished him by obstructing his "meaningful access" to his defense counsel in his state criminal prosecution, including turning away his defense counsel from prison visits.[302]

While housed as SCI-Camp Hill, Mr. Snider alleges he filed several grievances and appealed disciplinary sanctions.[303] After being housed in solitary confinement, prison officials transferred Mr. Snider to another cell block where Corrections Officers threatened him for filing grievances and denied him psychiatric medication, food, recreation, pens, paper, cleaning, supplies, a working toilet, and access to a phone as a result of filing grievances.[304] He alleges:

- Officer Crawford confiscated his legal and religious items "because [Mr. Snider] like[d] to write grievances" and forced him to carry heaving record boxes for a long distance between cell blocks;[305]

- Lieutenant Kuzar threatened, "You are complaining about staff . . . This a**h*** doesn't get his meds this morning";[306]

- Sergeant Cleaver threatened, "You keep complaining about staff and how we keep things here. We like the way things are. You came to prison. If you can break the rules, so can I. If you complain about staff, I don't have to let you shower, get meds, eat or go to yard. . . . If you keep telling, we are going to hurt you";[307]

- Corrections Officer Killeen threatened, "If you keep complaining and writing grievances I am going to put you on the ground, hard. When people tell, that's when bad things happen";[308]

- Corrections Officer Byrne threatened, "You are going to [another cell block] . . but when you get there, officers are going to put their hands on you";[309]

- Sergeant Rivera threatened, "You like to write grievances? We are going to kick your a** the entire time you are in the PA DOC . . . You are going to learn real soon.[310]

Mr. Snider alleges while at SCI-Coal, Defendant Corrections Officer Longendorfer or his supervisors left Mr. Snider in a cell for thirty-one hours with no working toilet, unknown individuals flooded the cell, and tore apart one of his remaining religious books after submitting grievances about solitary confinement and loss of his religious items..[311]

Mr. Snider alleges while at SCI-Greene in October 2014, Psychology Services Specialists Shrieve, Valko, Falcione, Burt, and Waine harassed him in mental health sessions, threatened him, and allegedly falsified his medical records after he attempted to use the grievance procedure

66

at SCI-Greene and pursue his claims against the Department of Corrections in his federal action.[312]

After filing this action on May 7, 2015, Mr. Snider alleges SCI-Greene Grievance Hearing Officer Kerns-Barr refused to allow him to call witnesses at a misconduct hearing an sentenced him to solitary.[313] He alleges Corrections Officer Sanders "repeatedly harassed him about his litigation," which so overwhelmed Mr. Snider, he began banging his head on the wall.[314]

We apply the three-part test for First Amendment retaliation. Mr. Snider must first allege constitutionally protected conduct. He alleges filing grievances and lawsuits, both constitutionally protected activity.[315]

The second element requires an adverse action by prison officials sufficient to deter a person of ordinary firmness from exercising his constitutional rights.[316] Our Court of Appeals, in *Allah*, "concluded that reduced access to phone calls, reduced access to the commissary, reduced access to recreation, confinement in his cell for all but five hours per week, denial of access to rehabilitative programs and, significantly, inadequate access to legal research materials and assistance, could significantly deter a person from exercising his first amendment rights."[317]

Mr. Snider alleges threats of physical harm, denial of psychiatric medication, food, recreation, pens, paper, cleaning, supplies, a working toilet, and access to a phone, denial of witnesses at a misconduct hearing, and destruction of a religious book. Accepting Mr. Snider's allegations of adverse action as true, as we must at this stage, they are sufficient to deter a person of ordinary firmness from exercising his rights.

The third element requires a causal connection. Mr. Snider must "allege that the protected activity was a substantial motivating factor in the state actor's decision to take the adverse

67

action."[318] Here, Mr. Snider attributes adverse action to specific comments threatening harm with the filing of grievances.

We allow Mr. Snider's First Amendment claims against Deputy Superintendent Miller, Deputy Superintendent Luscavage, Superintendent Mooney. Corrections Officers Crawford, Killeen, Byrne, Longendorfer, Sanders, Lieutenant Kuzar, Sergeant Cleaver, Sergeant Rivera, and Psychology Services Specialists Shrieve, Valko, Falcione, Burt, and Waine, and Grievance Hearing Officer Kerns-Barr to proceed into discovery.

> **D.   Mr. Snider may proceed on his Eighth and Fourteenth Amendment cruel and unusual punishment claims against Secretary Wetzel, Superintendent Mooney, Deputy Superintendent Luscavage, Deputy Superintendent Miller, Superintendents Harry and Gilmore, Chief Grievance Coordinator Varner, Grievance Coordinators Shawley, Alvord, and Kelley, and Major Caro alleged to have personal knowledge of the violations of constitutional rights.**

Mr. Snider challenges prison conditions as a pretrial detainee beginning in December 2012 at the Snyder County Prison, the Clinton County Correctional Facility, and SCI-Coal Township. He challenges prison conditions post-conviction at SCI-Coal Township, SCI-Camp Hill, SCI-Greene, and SCI-Waymart.

Mr. Snider seeks to hold Secretary Wetzel, Superintendents Harry, Gilmore, and Mooney, Deputy Superintendent Luscavage, Deputy Superintendent Miller, Chief Grievance Coordinators Varner, Shawley, Alvord, and Kelley, and Major Caro liable for Eighth Amendment cruel and unusual punishment. Mr. Snider alleges these supervising state actors knew from Mr. Snider's many letters, grievances, conversations, and court filings of the violations of his First, Fourth, Fifth, Sixth, and Eighth Amendment rights.  He specifically alleges these actors had knowledge of inhumane conditions in solitary confinement, deliberate indifference to his serious medical needs, retaliation for exercising his rights, and deprivation of meaningful access to his defense counsel.[319]

A challenge to conditions of confinement by a pretrial detainee arises under the Fifth Amendment.[320] "In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicated only the protection against deprivation of liberty without due process of law, we think the proper inquiry is whether those conditions amount to punishment of the detainee."[321] "Under the Due Process clause, 'a detainee may not be punished prior to an adjudication of guilt.'"[322] "To determine whether challenged conditions of confinement amount to punishment," we are directed by our Court of Appeals to determine "whether a condition of confinement is reasonably related to a legitimate governmental objective; if it is not, we may infer 'that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees qua detainees.'"[323]

The Eighth Amendment, prohibiting "cruel and unusual punishments," applies to condition of confinement challenges post-conviction. "A claim of inhumane prison conditions may rise to the level of an Eighth Amendment violation where the prison official 'deprived the prisoner of the minimal civilized measure of life's necessities' and 'acted with deliberate indifference in doing so, thereby exposing the inmate to a substantial risk of serious damage to [his] future health.'"[324] "Conditions . . . alone or in combination[ ] may deprive inmates of the minimal civilized measure of life's necessities."[325]

To determine whether prison officials violated the Eighth Amendment, we are directed to apply a two-prong test: "(1) the deprivation must be 'objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities'; and (2) the prison official must have been 'deliberate[ly] indifferen[t] to inmate health or safety.'"[326] "An official is deliberately indifferent if he 'knows of and disregards an excessive risk to inmate health or safety.'"[327] "Whether conditions constitute 'cruel and unusual

punishment' is measured against 'the evolving standards of decency that mark the progress of a maturing society.'"[328]

Mr. Snider cannot base liability on  a theory of *respondeat superior* liability.[329] Defendants "must have personal involvement in the alleged wrongs to be liable and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved.'"[330] "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence."[331] Allegations of personal involvement require "particular 'allegations of personal direction or of actual knowledge and acquiescence.'"[332]

### *The objective prong: Mr. Snider's allegations of conditions in solitary confinement.*

Mr. Snider alleges housing in solitary confinement for a total of two years both as a pretrial detainee and post-conviction.  He alleges a transfer as a pretrial detainee in May 2013 to SCI-Coal Township where he remained for fifteen months except for a two-week period at SCI-Graterford and three months of treatment at Torrance State Hospital. He alleges attempted suicide for which he received treatment at Torrance State Hospital. He alleges solitary confinement exacerbated his mental illnesses.

Mr. Snider describes "horrific and oppressive" conditions on the solitary unit beginning on May 7, 2013 when first transferred to SCI-Coal Township.  He describes inmates banging on doors and sinks and yelling twenty-four hours a day, making sleep impossible; guards keeping him and other inmates in cells twenty-three hours a day and only occasionally releasing them for one hour of recreation; guards allowing only one fifteen minute phone call per week; noise and proximity to other inmates making it impossible to communicate with mental health staff; and prison officials punishing him and other inmates for complaining either verbally or through the

grievance procedure, making the grievance process impossible and causing him and other inmates to resort to hunger strikes.[333]

In June 2013, Mr. Snider attempted suicide and the Department of Corrections sent him to Torrance State Hospital for treatment. When Mr. Snider returned to SCI-Coal Township from treatment at Torrance State Hospital in October 2013, prison officials returned him to solitary confinement. We can reasonably infer prison officials knew of his attempted suicide because officials sent him to Torrance State Hospital for treatment and Mr. Snider plausibly pleads deliberate indifference by prison officials who knew of and disregarded an excessive risk to Mr. Snider's health or safety.

Our Court of Appeals "acknowledge[s] the robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation in solitary confinement."[334] Solitary confinement "can cause severe and traumatic psychological damage, including anxiety, panic, paranoia, depression, post-traumatic stress disorder, psychosis, and even a disintegration of the basic sense of self identity" and cause physical harm including "high rates of suicide and self-mutilation amongst inmates who have been subjected to solitary confinement."[335]

### *The subjective prong: Mr. Snider's allegations of prison officials' deliberate indifference to his health and safety.*

Mr. Snider alleges he filed grievances, wrote letters and personally spoke to Secretary Wetzel, Superintendents Mooney, Harry, and Gilmore, Deputy Superintendent Luscavage, and Deputy Superintendent Miller, Chief Grievance Coordinator Varner, and Grievance Coordinators Shawley, Alvord, and Kelly, and Major Caro about conditions in solitary confinement and these how conditions exacerbated his mental illness. He also reported abuse and indifference to his mental health treatment, and he requested release from solitary confinement.[336]

71

Mr. Snider alleges the conditions at SCI-Camp Hill "have been so bad, for so long, and complained of by so many inmates that is would be impossible" for Secretary Wetzel and Superintendent Harry to "not know of those conditions and tradition of abuse."[337]

Defendants argue Mr. Snider fails to state a civil rights claim against Chief Grievance Officer Varner, SCI-Coal Township Superintendent Mooney, Grievance Coordinator Kelley, SCI-Camp Hill Superintendent Harry, Grievance Coordinator Alvord, SCI-Greene Superintendent Gilmore and Grievance Coordinator Shawley because their "only involvement was processing grievances," Mr. Snider fails to allege their personal involvement, and there is no constitutionally protected right to a specific grievance procedure for inmates. The Commonwealth Defendants argue we must dismiss with prejudice Mr. Snider's claims against these individuals "or anyone else" with regard to "processing his grievances."[338]

We do not read Mr. Snider's claims against these individuals to be based on the grievance process. We read his claims as pleading these individuals had knowledge of abuse against Mr. Snider—including the use of solitary confinement, abuse by mental health staff, inhumane conditions of solitary confinement, retaliation, and deficient mental health treatment—and did nothing to cure it. Mr. Snider alleges their actual knowledge through his written and verbal communications complaining of conditions of solitary confinement.

Our Court of Appeals' recent affirmance of the dismissal of a section 1983 Eighth Amendment claim against Secretary Wetzel and two other prison officials offers an instructive contrast.[339] The court found deficient the incarcerated person's allegations Secretary Wetzel knew his mental health needs through a copy of documents reflecting his guilty but mentally ill verdict and his request for certain mental health services. The incarcerated person alleged two other prison officials reviewed and denied grievances challenging the Department of

Corrections' refusal to provide the highest level of mental health services. Our Court of Appeals found the allegation "does not demonstrate the personal direction or actual knowledge required under *Rode*, and [inmate's] allegations of [Secretary] Wetzel's involvement are insufficient" as well as allegations of two prison officials whose "only involvement alleged . . . is their review and denial of [inmate's] grievance."[340]

Mr. Snider alleges slightly more than those found insufficient in *Dooley*. Mr. Snider alleges he wrote letters and had in-person conversations with these identified state actors complaining about conditions in solitary confinement, abuse, and depriving him of mental health treatment. We cannot judge whether this is true at this preliminary stage. Although very close, we are mindful of our "'obligation to liberally construe a pro se litigant's pleadings,' . . . particularly where the *pro se* litigant is imprisoned."[341]

Based on Mr. Snider's allegations of conditions in solitary confinement and the effect on his known and pleaded mental illness, he sufficiently alleges (1) an objectively, sufficiently serious denial of the minimal civilized measure of life's necessities and (2) prison officials Secretary Wetzel, Superintendents Harry, Gilmore, and Mooney, Deputy Superintendents Luscavage and Miller, Chief Grievance Coordinator Varner, Grievance Coordinators Shawley, Alvord, and Kelley, and Major Caro were deliberately indifferent to his health and safety. We will allow these claims to proceed into discovery.

# V.

## We dismiss Mr. Snider's remaining section 1983 claims.

We dismiss Mr. Snider's remaining section 1983 claims against the remaining Defendants. Mr. Snider did not respond to the motions to dismiss of Snyder County, Snyder

County Prison Warden Cooper, Clinton County Defendants, and Torrance State Hospital and we may treat these arguments as uncontested.

A.   **We dismiss Mr. Snider's civil rights claims against the Commonwealth, Department of Corrections, Office of Attorney General, Torrance State Hospital, Unified Judicial System, and Clinton County Correctional Facility.**

The Commonwealth, Department of Corrections, state prisons SCI-Somerset and SCI-Waymart, Torrance State Hospital, Office of Attorney General, the Unified Judicial System, and Clinton County Correctional Facility are not "persons" who may be sued under section 1983. Neither the Commonwealth nor its agencies and employees acting in their official capacities, the Department of Corrections, state prisons, and Torrance State Hospital are "persons" subject to a section 1983 action.[342] The Office of Attorney General is not a "person" subject to section 1983.[343] The Unified Judicial System is  part of "Commonwealth government" and is not a "person" subject to section 1983.[344] The Clinton County Correctional Facility is a county jail and SCI-Somerset and SCI-Waymart are state prisons and are not "person[s]" under section 1983.[345]

We dismiss civil rights claims against the Commonwealth, the Department of Corrections, state prisons SCI-Somerset and SCI-Waymart, Torrance State Hospital, the Unified Judicial System, Clinton County Correctional Facility, and the Office of Attorney General, and prison officials acting in their official capacities.

B.   **We dismiss Mr. Snider's civil rights claims against individual Commonwealth officials in their official capacity.**

Mr. Snider sues the Commonwealth and Department of Corrections officials in their official and individual capacities. We dismiss the official capacity claims with prejudice. The Eleventh Amendment bars suits against a state and its agencies in federal court seeking money damages.[346] "Because the Commonwealth of Pennsylvania's Department of Corrections is a part of the executive department of the Commonwealth,  . . . it shares in the Commonwealth's

Eleventh Amendment immunity."[347] Suits against a state official in his or her official capacity are really suits against the state itself and barred by the Eleventh Amendment.[348]

### C.   We dismiss Mr. Snider's *Monell* claims against Union County, the Union County Prison Board, and Snyder County.

Union County and Snyder County are "persons" for purposes of a section 1983 claim where their policies or customs cause constitutional injury.[349] But a county cannot be liable for the unconstitutional acts of its employees or agents on a theory of *respondeat superior*.[350] Instead, Mr. Snider must identify a municipal policy or custom of Union County and Snyder County resulting in his alleged constitutional violations.[351] Mr. Snider fails to allege a policy or custom of either Union County or Snyder County causing alleged his constitutional violations. We dismiss *Monell* claims against Union County and Snyder County.

As for the Union County Prison Board, "[t]here is a split of authority within the district courts in this Circuit as to whether or not a prison board is a separate corporate entity from a county such that it does not have the capacity to be sued as a 'person' under Section 1983."[352] The Union County Prison Board does not argue it is not a "person" under section 1983. Instead, it argues it cannot be held liable under a theory of *respondeat superior*, and Mr. Snider failed to allege a custom or policy of the Union County Prison Board causing his alleged constitutional deprivations.  Even assuming the Union County Prison Board is an entity separate from Union County and a "person" under section 1983, Mr. Snider failed to allege a Prison Board custom or policy. We dismiss a *Monell* claim against the Union County Prison Board.

### D.   We dismiss Mr. Snider's request for injunctive relief as moot.

State officials in their official capacity, when sued for injunctive relief, are "persons" under section 1983 because "official-capacity actions for prospective relief are not treated as

actions against the State."[353] Mr. Snider seeks injunctive relief to "address the ongoing retaliation, obstruction, defamation, exclusion, and failure to accommodate."[354]

Injunctive relief is moot. Mr. Snider is currently housed at SCI-Houtzdale, a state prison not currently the subject of any lawsuits by Mr. Snider.

### E.    We dismiss access-to-court claims.

Mr. Snider alleges generally the Commonwealth, Department of Corrections, and its employees denied him court access. As analyzed above, the Commonwealth, Department of Corrections, state prisons, and the Office of Attorney General are not "persons" under section 1983. To the extent Mr. Snider claims certain individuals deprived him of court access, he must allege their personal involvement. Again, "[p]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence."[355] Allegations of personal involvement requires "particular 'allegations of personal direction or of actual knowledge and acquiescence.'"[356]

We identified the following allegations of personal involvement prison officials:

- At SCI-Coal Township: Deputy Superintendent Miller, Deputy Superintendent Luscavage, Superintendent Mooney, and "other staff" obstructed Mr. Snider's meaningful access to his attorneys in the state criminal action including denying his attorneys the ability to visit him[357] and Law Librarian Eric Stracco, Deputy Superintendent Miller, Deputy Superintendent Luscavage, and Superintendent Mooney refused to provide him "meaningful court access" and removed all civil litigation materials from the unit law library including the instructions for computer research and allowed only one, three hour visit to the law library per month.[358]

- At SCI-Camp Hill: Mr. Snider alleges he told Sergeant Cleaver, Lieutenant Kuzar, and non-parties he needed to speak with his attorney because the deadline for filing a direct appeal from his conviction ran on September 8, 2013 and asked to make a phone call to counsel. Mr. Snider alleges these state actors denied his requests and non-party Corrections Classification Programs Manager Scott Moore told him he could make a call when he moved from the solitary confinement unit.[359] He does not allege he tried to make a phone call after moving from solitary confinement.

- At SCI-Greene: Mr. Snider asked for legal assistance from Law Librarian Jay Gardener and Deb Rand, an attorney for the Department of Corrections and "other staff" but they denied assistance and threatened him. Mr. Snider asked for legal assistance from Secretary Wetzel and Dan Caro, formerly Secretary Wetzel's staff assistance until August 2015, but they denied him legal assistance.[360]

Two Supreme Court decisions inform our access-to-court analysis: *Bounds v. Smith*[361] and *Lewis v. Casey*.[362] In *Bounds*, the Supreme Court held "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law."[363]

The Court in *Lewis* made clear the right recognized in *Bounds* is the right of "*access to the courts*" and not "an abstract, freestanding right to a law library or legal assistance."[364] "[P]rison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'"[365] "[B]*ounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration."[366]

The Supreme Court identified two general categories of denial-of-access claims. The first is "forward-looking" alleging "systemic official action frustrates a plaintiff . . . in preparing and filing suits at the present time.[367] The second is "backward–looking" claims "not in aid of a class of suits yet to be litigated, but of specific cases that cannot now be tried (or tried with all material

evidence), no matter what official action may be in the future. . . . These cases do not look forward to a class of future litigation, but backward to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable. The ultimate object of these sorts of access claims, then, is not the judgment in a further lawsuit, but simply the judgment in the access claim itself, in providing relief obtainable in no other suit in the future."[368]

"Where prisoners assert that defendants' actions have inhibited their opportunity to present a past legal claim, they must show (1) that they suffered an 'actual injury'—that they lost a chance to pursue a 'nonfrivolous' or 'arguable' underlying claim; and (2) that they have no other 'remedy that may be awarded as recompense' for the lost claim other than in the present denial of access suit."[369] To state a claim for denial of access to the courts, a plaintiff "must allege his efforts to pursue a legal claim were hindered and he suffered an actual injury."[370]

Mr. Snider alleges various prison officials' conduct denied him access to his state criminal action and his federal litigation.  Mr. Snider does not plead actual injury. He does not plead a lost chance to pursue a nonfrivolous or arguable underlying claim and no other "remedy that may be awarded as recompense" for the lost claim other than in the present denial-of-access claim. Mr. Snider is represented by counsel in his post-conviction relief appeal now proceeding through the Pennsylvania appellate courts.[371] Mr. Snider currently maintains two cases pending before Pennsylvania's Commonwealth Court in *Snider v. Union County*, No. 717 CD 2020 and *Snider v. Pennsylvania Department of Corrections*, 470 MD 2020 and cases in the United States District Court for the Western District of Pennsylvania in *Snider v. Wittig*, No. 18-703 and *Snider v. Gilmore*, No. 18-735. Mr. Snider currently maintains seven appeals in our Court of

Appeals from various rulings in this case, *Snider I*, another matter *Snider v. Corbett*, No. 13-1226,[372] and his cases in the Western District of Pennsylvania.

Failing to plead actual injury, we dismiss Mr. Snider's First Amendment access-to-court claims. Mr. Snider does not and cannot plead actual injury caused by lost access to court. His post-conviction petition and his *Snider I* case are proceeding. We dismiss his access-to-court claims. He has access. He is a prolific litigant in several courts. He just wants a higher level of legal assistance while incarcerated. The Constitution does not require the state to provide Mr. Snider with the lawyer of his choice in a civil case. The state actors have afforded Mr. Snider ample access. We dismiss access-to-court claims against the individual Commonwealth Defendants including Law Librarians Stracco and Gardner, Department of Corrections Attorney Rand, and Corrections Classification Programs Manager Moore.

### F.    We dismiss Eighth Amendment claims against Medical Defendants.

Mr. Snider includes Medical Defendants Nurse Practitioners Kaskie and Herrold, Dr. Polmueller, Dr. Martinez, and Dr. Pillai as employees of the Commonwealth or Department of Corrections. He alleges the Medical Defendants created "an ongoing hostile environment of cruel and unusual conditions, deliberate indifference to serious medical need, retaliation and meaningful access to defense counsel" in violation of the First, Sixth, Eighth, and Fourteenth Amendments, the Disabilities Act's retaliation provision, and a state law claim for intention infliction of emotional distress. We analyze the claims as an Eighth Amendment deliberate indifference to serious medical need claim.

With regard to the Medical Defendants, Mr. Snider alleges:

- After his June 6, 2013 attempted suicide, Nurse Practitioner Kaskie, Dr. Polmueller, and Dr. Martinez "refused to view" Mr. Snider's pre-incarceration mental health record; ignored the records and diagnoses of non-party Dr. Calvert, psychiatrist from Clinton County Correction Facility; created "false

documentation" in Mr. Snider's mental health records by falsely documenting Mr. Snider "was faking mental illness and being manipulative" and is a malingerer; intentionally omitted actual mental illness symptoms in his mental health records; and, documented a false diagnosis of personality disorder.[373]

- While at SCI-Graterford's mental health unit for a two-week period in June 2013, Dr. Martinez "claimed" Mr. Snider was malingering and stopped one of his medications causing him painful headaches and hallucinations.[374]

- Sometime between August 8, 2014 and August 21, 2014, Nurse Practitioner Herrold at SCI-Coal Township refused to treat him, refused to increase his medication, and refused to provide "continuity of care" upon his transfer to SCI-Camp Hill.[375]

- After arrival at SCI-Greene in October 2014, Dr. Pillai harassed him and threatened him in "mental health sessions," including threatening retaliation for "writing the court and for helping others."[376]

Medical Defendants move to dismiss the claims against them arguing the second amended complaint (a) fails to comply with Rule 8; (b) fails to comply with Rule 20; (c) is barred by the statute of limitations as to Dr. Martinez, Dr. Pillai, and Nurse Practitioner Herrold; and (d) fails to state a claim under Rule 12(b)(6).

### We dismiss untimely claims against Dr. Martinez, Dr. Pillai, and Nurse Practitioner Herrold.

Pennsylvania's two-year statute of limitations applies to Mr. Snider's section 1983 action.[377] "The limitations period begins to run 'when the plaintiff knew or should have known of the injury upon which its action is based.'"[378] Mr. Snider filed his original complaint on May 7, 2015.[379] He named Dr. Polmueller and Nurse Practitioner Kaskie as defendants alleging they "made false documentation" about his mental health to make it appear as if he faked his mental illness and as if he assaulted other inmates;[380] because of noise in SCI-Coal Township, Dr. Polmueller could not hear Mr. Snider when visiting him in his cell, confusing Dr. Polmueller and causing him to raise the dosage of a medication which made Mr. Snider more depressed;[381] and Dr. Polmueller threatened Mr. Snider "if he kept faking mental illness that he would spend a

long time in a very uncomfortable situation."[382] Mr. Snider did not make any allegations regarding Dr. Martinez, Nurse Practitioner Herrold, or Dr. Pillai.

On December 18, 2015, the court entered an order allowing Mr. Snider to file an amended complaint if he chose to do so by January 30, 2016.[383] Mr. Snider failed to do so, but sought at least two extensions of time to amend his original complaint. The court granted his extensions, allowing him one, final opportunity to amend his complaint by July 1, 2016.[384] After objecting to the court's order, Mr. Snider filed an amended complaint dated July 1, 2016 but not filed on the court's docket until September 30, 2016.[385] Mr. Snider's amended complaint did not name the Medical Defendants.[386]

On December 21, 2018, Mr. Snider filed his second amended complaint naming the Medical Defendants.[387]  He realleged claims against Nurse Practitioner Kaskie and Dr. Polmueller, and raised, for the first time, claims against Dr. Pillai, Dr. Martinez, and Nurse Practitioner Herrold.

The alleged claims against Dr. Martinez arose in June 2013, the claims against Nurse Practitioner Herrold arose between August 8 and August 21, 2014, and the claims against Dr. Pillai arose in October 2014. Mr. Snider did not raise these claims until December 2018 making them barred by the statute of limitations.

Mr. Snider responds his claims are timely because he tried to allege claims against Dr. Martinez, Dr. Pillai, and Nurse Practitioner Herrold in his amended complaint, but he was too sick to organize his pleadings; he asserts any defendant named in *any* legal document filed in this court are on notice of claims against them; and his claims "relate back" to the original pleading. He alternatively argues equitable tolling.

As analyzed above, an amended complaint "relates back" to the date of the original pleading under Rule 15(c) when: "(A) the law that provides the applicable statute of limitations allows relation back; (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment: (i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity."[388]

Rule 15(c)(1)(A) does not apply, and Mr. Snider does not meet the standard of Rule 15(c)(1)(B). His claims against Dr. Martinez arose out of events in June 2013 at SCI-Graterford, claims against Nurse Practitioner Herrold arose in August 2014 at SCI-Coal Township, and claims against Dr. Pillai arose in 2014 at SCI-Greene. They do not arise out of the same "conduct, transaction, or occurrence" as the alleged conduct of Dr. Polmueller and Nurse Practitioner Kaskie in June 2013 at SCI-Coal Township.[389]

We deny Mr. Snider's request for equitable tolling. Mental illness is not a basis for equitable tolling under Pennsylvania law.[390] Under federal law, "mental incompetence is not per se a reason to toll the statute of limitations in federal actions."[391] However, our Court of Appeals permits equitable tolling for mental disability where "plaintiff's mental incompetence motivated, to some degree, the injury that he sought to remedy."[392] Given Mr. Snider's abilities to litigate through multiple cases in two federal district courts and no finding of his mental incompetence,

there is no basis to equitably toll the limitations period. We dismiss claims against Dr. Martinez, Dr. Pillai, and Nurse Practitioner Herrold.

### Mr. Snider fails to state a claim against Nurse Practitioner Kaskie and Dr. Polmueller.

"The Eighth Amendment, through its prohibition on cruel and unusual punishment, prohibits the imposition of 'unnecessary and wanton infliction of pain contrary to contemporary standards of decency.'"[393] Prison officials violate the Eighth Amendment "when they act deliberately indifferent to a prisoner's serious medical needs by 'intentionally denying or delaying access to medical care or interfering with the treatment once prescribed.'"[394] "A prison official is deliberately indifferent if he or she knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm."[395] "[P]rison authorities are 'accorded considerable latitude in the diagnosis and treatment of prisoners,' . . . and 'disagreement as to the proper medical treatment' does not give rise to a constitutional violation."[396]

To state an Eighth Amendment claim based on medical needs, "a plaintiff must make (1) a subjective showing that 'the defendants were deliberately indifferent to [his] medical needs' and (2) an objective showing that 'those needs were serious.'"[397] Mr. Snider alleges he has serious mental illnesses. Because mental illness "may constitute a serious medical need,"[398] Mr. Snider meets the objective standard.

Having met the objective prong of an Eighth Amendment claim, we examine whether Mr. Snider alleges deliberate indifference. This is a subjective inquiry. "Deliberate indifference" may be shown "where, for example, 'prison authorities deny reasonable requests for medical treatment . . . and such denial exposes the inmate to undue suffering.'"[399] "Alternatively, 'deliberate indifference' is shown 'where knowledge of the need for medical care [is

83

accompanied by the] . . . intentional refusal to provide that care' or where 'prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to [a] physician capable of evaluating the need for such treatment.'"[400]

Our Court of Appeals makes a distinction "between cases where the complaint alleges a complete denial of medical care and those alleging inadequate medical treatment."[401] "Because 'mere disagreement as to the proper medical treatment' does not 'support a claim of an eighth amendment violation,'. . . when medical care is provided, we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care."[402]

Mr. Snider alleges after his June 6, 2013 attempted suicide, Nurse Practitioner Kaskie and Dr. Polmueller "refused to view" his pre-incarceration mental health record; ignored the records and diagnoses of non-party Dr. Calvert, a psychiatrist from Clinton County Correction Facility; created "false documentation" in Mr. Snider's mental health records by falsely documenting Mr. Snider "was faking mental illness and being manipulative" and is a malingerer; intentionally omitted actual mental illness symptoms in his mental health records; and, documented a false diagnosis of a personality disorder.

Mr. Snider does not allege denied medical care. We generously infer his allegations of ignored medical records as possibly inadequate medical treatment.  But he does not allege inadequate medical treatment. He alleges "false documentation," including notations he is "faking mental illness and being manipulative" and is a malingerer, omissions from his medical record of what he believes are his "actual mental illness symptoms," and a "false" diagnosis of a personality disorder. He does not allege denial or delay of treatment or an otherwise deliberate indifference to his serious medical needs. We dismiss Eighth Amendment deliberate indifference claims against Nurse Practitioner Kaskie and Dr. Polmueller.

To the extent Mr. Snider alleges claims against the Medical Defendants for violations of his First, Sixth, and Fourteenth Amendment rights, they are dismissed. There are no allegations supporting such claims against the Medical Defendants.

**G.  We dismiss remaining section 1983 claims against individual defendants.**

Mr. Snider's second amended complaint makes numerous allegations against a variety of Department of Corrections' employees challenging their role in denying his civil rights while he was housed in various facilities.  He alleges:

- After his June 6, 2013 attempted suicide, Psychological Services Specialist Fallon and Jeremiah refused to view his mental health records from prior to incarceration, ignored other doctor's records from Clinton County Correctional Facility diagnosing Snider with depression, post-traumatic stress disorder, and schizophrenia, created false documentation, intentionally omitted actual mental illness symptoms they observed from his mental health records, and documented he faked mental illness and is manipulative.[403]

- On June 23, 2016, Corrections Officers Jones and Adamson denied him a shower due to his hearing impairment. Mr. Snider does not allege how his hearing impairment relates to the denial of a shower. Mr. Snider, overwhelmed and manic because of his mental health symptoms, requested from Corrections Officers Jones and Adamson to speak with Psychological Services Specialist Burt because of his (Mr. Snider's) history of self-harm. Corrections Officers Jones and Adamson refused to do so and Corrections Officer Jones laughed and yelled at him "in front of the entire block." Mr. Snider began banging his head on the wall until he began to bleed to which Corrections Officer Jones laughed and Corrections Officers Jones and Adamson and John Doe Three failed to notify medical staff or mental health staff.[404] Mr. Snider alleges this is a violation of his Eighth and Fourteenth Amendment rights.

- SCI-Greene "solitary staff" denial him meals, recreation, showers, and "group" because of his mental illness.[405]

- Unnamed mailroom staff at SCI-Waymart tore his incoming mail, obstructed incoming mail, and tore apart a Hindu prayer card.[406]

Claims against unpleaded and unidentified "staff" do not meet the required pleading of personal involvement. For individual liability, a prison official must have personal involvement in the alleged wrongs to be liable and cannot be held responsible for a constitutional violation

which he or she neither participated in nor approved.'"[407] "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence."[408] Allegations of personal involvement requires "particular 'allegations of personal direction or of actual knowledge and acquiescence.'"[409] Mr. Snider fails to meet this standard.

We dismiss all other claim against all Defendants not explicitly recognized in this memorandum. Rule 8 requires Mr. Snider's complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief" "in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."[410] We cannot guess at Mr. Snider's allegations.

### H.    We dismiss the Sixth Amendment claims.

Mr. Snider alleges prison officials and employees violated his Sixth Amendment rights.[411] The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense."[412]

Mr. Snider alleges the Commonwealth Defendants obstructed his access to counsel in his underlying criminal action. For example, he alleges housing in solitary confinement "obstructed his ability to work with defense counsel, engage in the plea negotiation process, and participate in" the Union County Court of Common Pleas' judicial process.[413] But Mr. Snider had counsel in his state criminal action and still does. We dismiss his Sixth Amendment claim.

### I.      We dismiss the civil rights claims against Warden Shaffer.

Union County Prison Warden Shaffer moves to dismiss the section 1983 claims against him because (1) he cannot be held liable on a theory of *respondeat superior*, and the second amended complaint fails to plead Warden Shaffer's personal involvement; (2) the claims are barred by *res judicata* or claim preclusion; and (3) the claims are barred by the statute of limitations.

As we discussed in our analysis of the Title II claims against Warden Shaffer and Union County, Mr. Snider brought the same claims against Warden Shaffer in *Snider v. Motter*, No. 13-1226.  In that action, Mr. Snider alleged Warden Shaffer approved transfers from the Union County Prison (where he spent only one month in 2010) to Snyder County Prison and the Clinton County Correctional Facility.[414] Mr. Snider challenged conditions of confinement at both the Snyder County Prison and Clinton County Correctional Facility in violation of his Fifth Amendment due process rights and sought to hold Warden Shaffer liable under section 1983. The court dismissed claims against Warden Shaffer for failure to allege facts from which Warden Shaffer's personal involvement in the transfers to Snyder County Prison and Clinton County Correctional Facility and the alleged harms experienced there can reasonably be inferred.[415]

Mr. Snider, with the benefit of counsel, filed a second amended complaint on December 19, 2015.[416] The second amended complaint brought section 1983 claims against correctional and medical staff at the Clinton County Correctional Facility for a deprivation of Mr. Snider's Eighth and Fourteenth Amendments and under Title II during pretrial detention. The second amended complaint does not name Warden Shaffer as a defendant. The parties ultimately stipulated to the dismissal of the *Motter* action upon the parties' settlement which the

court granted, dismissing the case. Mr. Snider later appealed the dismissal, arguing he did not consent to settlement. The appeal is still pending in our Court of Appeals.

Warden Shaffer argues *res judicata*, or claim preclusion, applies and we must dismiss the constitutional claims against him. *Res judicata* applies when "there has been (1) a final judgment on the merits in a prior suit involving (2) the same claim and (3) the same parties or their privies."[417] The "pendency of an appeal does not affect the potential for *res judicata* flowing from an otherwise-valid judgment."[418]

For the reasons applied in our analysis of the Title II claims against Union County, Mr. Snider's claims against Warden Shaffer are barred by *res judicata*. The first element is met because there is a final judgment on the merits in *Motter*.[419] The second and third elements are met because Mr. Snider asserts the same claim against Warden Shaffer he asserted in *Motter*. The court dismissed with prejudice claims against Warden Shaffer and later dismissed the entire action upon the parties' settlement. Mr. Snider disagrees with the court's decision dismissing Warden Shaffer, argues the dismissal is not on the merits, and challenges his counsel's actions in drafting the second amended complaint, asserting she amended his complaint without his consent and without discovery. Mr. Snider is now challenging the court's dismissal of Warden Shaffer in our Court of Appeals. But this does not mean Mr. Snider can reassert here his dismissed claims in *Motter* simply because he disagrees with the court's earlier decision and his attorney. "The purpose of res judicata is to 'relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication.'"[420]

Even if not barred by *res judicata*, the claims against Warden Shaffer are barred by the two-year statute of limitations. Mr. Snider left Union County Prison in 2010. He did not bring his

claims against Warden Shaffer until 2015. In opposition to Warden Shaffer's motion to dismiss, Mr. Snider argues the Snyder County Prison, Clinton County Correctional Facility, and Department of Corrections are the agent of Warden Shaffer and Union County. There are no facts to support such an allegation and it cannot be reasonably inferred two other county prisons and Pennsylvania's Department of Corrections are the agents of Warden Shaffer. We dismiss the claims against Warden Shaffer as time barred.

Even if claims against Warden Shaffer are not barred by *res judicata* and the statute of limitations, Mr. Snider fails to state a claim against Warden Shaffer. As analyzed above, Mr. Snider cannot hold Warden Shaffer liable on a theory of *respondeat superior* and must allege the Warden's personal involvement either through "particular allegations" of personal direction or of actual knowledge and acquiescence.[421] Mr. Snider fails to do so.

### J.    We dismiss the civil rights claims against Warden Cooper.

Snyder County Prison Warden Cooper moves to dismiss the claims against him arguing (a) the claims are barred by the statute of limitations; (b) there is no *respondeat superior* liability; (c) the claims are barred by *res judicata*; and (d) Mr. Snider fails to state a claim against him. Mr. Snider's claims against Warden Cooper are, on the face of his second amended complaint, barred by the statute of limitations. We dismiss claims against him and need not reach the remaining arguments.

By Mr. Snider's pleading, he remained incarcerated at Snyder County Prison from September 9, 2010 to December 6, 2012.[422] He alleges in early December 2012, Mr. Snider complained to Warden Cooper about abuses exacerbating his symptoms of mental health illness and requested psychiatric medications.[423] He does not allege Warden Cooper denied him medication. In response to his complaints, Warden Cooper allegedly threatened he would "make

the abuse worse"; "bring . . . a [State Trooper] to harass you"; and "will make your case more difficult" if Mr. Snider continued to complain and "ask for grievances."[424]

On December 6, 2012, Mr. Snider asked Warden Cooper for a grievance form and to speak with State Police about abuse in the prison affecting his mental health.[425] Mr. Snider alleges within hours of his December 6, 2012 request, Warden Cooper, among others, transferred Mr. Snider to the Clinton County Correctional Facility.[426] He alleged Warden Cooper falsely told Clinton County Correctional Facility staff Mr. Snider assaulted a female officer at the Snyder County Prison and this false information remains in his Department of Corrections' "file."[427]

We assume these allegations attempt to assert, as a pretrial detainee, a Fifth Amendment claim. As analyzed above, "In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicated only the protection against deprivation of liberty without due process of law, we think the proper inquiry is whether those conditions amount to punishment of the detainee."[428] There are no facts allowing us to reasonably infer a Fifth Amendment claim against Warden Cooper, but even if Mr. Snider stated a claim, it is barred by the two-year statute of limitations.  Whatever claims Mr. Snider had against Deputy Warden Shaffer, the statute of limitations ran in December 2014.  He did not bring his original complaint until May 7, 2015. The claims are time barred and we will dismiss them.

### K.     We dismiss Mr. Snider's civil rights claims against Clinton County Defendants Warden Motter, Deputy Warden Bechdel, and Corrections Officers Nolte, Shearer, Richard, Walker, and Hughes.

Clinton County Defendants Warden Motter, Deputy Warden Bechdel, and Corrections Officers Nolte, Shearer, Richard, Walker, and Hughes move to dismiss the section 1983 claims against them because (a) they are barred by the statute of limitations; (b) joinder of the Clinton

County Defendants fails to comply with Rule 20; (c) claims are barred by "claim splitting," a subset of *res judicata*; and (d) Mr. Snider fails to state a claim under Rule 12(b)(6). We already dismissed section 1983 claims against the Clinton County Correctional Facility because it is not a "person" under section 1983.

Mr. Snider alleges incarceration at the Clinton County Correctional Facility from December 6, 2012 to May 7, 2013. He alleges unpleaded "CCCF staff" harassed him with the intention of exacerbating the symptoms of his mental health, obstructed access to psychiatric treatment and medications, and Corrections Officers Nolte, Shearer, Hughes, Walker, and Richards "wrote false documentation and numerous disciplinary sanctions" based on Mr. Snider's resulting behavior.[429] He alleges these Corrections Officer stole his pens, obstructed his ability to purchase paper, pens, and envelopes from the commissary. He alleges Warden Motter and Deputy Warden Bechdel put the Corrections Officers' "false documentation" in a report to the Department of Corrections.[430] He disputes a report signed by Warden Motter.[431] He alleges Deputy Warden Bechdel gave him the wrong information on how to file a Disabilities Act claim.[432]

The alleged conduct purportedly giving rise to civil rights violations occurred between December 6, 2012 to May 7, 2013. The statute of limitations ran on these claims on May 7, 2015. Mr. Snider filed his original complaint on May 7, 2015, but he did not name Warden Motter, Deputy Warden Bechdel, and Corrections Officers Nolte, Shearer, Richard, Walker, and Hughes.[433] He did not name the individual Clinton County Defendants in his September 30, 2016 amended complaint.[434] He did not name the individual Clinton County Defendants until his second amended complaint filed on December 21, 2018. The claims asserted against the individual Clinton County Defendants do not arise out of the same conduct or occurrence as

alleged in the original pleading and do not "relate back" under Rule 15(c). The claims against the individual Clinton County Defendants are time barred.

We note Mr. Snider brought the same claims against Warden Motter, Deputy Warden Bechdel, and Corrections Officers Nolte, Shearer, Richard, Walker, and Hughes in *Motter*, No. 13-1226. As discussed, the parties settled the case, stipulated to the dismissal of all claims, and the court dismissed the action.  Indeed, Mr. Snider concedes in his pleading "[t]he content of this abuse [at Clinton County Correctional Facility] has been litigated in *Snider v. Motter*, No. 13-1226, resulting in settlement. However, the sequence of retaliatory transfer out of discrimination, from [Snyder County Prison] to [Clinton County Correctional Facility] and from [Clinton County Correctional Facility] to the [Pennsylvania Department of Corrections] has not been litigated."[435]

To the extent Mr. Snider attempts to relitigate claims against Warden Motter, Deputy Warden Bechdel, and Corrections Officers Nolte, Shearer, Richard, Walker, and Hughes, his claims are barred by *res judicata*.  As he concedes, those claims have already been litigated and dismissed.  To the extent he tries to avoid the dismissal of his claims in *Motter* by arguing he did not litigate the "sequence of retaliatory transfer" among prisons, it is also barred by *res judicata* which, as analyzed above, bars claims brought in a previous action, but also claims that could have been brought.

We dismiss Mr. Snider's claims against Warden Motter, Deputy Warden Bechdel, and Corrections Officers Nolte, Shearer, Richard, Walker, and Hughes as barred by the statute of limitations and *res judicata*. We need not reach Defendants' Rule 20 and Rule 12(b)(6) arguments.

# VI.

## We allow Mr. Snider's intentional infliction of emotional distress state law claim against Corrections Officers McKeehan and Nichtman only.

Mr. Snider purports to state a claim for intentional infliction of emotional distress against "employees" of the Commonwealth and Department of Corrections.[436] We allow his claim to go forward against Corrections Officers McKeehan and Nichtman only.

Mr. Snider must plead four elements to state a claim for intentional infliction of emotional distress under Pennsylvania law: "(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe."[437] "Outrageous or extreme conduct" is defined by Pennsylvania courts as conduct that is "so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society."[438]

The Commonwealth employee Defendants argue they are immune from Mr. Snider's tort claims, even intentional torts. Mr. Snider responds actions by Commonwealth Defendants "were not within the scope of their employment and . . . cannot be seen to be intended to benefit their employer."[439] He also argues he should be allowed to plead additional claims of negligent infliction of emotional distress or we should construe his claim for intentional infliction of emotional distress as one for negligent infliction of emotional distress.

Under the Pennsylvania Constitution,[440] the Commonwealth and its employees acting within the scope of their duties are immune from suit for money damages unless the cause of action falls within one of ten enumerated exceptions[441] not applicable here or the individual's conduct falls outside the scope of the employee's employment.[442] The Commonwealth has not waived this immunity for intentional torts.[443]

93

Mr. Snider's state law claim is barred by sovereign immunity unless Corrections Officers McKeehan and Nichtman acted outside the scope of their employment. Under Pennsylvania law, "an assault committed by an employee upon another for personal reasons or in an outrageous manner is not actuated by an intent to perform the business of the employer and, as such, is not within the scope of [his or her] employment."[444]

Mr. Snider argues sovereign immunity should not apply because the beatings by Corrections Officers McKeehan and Nichtman could not have been within the scope of their employment. Pennsylvania adopted Section 228 of the Restatement (Second) of Agency's definition of conduct "within the scope of employment."[445] "According to the Restatement, 'conduct is within the scope of employment if, but only if: (a) it is the kind [the employee] is employed to perform; (b) it occurs substantially within the authorized time and space limits [and] (c) it is actuated, at least in part, by a purpose to serve the master . . . '"[446] In the context of officers' use of force, "[t]he relevant question in determining whether an officer acted outside the scope of his employment is whether the force used by the officer was 'of the kind that may reasonably be expected of a police officer under similar circumstances.'"[447] "Since an employee is generally authorized to use only 'reasonable' measures to achieve a result desired by his or her employer, an 'outrageous' act may lie beyond the scope of his or her employment even where it constitutes 'a means of accomplishing an authorized result.'"[448]

Mr. Snider pleads Corrections Officers McKeehan and Nichtman attempted to strangle him and slammed his head and body against a concrete wall. At the motion to dismiss stage, this allegation is sufficient to bring the Officers' conduct outside the scope of their employment and we decline to dismiss the intentional infliction of emotional distress claim against the Corrections Officers on the basis of sovereign immunity at this juncture.

# VII.

## Conclusion.

Experienced medical and criminal justice thought leaders have been warning society for years of the criminal justice system's need to properly manage mentally ill incarcerated persons mindful of the effects of isolation and lack of treatment for the mentally ill. Society often puts the mental illness of its incarcerated persons to the side and avoids thoughtful analysis. But Joel Snider's case, like the claims of Messrs. Porter and Geness recently before our Court of Appeals and scheduled to be before juries in the first half of 2021, highlights these concerns. We are obligated by our oath to study his claims regardless of how much the challenged state actors would prefer a more organized presentation. Mr. Snider is unable to pay for an attorney and no judge has been recently able to persuade a lawyer to voluntarily represent Mr. Snider to date. Lacking or refusing to accept legal direction results in Mr. Snider repetitively filing lawsuits and asserting theories largely unmoored to the Law. The state actors then move to dismiss arguing they cannot or will not understand his allegations as either unwieldly or confusing. But when you study his plead facts, Mr. Snider states a claim against the Commonwealth, through its Department of Corrections, for discrimination under the Disabilities Act under our governing Circuit precedent. Among his hundreds of allegations, and assuming his allegations to be true at this stage, he also states claims against some but not all the named individual state actors for violating his civil rights knowing of his mental illness and for intentional infliction of emotional distress. We must  dismiss several claims as lacking a basis after three attempts at pleading. It is now time to move into discovery on these claims.

---

[1] The Court granted Mr. Snider leave to proceed without paying the filing fees. ECF Doc. No. 36. Congress, through 28 U.S.C. § 1915(e)(2)(B), requires we screen his allegations for merit before proceeding. Mr. Snider sues nine groups of alleged state actors: (1) Commonwealth Defendants, as defined below; (2) Unified Judicial System; (3) Torrance State Hospital; (4) Medical Defendants, as defined below; (5) Union County and Union County Prison Warden Shaffer; (6) Union County Prison Board; (7) Snyder County Prison Warden Cooper; (8) Snyder County; and (9) Clinton County Defendants, as defined below.

Commonwealth Defendants, defined as the Commonwealth, Department of Corrections, Office of Attorney General, SCI-Somerset, SCI-Waymart, Secretary of Corrections John Wetzel, and forty prison officials and employees of the Department of Corrections, filed a motion to dismiss (ECF Doc. Nos. 379, 380). The Unified Judicial System filed a separate motion to dismiss (ECF Doc. Nos. 316, 317). Mr. Snider responded to both motions in one combined response (ECF Doc. Nos. 468, 470, 472).

Union County and Warden Shaffer filed a motion to dismiss (ECF Doc. Nos. 382, 383) and Union County Prison Board filed its own motion to dismiss (ECF Doc. Nos. 375, 376) to which Mr. Snider filed a combined response (ECF Doc. No. 458).

Medical Defendants, defined as Nurse Practitioners Karen Kaskie and Jennifer Herrold, Dr. Polmueller, Dr. Martinez, and Dr. Pillai, filed a motion to dismiss (ECF Doc. Nos. 358, 359) to which Mr. Snider filed a response (ECF Doc. No. 487).

Torrance State Hospital (ECF Doc. Nos. 444, 445); Snyder County Prison Warden Cooper (ECF Doc. Nos. 370, 371); Snyder County (ECF Doc. Nos. 384, 385); and Clinton County Defendants, defined as Clinton County Correctional Facility, Warden Jacqueline Motter, Deputy Warden Wayne Bechdel, and Corrections Officers Ronald Nolte, Michael Shearer, Joshua Richard, Tyler Walker, and Darby Hughes, (ECF Doc. Nos. 329, 330) each filed motions to dismiss.  Mr. Snider did not respond to their motions.

[2] We may but do not rest on Local Rule 7.6 requiring parties opposing a motion "file a brief in opposition within fourteen (14) days after service of the movant's brief . . . . Any party who fails to comply with this rule shall be deemed not to oppose such motion." M.D. Pa. R. 7.6.

[3] Discovery may also allow Mr. Snider to identify and plead viable claims against John Does One through Four.

[4] *Commonwealth v. Snider*, CP-60-CR-340-2010 (Union Cty. Ct. C.P. Nov. 9, 2016).

[5] *Id.*

[6] ECF Doc. No. 237 ¶ 6.

[7] *Id.* ¶¶ 107, 169. Mr. Snider later challenged his competency to accept a plea of guilty but mentally ill and sought to pursue a mental health defense of not guilty by reason of insanity in his post-conviction filings. *Id.* ¶¶ 170, 271-273.

[8] *Commonwealth v. Snider*, CP-60-CR-340-2010 (Union Cty. Ct. C.P. Nov. 9, 2016).

[9] *Snider v. Motter*, No. 13-1226, 2016 WL 4154927, at *1 (M.D. Pa. June 2, 2016), *report and recommendation adopted*, No. 13-1226, WL 4140728 (M.D. Pa. Aug. 4, 2016). Mr. Snider initially sued former Governor Tom Corbett and other state actors, with the action captioned *Snider v. Corbett. Id.* After Mr. Snider dismissed Governor Corbett, the Clerk of Court recaptioned the matter as *Snider v. Motter. Id.*

[10] *Snider v. Motter*, No. 13-1226, (M.D. Pa. Aug. 4, 2016), ECF Doc. Nos. 211, 222.

[11] *Snider v. Motter*, No. 13-1226, (M.D. Pa. Aug. 4, 2016), ECF Doc. No. 222.

[12] *Snider v. Motter*, No. 13-1226, (M.D. Pa. Aug. 4, 2016), ECF Doc. No. 310.

[13] *Snider v. Motter*, No. 13-1226, (M.D. Pa. Aug. 4, 2016), ECF Doc. No. 314.

[14] Mr. Snider gave his complaint to prison officials for mailing on May 7, 2015. The Clerk's Office filed the complaint on May 15, 2015. Under "the federal "'prisoner mailbox rule,'" a document is deemed filed on the date it is given to prison officials for mailing." *Pabon v. Mahanoy*, 654 F.3d 385, 391, n. 8 (3d Cir. 2011) (citing *Burns v. Morton*, 134 F.3d 109, 113 (3d Cir. 1998)).

[15] ECF Doc. No. 432. We granted Mr. Snider's motion to withdraw his class claims and dismissed all class claims on June 18, 2020. *Id.*

[16] *Id.* at 2.

[17] 42 Pa. Stat. And Cons. Stat. Ann. § 9541, *et seq*. (West amended 1988); *Commonwealth v. Snider*, CP-60-CR-340-2010 (Union Cty. Ct. C.P. Nov. 9, 2016).

[18] *Commonwealth v. Snider*, CP-60-CR-340-2010 (Union Cty. Ct. C.P. Nov. 9, 2016).

[19] *Commonwealth v. Snider*, No. 2013 MDA 2016, 2017 WL 5938815, at *1 (Pa. Super. Ct. Nov. 21, 2017).

[20] *Id.* at *2.

[21] *Commonwealth v. Snider*, CP-60-CR-340-2010 (Union Cty. Ct. C.P. Nov. 9, 2016).

[22] *Id.*

[23] *Commonwealth v. Snider*, No. 1161 MDA 2019, 2020 WL 6375386 (Pa. Super. Ct. Oct. 30, 2020).

[24] Mr. Snider initially sued Officer McKeehan and other individuals as well as SCI-Coal, SCI-Camp Hill, and the United States District Court for the Middle District of Pennsylvania. *Snider v. McKeehan*, No. 18-801 (M.D. Pa. Dec. 2, 2020), ECF Doc. No. 1. In our October 22, 2018 Order granting Mr. Snider's motion for leave to proceed *in forma pauperis*, denying his motion to appoint counsel, and granting his motion for leave to file a supplemental complaint, we dismissed with prejudice his claims against SCI-Coal, SCI-Camp Hill, and the United States District Court for the Middle District of Pennsylvania. *Id.* ECF Doc. No. 15. Mr. Snider admitted he initially raised claims against Defendant Officer McKeehan and others in another action pending before Judge Brann at No. 13-1226 and in this action. *Id.* We found his complaint malicious to the extent Mr. Snider raised claims he raised in earlier lawsuits. *Id.*, ECF Doc. No. 15 ¶ 4, n. 2. We dismissed Mr. Snider's complaint and "supplemental complaint" (*Id.*, ECF Doc. Nos. 1, 16) but allowed him to file an amended complaint. *Id.* Mr. Snider filed his amended complaint and did not name Officer McKeehan, other prison staff, SCI-Coal, and SCI-Camp Hill. The caption of the case, however, remained *Snider v. McKeehan, et al.* until we dismissed all but a few claims against two psychological services staff Alvarez and Stevens on November 2, 2020. *Snider v. Alvarez*, No. 18-801, 2020 WL 6395499, at *1 (M.D. Pa. Nov. 2, 2020). We transferred this case to the Western District of Pennsylvania as all parties and the alleged conduct are situated in the Western District. *Snider v. Alvarez*, No. 18-801, ECF Doc. No. 144.

[25] *Id.* (citing ECF Doc. No. 28 at 1).

[26] *Id.* (citing ECF Doc. No. 28 ¶ 318).

[27] *Id.* (citing ECF Doc. No. 28 ¶ 319.

[28] *Id.* (citing ECF Doc. No. 28 ¶¶ 320–321).

[29] *Id.* (citing ECF Doc. Nos. 134, 135).

[30] *Snider v. United States*, No. 18-1789, 2018 WL 4760840, at *4 (M.D. Pa. Oct. 2, 2018).

[31] *Id.* at *6.

[32] *Id., app. denied*, *Snider v. United States*, No. 19-1079 (3d Cir. Jan. 10, 2019).

[33] In his opposition to the Commonwealth's and Unified Judicial System's motions to dismiss, Mr. Snider refers to assertions made in his "Brief in Support of Holding a Mental Health Evaluation and Hearing Regarding Appointment of Guardian *Ad Litem*." ECF Doc. No. 277. This is not the operative pleading. We do not consider Mr. Snider's assertions in ECF Doc. No. 277. A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint under Rule 8(a). *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007).

[34] ECF Doc. No. 237 ¶¶ 81, 96.

[35] *Id.* ¶¶ 82, 83, 92.

[36] *Id.* ¶ 85.

[37] *Id.* ¶ 91.

[38] *Id.* ¶¶ 93-95.

[39] *Id.* ¶¶ 6, 7.

[40] *Id.* ¶ 6.

[41] *Id.* ¶ 7.

[42] *Id.* ¶ 8.

[43] *Id.* ¶¶ 6, 105.

[44] *Id.*

[45] *Id.*

[46] *Id.* ¶ 106.

[47] *Id.* ¶ 107.

[48] *Id.* ¶ 108.

[49] *Id.* ¶¶ 109, 113.

[50] *Id.* ¶ 110.

[51] *Id.* ¶ 111.

[52] *Id.* ¶ 112.

[53] *Id.* ¶ 114.

[54] *Id.* ¶¶ 116, 117, 121.

[55] *Id.* ¶¶ 123, 124, 129.

[56] *Id.* ¶¶ 281–283.

[57] *Id.* ¶ 126.

[58] *Id.* ¶ 127.

[59] *Id.* ¶ 129.

[60] *Id.* ¶ 130.

[61] *Id.* ¶¶ 120, 122.

[62] *Id.* ¶ 114 n. 14.

[63] *Id.* ¶¶ 131, 137, 145.

[64] *Id.* ¶¶ 6 n .3, 137 n. 19.

[65] *Id.* ¶¶ 132–134, 226.

[66] *Id.* ¶ 138.

[67] *Id.* ¶¶ 135, 136, 225.

[68] *Id.* ¶¶ 139–142, 231.

[69] *Id.* ¶ 143.

[70] *Id.* ¶ 227.

[71] *Id.* ¶ 146.

[72] *Id.* ¶ 284.

[73] *Id.* ¶ 150.

[74] *Id.* ¶¶ 151, 228.

[75] *Id.* ¶ 153. Mr. Snider clarifies the Sergeant Rivera who befriended him at SCI-Graterford is not the same person as Defendant Sergeant Rivera at SCI-Camp Hill. *Id.* at n. 24.

[76] *Id.* ¶ 154.

[77] *Id.* ¶ 155.

[78] *Id.* ¶¶ 6 n. 4, 156.

[79] *Id.* ¶ 156.

[80] *Id.* ¶¶ 157–158.

[81] *Id.* ¶ 159.

[82] *Id.* at n. 26.

[83] *Id.* ¶ 160.

[84] *Id.* ¶¶ 161–162.

[85] *Id.* ¶ 163.

[86] *Id.* ¶ 164.

[87] *Id.* ¶ 166 n. 24. There are two paragraphs numbered 166. This footnote references the first of the two.

[88] *Commonwealth v. Snider*, CP-60-CR-340-2010 (Union Cty. Ct. C.P. Nov. 9, 2016).

[89] *Id.*

[90] ECF Doc. No. 237 ¶ 166. There are two paragraphs numbered 166. This footnote references the first of the two.

[91] *Id.* ¶ 168.

[92] *Id.* ¶¶ 169–170.

[93] *Commonwealth v. Snider*, CP-60-CR-340-2010 (Union Cty. Ct. C.P. Nov. 9, 2016).

[94] ECF Doc. No. 237 ¶ 171.

[95] *Id.* ¶¶ 172–173.

[96] *Id.* ¶ 179.

[97] *Id.* ¶¶ 174–177.

[98] *Id.* ¶ 180.

[99] *Id.* ¶ 181.

[100] *Id.* ¶ 232.

[101] *Id.* ¶¶ 182–183.

[102] *Id.* ¶¶ 184–185.

[103] *Id.* ¶ 186.

[104] *Id.* ¶¶ 188–189.

[105] *Id.* ¶¶ 191–199.

[106] *Id.* ¶¶ 201–203.

[107] *Id.* ¶ 204.

[108] *Id.* ¶ 205.

[109] *Id.* ¶ 206.

[110] *Id.* ¶¶ 207–208.

[111] *Id.* ¶ 209.

[112] *Id.* ¶ 211.

[113] *Id.* ¶¶ 211–212.

[114] *Id.* ¶¶ 213–215.

[115] *Id.* ¶¶ 217–219.

[116] *Id.* ¶ 223.

[117] *Id.* ¶ 233.

[118] *Id.* ¶ 223. There are two paragraphs numbered 223. This footnote refers to the second of the two footnotes.

[119] It appears Mr. Snider is suing Dr. Wittig in *Snider v. Wittig* now pending before Judge Bissoon and Magistrate Judge Lenihan in the Western District of Pennsylvania. *Snider v. Wittig, et al.*, No. 18-703 (W.D. Pa.).

[120] ECF Doc. No. 237 ¶ 234.

[121] *Id.* ¶ 235.

[122] *Id.* ¶ 236.

[123] *Id.* ¶ 285.

---

[124] *Id.* ¶ 237.

[125] *Id.* ¶ 239.

[126] *Id.* ¶ 240.

[127] *Id.* ¶ 241.

[128] *Id.* ¶ 243.

[129] *Id.* ¶¶ 244–245.

[130] *Id.* ¶ 246. It appears Mr. Snider is suing Superintendent Gilmore and others in *Snider v. Gilmore* now pending before Judge Bissoon and Magistrate Judge Lenihan in the Western District of Pennsylvania. *Snider v. Gilmore, et al.*, No. 18-735 (W.D. Pa.).

[131] ECF Doc. No. 237 ¶¶ 247–248.

[132] *Id.* ¶¶ 250–256.

[133] *Id.* ¶¶ 257–258.

[134] *Id.* ¶ 259.

[135] *Id.* ¶¶ 260–261.

[136] *Id.* ¶ 262.

[137] ECF Doc. No. 468 at 1.

[138] 29 U.S.C. § 794 (Oct. 1, 2016).

[139] ECF Doc. No. 237 ¶¶ 289–300. There are two claims numbered ten. We identify them here as ten and eleven. The claim numbered "eleven" in the second amended complaint is against the Federal Defendants which, as we earlier noted, are dismissed from the case.

[140] A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint against the pleading requirements of Rule 8(a). Rule 8(a)(2) requires a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" "in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (quoting *Twombly*, 550 U.S. at 570). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege facts "rais[ing] a right to relief above the speculative level . . ." and the complaint "must indicate that a defendant's liability is more than a 'sheer possibility.'" *Siwulec v. J.M. Adjustment*

*Servs., LLC*, 465 F. App'x 200, 202 (3d Cir. 2012) (quoting *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007); *Iqbal*, 556 U.S. at 678) (internal citations omitted). Our Court of Appeals requires us to apply a three-step analysis under a 12(b)(6) motion: we (1) "must 'tak[e] note of the elements [the] plaintiff must plead to state a claim;'" (2) "should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth;'" and, (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679). "Despite Iqbal's heightened pleading requirements, the district court must be more flexible in its interpretation of pro se pleadings." *Boyer v. Mohring*, 994 F. Supp. 2d 649, 654 (E.D. Pa. 2014). ("[W]hen presented with a *pro se* litigant, we 'have a special obligation to construe his complaint liberally.'" *Higgs v. Attorney Gen. of the United States*, 655 F.3d 333, 339 (3d Cir. 2011), *as amended* (September 19, 2011) (quoting *United States v. Miller*, 197 F.3d 644, 648 (3d Cir. 1999))).

Commonwealth Defendants, Medical Defendants, and Torrance State Hospital move to dismiss the second amended complaint under Federal Rule of Civil Procedure 20. ECF Doc. Nos. 359, 379, 444. Under Rule 20, defendants may be joined in one action if "(A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2). Defendants argue Mr. Snider's claims arise out of different transactions or occurrences. Mr. Snider alleges abuses from 2012 through 2016 as both a pretrial detainee and post-conviction at multiple facilities. We have "broad discretion in applying Rule 20 to reduce inconvenience, delay, and added expense to the parties and to the court, and to promote judicial economy." *Lester v. Rosato*, No. 14–1046, 2014 WL 3421072, at *2 (M.D. Pa. July 11, 2014). We recognize our broad discretion "is not a license to join unrelated claims and defendants in one lawsuit." *Id.* (citing *Pruden v. SCI Camp Hill*, 252 F. App'x 436 (3d Cir. 2007); *George v. Smith*, 507 F.3d 605 (7th Cir. 2007)). But our findings today address issues arising out of Mr. Snider's mental illness disability and placement in solitary confinement by the Commonwealth. While we may sever claims at a later time, Mr. Snider is the master of his pleading. We will address these claims as there may be a related series of occurrences and discovery will afford a clearer picture of whether triable claims should be severed.

[141] 28 U.S.C. § 1915(e)(2)(B)(i)–(iii). (Apr. 26, 1996). Judge Schwab granted Mr. Snider's Motion to proceed *in forma pauperis* on September 18, 2015. ECF Doc. No. 36.

[142] *Elansari v. Univ. of Pennsylvania*, 779 F. App'x 1006, 1008 (3d Cir. 2019) (citing *Allah v. Seiverling*, 229 F.3d 220, 223 (3d Cir. 2000)).

[143] *Disability Rights New Jersey, Inc. v. Comm', N.J. Dep't of Hum. Servs.*, 796 F.3d 293, 301 (3d Cir. 2015) (citing *Tennessee v. Lane*, 541 U.S. 509, 517 (2004)).

[144] 42 U.S.C. § 12132.

[145] *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998). Similarly, the Rehabilitation Act provides, inter alia, "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. . . .." 29 U.S.C. § 794(a). Mr. Snider alleges the Department of Corrections, Torrance State Hospital, and the Pennsylvania Attorney General's Office receive federal funding. ECF Doc. No. 237 ¶¶ 11–13.

[146] "The term 'qualified individual with a disability' means an individual with a disability who, ***with or without reasonable modifications to rules, policies, or practices,*** the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2) (emphasis added).

[147] *Furgess v. Pa. Dep't of Corr.,* 933 F.3d at 285, 289 (3d Cir. 2019) (citing *Chambers ex rel. Chambers v. Sch. Dist. of Phila.*, 587 F.3d 176, 189 n.19 (3d Cir. 2009)).

[148] *Waters v. Amtrak*, 456 F.Supp.3d 666, 671 n. 43 (E.D. Pa. 2020).

[149] *Harris v. Mills*, 572 F.3d 66, 73 (2d Cir. 2009).

[150] *Muhammad v. Ct. Comm. Pl. of Allegheny Cty., Pa*. 483 F. App'x. 759, 763 (3d Cir. 2012) (quoting 28 C.F.R. § 35.130(b)(7) (Oct. 11, 2016)) (citations omitted).

[151] *Furgess,* 933 F.3d at 289 (citing *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013)); *Geness v. Administrative Office of Pennsylvania Courts*, 974 F.3d at 263, 274, n.11 (3d Cir. 2020) ("*Geness II*").

[152] *Geness II*, 974 F.3d at 292 (citing *S.H. ex rel. Durrell*, 729 F.3d at 265).

[153] *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 128 (2005).

[154] 42 U.S.C. § 12182(a).

[155] Certain "private entities," defined as "any entity ***other than*** a public entity . . ." are considered "public accommodations . . . if the operations of such entities affect commerce": "(A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor; (B) a restaurant, bar, or other establishment serving food or drink; (C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment; (D) an auditorium, convention center, lecture hall, or other place of public gathering; (E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment; (F) a laundromat, dry-

cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment; (G) a terminal, depot, or other station used for specified public transportation; (H) a museum, library, gallery, or other place of public display or collection; (I) a park, zoo, amusement park, or other place of recreation; (J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education; (K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and (L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation." 42 U.S.C. §§ 12181(6), (7) (emphasis added).

[156] *See e.g. Johnson v. Tritt*, No. 18-203, 2020 WL 1911538, at *11, n. 9 (M.D. Pa. Apr. 20, 2020) (on summary judgment, considering plaintiff's claims against prison officials, Secretary Wetzel, and the Department of Corrections as arising under Title II only because nothing in the record suggested two state correctional facilities and the Department of Corrections can be considered service establishments); *Harris v. Lanigan*, No. 11-1321, 2012 WL 983749, * 4 (D.N.J. Mar. 22, 2012) (dismissing under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A plaintiff's Title III Disabilities Act claim against New Jersey correctional facility, finding the Disabilities Act claim fell under Title II only).

[157] In response to the Commonwealth Defendants' and Unified Judicial Systems' motions to dismiss, Mr. Snider argued his Disabilities Act claims under Title II only (with no mention of Title III), meets the standard of Rule 12(b)(6). *See* ECF Doc. No. 468 at 24.

[158] Section 12203 prohibits:

> (a) Retaliation
>
> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.
>
> (b) Interference, coercion, or intimidation
>
> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

42 U.S.C. § 12203 (1990).

[159] *Talley v. Clark*, No. 18-5315, 2019 WL 3573524, at *3 (E.D. Pa., Aug. 5, 2019) (citing *Fogleman v. Mercy Hosp. Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002)). The elements of an Disabilities Act retaliation claim are developed in the context of employment discrimination

under Title I. Mr. Snider's claims arise under Title II, the state and local government services provision of the Disabilities Act.  Neither party argues a different set of elements apply.

[160] *Fogleman*, 283 F.3d at 570 (quoting *Mondzelewski v. Pathmark Stores, Inc.* 162 F.3d 778, 789 (3d Cir.1998)).

[161] *Wishnefsky v. Salameh*, No. 15-148, 2016 WL 11480717, at *6 (W.D. Pa., Nov. 18, 2016), *report and recommendation adopted by*, No. 15-148J, 2016 WL 7324080 (W.D. Pa. Dec. 16, 2016) (citing *Romero v. Allstate Ins. Co.*, 3 F. Supp. 3d 313, 335 (E.D. Pa. 2014)).

[162] *Romero*, 3 F. Supp. 3d at 335 (quoting *Wray v. Nat'l R.R. Passenger Corp.*, 10 F.Supp.2d 1036, 1040 (E.D. Wis. 1998)).

[163] *Id.*, (quoting *Breimhorst v. Educ. Testing Serv.*, No. 99–3387, 2000 WL 34510621, at *7 (N.D. Cal. Mar. 27, 2000)).

[164] 974 F.3d 431 (3d Cir. 2020).

[165] 902 F.3d 344 (3d Cir. 2018) ("*Geness*").

[166] 974 F.3d 263 (3d Cir. 2020) ("*Geness II*").

[167] *Porter*, 974 F.3d at 437.

[168] *Id.* at 442–43 (collecting cases).

[169] *Id.* at 441.

[170] *Id.* at 442 (quoting *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549 (3d Cir. 2017)).

[171] *Id.* (emphasis in original). While not yet addressed by our Court of Appeals, we are also aware of commentary in Georgetown's Journal on Poverty Law and Policy last Winter addressing whether, and to what extent, we could apply the Supreme Court's 1999 decision in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), to challenges by mentally ill prisoners to solitary confinement. Sarah Takshi, Note, *Behind Bars and in the Hole: Applying Olmstead to Incarcerated Individuals with Mental Illness*, 27 Geo. J. on Poverty L. & Pol'y 319 (Winter 2020). The Note highlights prisons as "*de facto* mental health providers" and the frequent segregation of inmates with mental health issues. *Id.* at 323–27. "[S]olitary confinement is frequently used to isolate inmates with mental illness who prison officials are not equipped to handle," citing, as an example, "a 2013 investigation of the Pennsylvania Department of Corrections concluded unequivocally that the state 'unnecessarily and inappropriately places prisoners in solitary confinement *because* they have [serious mental illness/intellectual disabilities]' and that the state 'uses isolation to control prisoners with mental illness.'" *Id.* at 326 (emphasis in original). The Note posits "[i]ndividuals with mental health needs are disproportionately confined to restricted housing compared to their non-mentally ill

counterparts," citing a 2017 Department of Justice investigation "reveal[ing] the extent of the disparate treatment" between inmates with mental health needs and non-mentally ill inmates. *Id.* at 326–27. The investigation found: "inmates with mental disorders were confined to solitary confinement for longer periods of time--an average of 896 consecutive days--than their non mentally-ill counterparts" and "in some states as many as a third or even half of the people in solitary confinement are severely mentally ill or cognitively disabled." *Id.*

The Note attributes problems may arise because "inmates with mental illness have difficulty conforming to prison rules and are sent to solitary confinement for disciplinary or administrative reasons" and "some inmates may develop mental illness as a result of frequent or prolonged isolation in solitary confinement" but "[i]n either case, the fact remains that inmates with serious mental illness do not receive the treatment they require, instead they are segregated to solitary confinement because of their mental illness." *Id.* at 327. Prolonged periods of isolation "have the effect of deteriorating inmates' psychological conditions" including exposure to "mechanized cameras and doors instead of in person contact, 24/7 fluorescent lights instead of natural sun, and caged recreational areas instead of time outdoors" leading to "inability to socialize or participate in prison programming, such as educational and job training opportunities." *Id.* at 327–28. "For inmates with existing mental illness, solitary confinement exacerbates symptoms; for inmates without existing mental illness, solitary confinement could trigger psychological conditions." *Id.* Citing a 2014 American Journal of Public Health article, "solitary confinement may as well be a death sentence due to the high rates of suicide." *Id.* at 328.

[172] *Porter*, 974 F.3d at 442.

[173] *Id.*

[174] *Id.* at 445.

[175] *Id.* at 446.

[176] *Geness*, 902 F.3d at 362.

[177] *Id.* (quoting *Olmstead*, 527 U.S. at 600).

[178] *Id.* at 362.

[179] *Id.*

[180] *Id.* at 363.

[181] 546 U.S. 151 (2006).

[182] *Geness II*, 974 F.3d at 270.

[183] *Id.* (citing *Georgia*, 546 U.S. 151, 154). In *Georgia*, a paraplegic inmate in the state prison system filed a complaint in federal court challenging the conditions of his confinement under Title II. *Georgia*, 546 U.S. at 151.

[184] *Id.* at 159.

[185] *Id.*; *Geness II*, 974 F.3d at 274.

[186] *Id.* at 274–75.

[187] *Id.* at 275.

[188] *Id.* at 276.

[189] *Id.* at 278.

[190] *Id.* at 277 (citing *Furgess*, 933 F.3d at 289) (emphasis added).

[191]  *Geness v. Commw. of Pa.*, No. 16-876, 2020 WL 4350239 (W.D.Pa. July 29, 2020).

[192]  *Geness*, No. 16-876, 2020 WL 7027495 (W.D. Pa. Nov. 30, 2020).

[193] Mr. Snider alleges in March 2013 the Disability Rights Network filed an action against Secretary Wetzel challenging the Department of Corrections' abuse of mentally ill inmates by housing them in solitary confinement because of their disability. He alleges the Department of Justice investigated the Department of Corrections' use of solitary confinement. ECF Doc. No. 237 ¶¶ 97–104.

[194] U.S. Dep't of Justice, *Investigation of the Pennsylvania Department of Corrections' Use of Solitary Confinement on Prisoners with Serious Mental Illness and/or Intellectual Disabilities* (Feb.24,2014), https://www.justice.gov/sites/default/files/crt/legacy/2014/02/25/pdoc _finding_2-24-14.pdf.

The Department of Justice's findings are consistent with medical and sociological analysis for the last ten years. For example:

*American Public Health Association: November 5, 2013. Solitary Confinement as a Public Health Issue*:
- "Patients whose medical or mental health conditions contraindicate placement in segregation should be categorically excluded from solitary confinement, as should juveniles. Correctional authorities should implement policies that eliminate solitary confinement for security purposes unless no other less restrictive option is available to manage a current, serious, and ongoing threat to the safety of others. Punitive segregation should be eliminated. Isolation for clinical or therapeutic purposes should be allowed only upon the order of a health care professional and for the shortest duration and under the least restrictive conditions possible." Am. Pub. Health Ass'n, *Solitary Confinement as*

*a Public Health Issue* (Nov. 5, 2013), https://apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2014/07/14/13/30/solitary-confinement-as-a-public-health-issue

*American Psychiatric Association, December 2012. Position Statement on Segregation of Prisoners with Mental Illness*:

- "Prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates. If an inmate with serious mental illness is placed in segregation, out-of-cell structured therapeutic activities (i.e., mental health/psychiatric treatment) in appropriate programming space and adequate unstructured out-of-cell time should be permitted. Correctional mental health authorities should work closely with administrative custody staff to maximize access to clinically indicated programming and recreation for these individuals." Am. Psychiatry Ass'n, *Position Statement on Segregation of Prisoners with Mental Illness* (2012), https://www.psychiatry.org/file%20library/about-apa/organization-documents-policies/policies/position-2012-prisoners-segregation.pdf

*American College of Correctional Physicians, 2013. Restricted Housing of Mentally Ill Inmates Position Statement*:

- "Prolonged segregation of inmates with serious mental illness, with rare exceptions, violates basic tenets of mental health treatment'
- Serious mental illness includes "incarcerated persons with one of the conditions listed below shall not be admitted to the to a segregation unit for a prolonged period of time (i.e. for more than 4 weeks)."
- "Documented diagnosis or evidence of any of the following Diagnostic and Statistical Manual IV Axis 1 conditions in existence currently or within the preceding three months: Schizophrenia (all sub-types); Delusional Disorder; Schizophreniform Disorder; schizoaffective Disorder; Brief Psychotic Disorder Substance-Induced Psychotic Disorder (excluding intoxication and withdrawal); Psychotic Disorder Not Otherwise Specified; Major Depressive Disorders; Bipolar Disorder I and II." Am Coll. of Corr. Physicians, *Restricted Housing of Mentally Ill Inmates*, (last visited on Dec. 7, 2020) http://accpmed.org/restricted_housing_of_mentally.php

*The Journal of the American Academy of Psychiatry and the Law*:

- "The adverse effects of solitary confinement are especially significant for persons with serious mental illness, commonly defined as a major mental disorder (e.g., schizophrenia, bipolar disorder, major depressive disorder) that is usually characterized by psychotic symptoms and/or significant functional impairments. The stress, lack of meaningful social contact, and unstructured days can exacerbate symptoms of illness or provoke recurrence."
- "Persons with mental illness are often impaired in their ability to handle the stresses of incarceration and to conform to a highly regimented routine. They may exhibit bizarre, annoying, or dangerous behavior and have higher rates of disciplinary infractions than other prisoners. Prison officials generally respond to them as they do to other prisoners who break the rules. When lesser sanctions do not curb the behavior, they isolate the

prisoners in the segregation units, despite the likely negative mental health impact. Once in segregation, continued misconduct, often connected to mental illness, can keep the inmates there indefinitely." Jeffrey L. Metzner, *et al.*, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. Am. Acad. of Psychiatry and the L. 104, 108 (Mar. 2010).

[195] ECF Doc. No. 237 ¶ 274. Mr. Snider claims Law Librarian Stracco, Deputy Superintendent of Facilities Miller, Deputy Superintendent of Centralized Services Luscavage, and Superintendent Mooney at SCI-Coal Township "refused" to provide him with meaningful court access and removed all civil litigation materials from the "RHU law library" including research instructions and limited his time in the law library. *Id.* ¶ 284.

Mr. Snider alleges his mental health disability limits his ability to learn how to perform legal research and produce legal documents and to use Westlaw legal research. He alleges because of his disability, he "could not find information on how to plead an ADA claim" and, when he asked Clinton County Correctional Facility Deputy Superintendent Bechdel for information on how the Disabilities Act applied to prisoners and prisons, Deputy Superintendent Bechdel only provided him with architectural requirements. This claimed deprivation allegedly denied Mr. Snider "meaningful court access" because he could not "properly plead" his Disabilities Act claim against the Clinton County Correctional Facility. *Id.* ¶¶ 278–283.

He alleges SCI–Greene Law Librarian Gardner, Department of Corrections Attorney Rand, "other staff," Secretary Wetzel, and Major Caro denied him legal assistance causing the dismissal of his legal filings as "being incorrectly written or as not following federal or court rules." *Id.* ¶¶ 285–287.

[196] *Emerson v. Thiel Coll.*, 296 F.3d 184, 189–190 (3d Cir. 2002).

[197] ECF Doc. No. 237 ¶ 1.

[198] *Furgess*, 933 F.3d at 288 (citing *McDonald v. Com. of Pa., Dep't of Pub. Welfare Polk Ctr.*, 62 F.3d 92, 95 (3d Cir. 1995)).

The Rehabilitation Act prohibits qualified individuals with a disability being "excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." "solely by reason of his or her disability." 29 U.S.C. § 794. Mr. Snider alleges the Department of Corrections, Torrance State Hospital, and the Pennsylvania Attorney General's Office receive federal funding. ECF Doc. No. 237 ¶¶ 11–13.

[199] ECF Doc. No. 380.

[200] ECF Doc. No. 237 ¶ 274 (emphasis added).

[201] ECF Doc. No. 468 at 11.

---

[202] *Id.* at 11–12.

[203] *Id.* at 24–25.

[204] ECF Doc. No. 237 ¶ 183.

[205] *Id.* (citing Department of Correction Policy No. 13.8.1).

[206] ECF Doc. No. 468 at 24–25; *Geness II*, 974 F.3d at 274.

[207] Mr. Snider alleges disability from mental health illnesses including schizophrenia, bipolar disorder, and post-traumatic stress disorder. Schizophrenia, bipolar disorder, and post-traumatic stress disorder "substantially limit brain function" for purpose of the definition of disability under the Disabilities Act. 29 C.F.R. § 1630.2(j)(3)(iii).

[208] 42 Pa. Cons. Stat. Ann. § 9727(b)(1).

[209] Department of Corrections Policy No. 13.8.1, § III.

[210] Department of Corrections Policy No. 13.8.1, Procedures Manual, § 2.K,

[211] *Id.*

[212] 35 C.F.R. § 35.152(b). *See also Geness*, 902 F.3d at 361–62 (applying 35 C.F.R. § 35.152(b) as services the Commonwealth must provide but denied Mr. Geness).

[213] *Id.*

[214] *Geness*, 902 F.3d at 362.

[215] ECF Doc. No. 237 ¶ 274.

[216] *Geness*, 902 F.3d at 363-64.

[217] *See e.g. Geness*, 902 F.3d at 262.

[218] 42 Pa. Cons. Stat. Ann.§ 301.

[219] *In re Bruno*, 101 A.3d 635, 662–63 (Pa. 2014) (citing PA. CONST. art. V, § 1.A).

[220] 426 F.3d 233 (3d Cir. 2005).

[221] 531 U.S. 356 (2001).

[222] *Benn*, 426 F.3d at 238–39, 241.

112

[223]*Benn*, 426 F.3d at 239, n. 3 (quoting 42 U.S.C. § 12132).

[224] 541 U.S. 509 (2004).

[225] *Benn*, 426 F.3d at 239, n.3.

[226] ECF Doc. No. 237 ¶ 155.

[227] *Id.* ¶ 156.

[228] *Id.* ¶ 164.

[229] *Id.* ¶ 165.

[230] *Id.* ¶ 166. Mr. Snider alleges "[t]his can be construed to mean 'as long as Mr. Snider is not having severe mental health issues or having behaviors caused by his mental illness." *Id.* at n.24.

[231] ECF Doc. No. 237 ¶¶ 183, 224.

[232] *Geness II*, 974 F.3d at 274 (quoting *Geness*, 902 F.3d at 361–62).

[233] *Geness,* No. 16-876, 2020 WL 7027495 (W.D.Pa. Nov. 30, 2020).

[234] *Id.* ¶ 268.

[235] *Id.* ¶¶ 266–273.

[236] 71 Pa. Stat. and Cons. Stat. Ann. § 732-201 (West Oct. 1, 2012).

[237] *Id.* § 732-204.

[238] *Id.* § 732-205.

[239] *Geness II*, 974 F.3d at 275.

[240] *Id.* at 277.

[241] *See id.* at 278.

[242] ECF Doc. No. 445 at 8.

[243] ECF Doc. No. 237 ¶¶ 81, 96.

[244] *Id.* ¶¶ 156, 159.

[245] *Id.* ¶¶ 157–158.

[246] *Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 539 F.3d 199, 208 (3d Cir. 2008).

[247] Fed. R. Civ. P. 15(c).

[248] *Mayle v. Felix*, 545 U.S. 644, 659 (2005).

[249] *Tenon v. Dreibelbis*, 190 F.Supp.3d 412, 416 (M.D. Pa. 2016) (quoting *Bensel v. Allied Pilots Ass'n,* 387 F.3d 298, 310 (3d Cir. 2004)).

[250] *Id.*

[251] *Id.* (quoting *Mayle*, 545 U.S. at 650).

[252] ECF Doc. No. 1 ¶¶ 6, 65.

[253] Warden Shaffer moves to dismiss the Title II claims against him. As analyzed, there is no individual liability under Title II. We dismiss Title II claims against Warden Shaffer.

[254] ECF Doc. No. 458 at 8, n. 5.

[255] ECF Doc. No. 237 ¶ 6.

[256] ECF Doc. No. 458 at 9.

[257] *Id.* at 9–10.

[258] *Id.* at 17.

[259] *US Coal Corporation v. Dinning*, 222 A.3d 431, 441 (Pa. Super. Ct. 2019) (citing *Ettinger v. Triangle-Pac. Corp.*, 799 A.2d 95, 109 (Pa. Super. Ct. 2002), *appeal denied*, 815 A.2d 1042 (Pa. 2003)).

[260] *Snider v. Motter*, No. 13-1226 (M.D. Pa. Aug. 4, 2016), ECF Doc. No. 72. Mr. Snider disagreed with the court's order dismissing Warden Shaffer and appealed from the order, among others, including the eventual dismissal of the case on the parties' stipulation upon settlement.

[261] *Snider v. Motter*, No. 13-1226 (M.D. Pa. Aug. 4, 2016), ECF Doc. No. 222.

[262] *Ross v. Meyer*, 741 F. App'x  56, 60 (3d Cir. 2018) (quoting *United States v. 5 Unlabeled Boxes,* 572 F.3d 169, 173 (3d Cir. 2009)).

[263] *Id.* (citing *5 Unlabeled Boxes*, 572 F.3d at 175; Restatement (Second) of Judgments § 13(f)).

[264] "Judicially approved settlement agreements are considered final judgments on the merits for the purposes of claim preclusion." *Toscano v. Conn. General Life Ins. Co*., 288 F. App'x 36, 38 (3d Cir. 2008).

[265] *Davis v. Wells Fargo*, 824 F.3d 333, 342 (3d Cir. 2016) (quoting *In re Mullarkey*, 536 F.3d 215, 225 (3d Cir. 2008)).

[266] He appears to recognize this by arguing in his opposition he did not receive evidence of Union County's "direct involvement" in sanctioning his transfers to various state and county prisons as a pretrial detainee until February 2019. But his original *Motter* complaint filed in May 2013, he alleged Warden Shaffer of the Union County Prison approved prison transfers. He claims arise out of the same events.

[267] *Snider v. Motter*, No. 13-1226 (M.D. Pa. Aug. 4, 2016), ECF Doc. No. 72. Mr. Snider filed an amended Notice of Appeal in which he challenges, among other orders, the court's order dismissing Warden Shaffer with prejudice. *Snider v. Motter*, No. 13-1226 (M.D. Pa. Aug. 4, 2016), ECF Doc. No. 378.

[268] Union County Prison Board does not argue *res judicata* and we do not apply it.

[269] ECF Doc. No. 385 at 6–7.

[270] 61 Pa. Cons. Stat. Ann. § 1731(a)(3) (West Oct. 13, 2009).

[271] ECF Doc. No. 237 ¶ 96.

[272] *Id.* ¶ 247.

[273] *Id.* ¶ 248.

[274] *Id.* ¶ 249.

[275] *Id.* ¶¶ 292, 293, 294.

[276] 42 U.S.C. § 12203(a).

[277] *Talley*, 2019 WL 3573524, at *3 (citing *Fogleman v. Mercy Hosp. Inc*., 283 F.3d 561, 567-68 (3d Cir. 2002)). The elements of a Disabilities Act retaliation claim are developed in the context of employment discrimination under Title I. Mr. Snider's claims arise under Title II, the state and local government services provision of the Disabilities Act. Neither party argues a different set of elements apply.

[278] 42 U.S.C. § 12203(b).

[279] *Wishnefsky v. Salameh*, No. 15-148, 2016 WL 11480717, at *6 (W.D. Pa., Nov. 18, 2016), *report and recommendation adopted by*, No. 15-148J, 2016 WL 7324080 (W.D. Pa. Dec. 16, 2016) (citing *Romero*, 3 F. Supp. 3d at 335).

[280] ECF Doc. No. 237 ¶ 263.

[281] Because Mr. Snider fails to sufficiently plead Disabilities Act retaliation, we need not resolve the unsettled legal issue of whether individual liability may be imposed for retaliation in exercise of rights under Title II.

[282] 42 U.S.C. § 1983.

[283] *Bressi v. Brennen*, 823 F. App'x 116, 118 (3d Cir. 2020) (citing *Bougher v. Univ. of Pitt.*, 882 F.2d 74, 78-79 (3d Cir. 1989)).

[284] Medical Defendants filed a separate motion to dismiss. We later address their motion.

[285] ECF Doc. No. 237 ¶ 293.

[286] *Ricks v. Shover*, 891 F.3d 468, 480 (3d Cir. 2018) (quoting *Smith v. Mensinger*, 293 F.3d 641, 649 (3d Cir. 2002)).

[287] *Id.*

[288] ECF Doc. No. 237 ¶¶ 190–199.

[289] *Id.* ¶ 187.

[290] *Id.* ¶¶ 205, 223.

[291] *Id.* ¶ 225.

[292] *Id.* ¶ 227.

[293] *Heleva v. Kramer*, 214 F. App'x 244, 246 (3d Cir. 2007) (quoting *DeHart v. Horn*, 227 F.3d 47, 51 (3d Cir. 2000)).

[294] 482 U.S. 78 (1987).

[295] *Heleva*, 214 F. App'x at 246 (quoting *DeHart*, 227 F.3d at 51). In a footnote, our Court of Appeals noted "[a]lthough the *Turner* test was articulated in the context of challenges to prison regulations, as opposed to challenges to individual conduct, the analysis in the later context is the same." *Id.* at 246 n.1 (citing *Ford v. McGinnis*, 352 F.3d 582, 595 n.15 (2d Cir. 2003)).

[296] *Turner*, 482 U.S. at 89–91.

[297] *Jackson v. Carter*, 813 F. App'x 820, 825 (3d Cir. 2020) (quoting *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003)).

[298] ECF Doc. No. 237 ¶ 105.

[299] *Id.* ¶ 109, 113.

[300] *Id.* ¶ 135.

[301] *Id.* ¶¶ 139–142, 231. Mr. Snider alleges "other staff" at SCI-Coal Township threatened him, but does not identify them. We dismiss claims against "other staff" as we do not know who they are or their alleged personal involvement in the alleged retaliation.

[302] *Id.* ¶¶ 142–143,

[303] *Id.* ¶¶ 207, 210.

[304] *Id.* ¶ 208.

[305] *Id.* ¶¶ 217–218.

[306] *Id.* ¶ 209.

[307] *Id.*

[308] *Id.*

[309] *Id.* ¶ 214.

[310] *Id.*

[311] *Id.* ¶ 227.

[312] *Id.* ¶¶ 233-235.

[313] *Id.* ¶ 237–241.

[314] *Id.* ¶ 243.

[315] *Robinson v. Taylor*, 204 F. App'x 155, 157 (3d Cir. 2006) (citing *Mitchell*, 318 F.3d at 530; *Davis v. Goord*, 320 F.3d 346, 352–53 (2d Cir.2003)).

[316] *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir.2000) (quoting *Suppan v. Dadonna*, 203 F.3d 235 (3d Cir.2000)).

[317] *Cash v. Wetzel*, 8 F.Supp.3d 644, 660 (E.D. Pa. 2014) (citing *Allah*, 229 F.3d at 225).

[318] *Id.* at 660–61 (citing *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

[319] ECF Doc. No. 237 ¶¶ 263–265. We address Mr. Snider's First Amendment claims in other sections of this memorandum, allowing certain claims to move forward. We dismiss his Sixth Amendment claims below.

[320] *Bistrian v. Levi*, 912 F.3d 79, 91 n.19 (3d Cir. 2018) ("The Fifth Amendment protects pretrial detainees, while the Eighth Amendment protects post-trial convicts") (citing *Kost v. Kozakiewicz*, 1 F.3d 176, 188 (3d. Cir. 1993)).

[321] *E. D. v. Sharkey*, 928 F.3d 299, 307 (3d Cir. 2019) (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)).

[322] *Id.*

[323] *Id.* (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)).

[324] *Palakovic v. Wetzel*, 854 F.3d 209, 225 (3d Cir. 2017) (quoting *Parkell v. Danberg*, 833 F.3d 313, 335 (3d Cir. 2016)).

[325] *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 373 (3d Cir. 2019) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

[326] *Porter*, 974 F.3d at 441 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

[327] *Id.* (quoting *Farmer*, 511 U.S. at 837).

[328] *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)).

[329] *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010) (citing *Iqbal*, 556 U.S. at 676).

[330] *Saisi v. Murray*, 822 F. App'x 47, 48 (3d Cir. 2020) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007)).

[331] *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

[332] *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) (quoting *Rode*, 845 F.2d at 1207).

[333] ECF Doc. No. 237 ¶ 138.

[334] *Palakovic*, 854 F.3d at 225–26; *Porter*, 974 F.3d at 442–43.

---

[335] *Palakovic*, 854 F.3d at 225–26 (citing *Williams*, 848 F.3d at 549).

[336] ECF Doc. No. 237 ¶¶ 138–139, 263–265.

[337] *Id.* ¶ 203.

[338] ECF Doc. No. 380 at 11-12.

[339] *Dooley,* 957 F.3d at 374 (quoting *Rode*, 845 F.2d at 1207).

[340] *Id.*

[341] *Id.* (quoting *Higgs v. Att'y Gen.*, 655 F.3d 333, 339 (3d Cir. 2011) and *Mala v. Crown Bay Marina, Inc*., 704 F.3d 239, 244–45 (3d Cir. 2013)).

[342] *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 60 (1989) (neither the state nor an official of the state acting in his or her official capacity is a "person" within the meaning of section 1983); *Foye v. Wexford Health Sources Inc.*, 675 F. App'x 210, 215 (3d Cir. 2017) (state prison and Department of Corrections not "persons" subject to suit under section 1983).

[343] *Wattie-Bey v. Att'y Gen. Office*, 424 F. App'x 95, 97-98 (3d Cir. 2011).

[344] *Callahan v. City of Phila.*, 207 F.3d 668, 673 (3d Cir. 2000).

[345] *Latham v. Clinton Cty. Corr. Facility*, No. 14–1174, 2014 WL 4546779, at *2 (M.D. Pa. Sept. 12, 2014).

[346] *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99-100 (1984); *see also A. W. v. Jersey City Pub. Schs*., 341 F.3d 234, 238 (3d Cir. 2003).

[347] *Lavia v. Pa., Dept. of Corr.*, 224 F.3d 190, 195 (3d Cir. 2000) (citing 71 Pa. Stat. § 61).

[348] *Will*, 491 U.S. at 71.

[349] *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 659 (1978).

[350] *Berg v. Cty. of Allegheny*, 219 F.3d 261, 275 (3d Cir. 2000) (citing *Monell*, 436 U.S. at 691); *Vargo ex rel. Vargo v. Plum Borough*, 376 F. App'x 212, 215 (3d Cir. 2010) (citing *Collins v. City of Harker Heights,* 503 U.S. 115, 122 (1992)).

[351] *Williams v. Toomey*, 808 F. App'x  66, 69 (3d Cir. 2020) (citing *Monell*, 436 U.S. at 690–92).

[352] *Stanford v. Walton*, 16-1584, 2019 WL 5068666, at *8 (W.D. Pa. Oct. 9, 2019) (quoting *Langella v. Cty. of McKean*, No. 09-311E, 2010 WL 3824222, at *4 (W.D. Pa. Sept. 23, 2010) (collecting cases).

353 *Will*, 491 U.S. at 71 n.10 (citing *Kentucky v. Graham*, 473 U.S., at 167, n. 14 (1985)*; Ex parte Young,* 209 U.S. 123, 159–160 (1908)).

354 ECF Doc. 237 § VII(c).

355 *Rode*, 845 F.2d at 1207.

356 *Dooley*, 957 F.3d at 374 (quoting *Rode*, 845 F.2d at 1207).

357 ECF Doc. No. 237 ¶ 143.

358 *Id.* ¶ 284.

359 Id. ¶¶ 211–212. "Inmates enjoy a First Amendment right to reasonable telephone access" but they do not have a "right to unlimited telephone use and reasonable restrictions on telephone privileges do not violate their First Amendment rights. *Aruanno v. Main*, No. 07–3867, 2010 WL 251590, at *9 (D.N.J. Jan. 15, 2010) (collecting cases). An inmate's "right to telephone access is 'subject to rational limitations in the face of legitimate security interests of the penal institution.'" *Almahdi v. Ashcroft*, 310 F. App'x 519, 522 (3d Cir. 2009) (quoting *Strandberg v. City of Helena*, 791 F.2d 744, 747 (9th Cir.1986)). To determine whether Mr. Snider states a claim for the deprivation of his First Amendment right, we must consider: "(1) whether [he] has alleged facts giving rise to an inference that no legitimate penological interest was served by...[d]efendants' actions, (2) whether he has sufficiently alleged that . . . [d]efendants' actions caused him an 'actual injury,' and (3) whether he had alternative avenues through which he could communicate with his attorneys and the courts' . . .." *Nelson v. Quigley*, No. 15-4670, 2016 WL 2959284, at *1 (E.D. Pa. May 23, 2016) (quoting *Aruanno*, 2010 WL 251590 at * 10). Mr. Snider fails to allege facts to sufficiently support of these factors. We dismiss his First Amendment claim to the extent it is based on limitations of telephone use.

360 ECF Doc. No. 237 ¶ 285.

361 430 U.S. 817 (1977).

362 518 U.S. 343 (1996).

363 *Lewis*, 518 U.S. at 346.

364 *Id.* at 351 (emphasis in original).

365 *Id.* (quoting *Bounds*, 430 U.S. at 825).

366 *Id.* at 355. *See also Monroe v. Beard*, 536 F.3d 198, 205–06 (3d Cir. 2008) (citing *Lewis*, 518 U.S. at 354–55) ("prisoners may only proceed on access-to-courts claims in two types of cases, challenges (direct or collateral) to their sentences and conditions of confinement").

[367] *Christopher v. Harbury*, 536 U.S. 403, 412–13 (2002). *See also Milas v. Wetzel*, No. 19-313, 2020 WL 3840345, at *2, n.2 (W.D. Pa. July 7, 2020) (describing "forward-looking" and "backward-looking" claims).

[368] *Christopher*, 536 U.S. at 414 (citations omitted) (footnotes omitted); *Milas*, 2020 WL 3840345, at *2, n. 2.

[369] *Monroe*, 536 F.3d at 205 (quoting *Christopher*, 536 U.S. at 415).

[370] *Prater v. Wetzel*, F. App'x 177, 178 (3d Cir. 2015) (citing *Lewis*, 518 U.S. at 351).

[371] *Commonwealth v. Snider*, 1161 MDA 2019 (Pa. Super. Ct.).

[372] *Snider v. Corbett* settled with assistance from Mr. Snider's court-appointed volunteer counsel. Mr. Snider then challenged the settlement and is now on appeal in our Court of Appeals.

[373] ECF Doc. No. 237 ¶¶ 150–154, 228.

[374] *Id.* ¶ 154.

[375] *Id.* ¶ 181.

[376] *Id.* ¶¶ 234, 237.

[377] *Mote v. Murtin*, 816 F. App'x 635, 636 (3d Cir. 2020) (citing *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009)).

[378] *Id.* (quoting *Sameric Corp. of Del. v. City of Phila.*, 142 F.3d 582, 599 (3d Cir. 1998)).

[379] ECF Doc. No. 1.

[380] *Id.* ¶ 39.

[381] *Id.* ¶ 41.

[382] *Id.* ¶ 44.

[383] ECF Doc. No. 91.

[384] ECF Doc. No. 139.

[385] ECF Doc. No. 170.

[386] ECF Doc. No. 171.

---

[387] ECF Doc. No. 237.

[388] Fed. R. Civ. P. 15(c).

[389] *Wadis v. Norristown State Hosp.*, 617 F. App'x 133, 136 (3d Cir. 2015) (*pro se* prisoner's allegations of new abuses not arising out of the originally claimed incident of abuse at state hospital did not relate back).

[390] *Mote*, 816 F. App'x at 636 (citing *Seto v. Willits*, 638 A.2d 258, 262 (Pa. Super. Ct. 1994) (noting that Pennsylvania law does not allow for the tolling of a statute of limitations due to mental incapacity).

[391] *Lake v. Arnold*, 232 F.3d 360, 371 (3d Cir. 2000). In *Lake*, our Court of Appeals allowed equitable tolling for the claims of a mentally retarded girl whose guardians sterilized her without her knowing consent. When plaintiff discovered her sterilization procedure sixteen years later, well beyond the statute of limitations, our Court of Appeals permitted the district court to determine whether equitable tolling applied.

[392] *Id.*

[393] *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Helling v. McKinney*, 509 U.S. 25, 32 (1993)).

[394] *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 104–95 (1976)).

[395] *Ryle v. Fuh*, 820 F. App'x 121, 123 (3d Cir. 2020) (quoting *Farmer*, 511 U.S. at 837).

[396] *Id.* (quoting *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993); *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004)).

[397] *Pearson*, 850 F.3d at 534 (quoting *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)); *Ryle*, 820 F. App'x at 123 (citing *Estelle*, 429 U.S. at 104).

[398] *Goodrich v. Clinton Cty. Prison*, 214 F. App'x 105, 110 (3d Cir. 2007) (citing *Inmates of the Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 763 (3d Cir.1979)).

[399] *Id.* at 111 (quoting *Lanzaro*, 834 F.2d at 346 (quotation and citation omitted)).

[400] *Id.* (quoting *Lanzaro* at 346–47 (quotations and citations omitted)).

[401] *Pearson*, 850 F.3d at 535 (quoting *United States ex. rel. Walker v. Fayette Cty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)).

[402] *Id.* (internal citation omitted and citing *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990)).

[403] ECF Doc. No. 237 ¶ 151.

[404] *Id.* ¶¶ 250–256.

[405] *Id.* ¶ 247.

[406] *Id.* ¶ 261.

[407] *Saisi v. Murray*, 822 F. App'x 47, 48 (3d Cir. 2020) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007)).

[408] *Rode*, 845 F.2d at 1207.

[409] *Dooley*, 957 F.3d at 374 (quoting *Rode*, 845 F.2d at 1207).

[410] *Twombly*, 550 U.S. at 555.

[411] ECF Doc. No. 237 ¶¶ 292, 294.

[412] U.S. CONST. art. VI.

[413] ECF Doc. No. 237 ¶ 163.

[414] *Motter*, No. 13-1226, ECF Doc. No. 1 ¶¶ 21, 215–216, 232, 233–253, 283.

[415] *Id.* ECF Doc. Nos. 65, 72.

[416] *Id.* at ECF Doc. No. 222.

[417] *Ross v. Meyer*, 741 F. App'x  56, 60 (3d Cir. 2018) (quoting *5 Unlabeled Boxes,* 572 F.3d at 173).

[418] *Id.* (citing *5 Unlabeled Boxes*, 572 F.3d at 175; Restatement (Second) of Judgments § 13(f)).

[419] "Judicially approved settlement agreements are considered final judgments on the merits for the purposes of claim preclusion." *Toscano v. Conn. Gen. Life Ins. Co*., 288 F. App'x 36, 38 (3d Cir. 2008).

[420] *Davis v. Wells Fargo*, 824 F.3d 333, 341–42 (3d Cir. 2016) (quoting *Marmon Coal Co. v. Dir., Office of Workers' Comp. Programs*, 726 F.3d 387, 394 (3d Cir. 2013)).

[421] *Dooley*, 957 F.3d at 374 (quoting *Rode*, 845 F.2d at 1207).

[422] ECF Doc. No. 237 ¶ 6 n. 1.

[423] *Id.*

[424] *Id.* ¶ 106.

[425] *Id.* ¶ 108.

[426] *Id.* ¶¶ 109, 113.

[427] *Id.* ¶¶ 110-111.

[428] *Sharkey*, 928 F.3d at 307 (quoting *Wolfish*, 441 U.S. at 535).

[429] ECF Doc. No. 237 ¶¶ 114-116.

[430] *Id.* ¶¶ 121–124.

[431] *Id.* ¶ 128.

[432] *Id.* ¶¶ 281–283.

[433] ECF Doc. No. 1.

[434] ECF Doc. No. 171.

[435] ECF Doc. No. 237 ¶ 114 n.14.

[436] Mr. Snider defines these as individuals' names in paragraph 15–64 of this second amended complaint. *See id.* ¶ 292.  He brings a separate claim for intentional infliction of emotional distress against Corrections Officers Jones and Adamson and Psychological Services Specialist Burt. He alleges Corrections Officers Jones and Adamson denied him a shower because of his hearing impairment, refused to call Psychological Services Specialist Burt when Mr. Snider asked to speak with him, and laughed and yelled at him in front of the "entire block" and, when Mr. Snider began banging his head against the wall, refused to notify medical staff. This does not rise to "outrageous or extreme conduct" as defined by Pennsylvania law. We similarly dismiss Mr. Snider's claim for intentional infliction of emotional distress against Lieutenant Kuzar, Sergeant Cleaver, and Corrections Officers Byrne and Killeen for their alleged obstruction of his ability to file a direct appeal in his criminal case. This does not rise to "outrageous or extreme conduct" under Pennsylvania law.

[437] *Miller v. Comcast*, 724 F. App'x 181, 182 (3d Cir. 2018) (quoting *Bruffett v. Warner Commc'ns, Inc.*, 692 F.2d 910, 914 (3d Cir. 1982)).

[438] *Swisher v. Pitz*, 868 A.2d 1228, 1230 (Pa. Super. Ct. 2005) (citation omitted).

[439] ECF Doc. No. 468 at 3.

---

[440] 1 Pa. Stat. and Cons. Stat. Ann. § 2310 (West 1978).

[441] 42 Pa. Stat. and Cons. Stat. Ann. § 8522(b).

[442] *Johnson v. Townsend*, 314 F. App'x 436, 439 (3d Cir. 2008).

[443] *Wongus v. Corr. Emer. Resp. Team*, 389 F.Supp.3d 294, 302 (E.D. Pa. 2019) (citing *Muhammad v. DeBalso*, No. 19-666, 2019 WL 2501467, at *3 (M.D. Pa. June 17, 2019)).

[444] *DeGroat v. Cavallaro*, No. 16-1186, 2017 WL 2152376, at *5 (M.D. Pa. May 17, 2017) (quoting *Costa v. Roxborough Mem'l Hosp.*, 708 A.2d 490, 493 (Pa. Super. Ct. 1998)).

[445] *Johnson*, 314 F. App'x at 439–40 (citing *Brumfield v. Sanders*, 232 F.3d 376 (3d Cir. 2000)).

[446] *Id.* (quoting *Brumfield*, 232 F.3d at 380); RESTATEMENT (SECOND) OF AGENCY § 228.

[447] *DeGroat,* 2017 WL 2152376 at * 5 (quoting *Meadows v. Se. Pa. Transp. Auth.*, No. 16-2074, 2017 WL 412806, at *3 (E.D. Pa. Jan. 31, 2017)) (analyzing scope of employment to police officer); *Robus v. Pa. Dep't of Corr.*, No. 04-2175, 2006 WL 2060615, * 8 (E.D. Pa. July 20, 2006) (analyzing scope of employment to prison official).

[448] *Id.* (quoting *Zion v. Nassan*, 283 F.R.D. 247, 267 (W.D. Pa. 2012)).